UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

BIOGEN IDEC INC., BIOGEN IDEC MA, INC. and GENZYME CORPORATION

                  Plaintiffs,

       v.

THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK,

                  Defendant.

Civil Action No. 04-CV-12009 MLW

## COLUMBIA UNIVERSITY'S MEMORANDUM
## IN SUPPORT OF MOTION TO DISMISS

Dated: January 14, 2005

Morgan Chu
David I. Gindler
Jason G. Sheasby
Irell & Manella LLP
1800 Ave of the Stars, Suite 900
Los Angeles, CA 90067
Telephone: (310) 277-1010
Facsimile: (310) 203-7199

Thomas F. Maffei (BBO # 313220)
Scott McConchie (BBO # 634127)
Griesinger, Tighe & Maffei, LLP
176 Federal Street
Boston, MA 02210-2600
Telephone: (617) 542-9900
Facsimile: (617) 542-0900

ATTORNEYS FOR DEFENDANT
THE TRUSTEES OF COLUMBIA
UNIVERSITY IN THE CITY OF
NEW YORK

TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ....................................................................................... 1

PROCEDURAL HISTORY............................................................................................... 3

ARGUMENT ..................................................................................................................... 8

I.      The Court Should Dismiss The Declaratory Relief Claims In Counts IV
        Through VII Pursuant To Rule 12(b)(1) For Lack Of Subject Matter
        Jurisdiction ............................................................................................................. 8

        A.      Columbia Has Not Engaged In Any Conduct Sufficient To Create A
                Reasonable Apprehension That Biogen Idec Will Face An Infringement
                Suit .............................................................................................................. 8

        B.      Biogen and Genzyme Cannot Pursue Count VII In Light Of The
                Covenant Not To Sue And The Court's Granting of Columbia's Motion
                To Dismiss ................................................................................................. 13

        C.      Even If Subject Matter Jurisdiction Exists Over the Declaratory
                Judgment Claims, The Court Should Exercise Its Discretion To Decline
                To Hear Such Claims ................................................................................ 15

II.     The Court Should Dismiss Counts I, II, and III Pursuant to Rule 12(b)(6) For
        Failure To State A Claim ...................................................................................... 16

        A.      The Court Should Dismiss Count I For Abuse Of Process Because
                Columbia Has Never Used "Process" With Respect To Plaintiffs ..................... 16

        B.      The Court Should Dismiss Count II For Breach Of Contract And
                Breach Of The Implied Covenant, With The Sole Exception Of The
                Claim Based On Section 3(j) Of The License Agreements ................................ 18

                1.      Because Columbia Had The Right To Terminate Plaintiffs'
                        License Agreements For Failure To Pay Royalties, The Court
                        Should Dismiss Plaintiffs' Claim That Columbia Wrongfully
                        Terminated Their License Agreements................................................... 18

                2.      Because Section 2(b) Of The License Agreements Does Not
                        Create Any Contractual Obligations Owed To Biogen And
                        Genzyme, The Court Should Dismiss Plaintiffs' Claim For
                        Breach of Section 2(b) .......................................................................... 21

Page

3.  The Claim For Breach Of The Implied Covenant Of Good Faith And Fair Dealing Should Be Dismissed As Duplicative Of The Claim For Breach Of Contract ................................................. 24

C.  Count III For Violation Of Mass. Gen. Laws Ch. 93A Should Be Dismissed Because It Is Barred By The Noerr-Pennington Doctrine And Fails To State A Claim For Which Relief Can Be Granted ...................... 24

1.  The Noerr-Pennington Doctrine Precludes Plaintiffs' G.L. 93A Claim ............................................................................................... 25

    a.  The Noerr-Pennington Doctrine Precludes Liability For Columbia's Alleged Lobbying Activities ................................... 27

    b.  The Noerr-Pennington Doctrine Precludes Liability Under G.L. 93A For Columbia's Alleged Conduct Before The PTO ................................................................. 28

    c.  The Noerr-Pennington Doctrine Precludes Liability Under G.L. 93A For Columbia's Defense Of Biogen I ............. 29

    d.  The Noerr-Pennington Doctrine Precludes Liability for Columbia's Alleged Efforts to "Enforce" The '275 Patent .......................................................................... 34

2.  Wholly Apart From Noerr-Pennington Immunity, Plaintiffs' Allegations Do Not State A Claim Under G.L. 93A ............................. 35

    a.  The Court Should Dismiss Plaintiffs' G.L. 93A Claim Because It Is Not Based On Conduct That Occurred "Primarily And Substantially" Within Massachusetts ............... 35

    b.  The Only Alleged Conduct That Occurred "Primarily And Substantially" Within Massachusetts Is Insufficient To State A Claim Under G.L. 93A ........................................... 38

        (1)  Plaintiffs' Allegations That Columbia Wrongfully Terminated Their License Agreements Cannot Support Their G.L. 93A Claim ............................................................... 38

        (2)  Plaintiffs' Allegations Regarding Columbia's Litigation Conduct Cannot Support Their G.L. 93A Claim .................................................... 39

<u>Page</u>

III.   As An Alternative To Dismissal Of Count III, The Court Should Require
       Plaintiffs To Provide A More Definite Statement Pursuant to Rule 12(e) ....................41

CONCLUSION ....................................................................................................................43

<u>TABLE OF AUTHORITIES</u>

Page(s)

**<u>Cases</u>**

*Ahern v. Scholz,*
    85 F.3d 774 (1st Cir. 1996) ...................................................................................... 38

*Allied Tube & Conduit Corp. v. Indian Head, Inc.,*
    486 U.S. 492 (1988) ................................................................................................. 27

*Anderson v. Dist. Bd. of Trustees of Cent. Florida Comm. Coll.,*
    77 F.3d 364 (11th Cir. 1996) .............................................................................. 41, 42

*Anthony's Pier Four, Inc. v. HBC Associates,*
    583 N.E.2d 806 (Mass. 1991) .................................................................................. 39

*Atkinson v. Rosenthal,*
    598 N.E.2d 666 (Mass. App. Ct. 1992) ................................................................... 38

*Beddall v. State St. Bank & Trust Co.,*
    137 F.3d 12 (1st Cir. 1998) ...................................................................................... 19

*Biogen Idec MA Inc. v. Trustees of Columbia Univ.,*
    332 F. Supp. 2d 286 (D. Mass. 2004) .............................................................. passim

*BP Chems. Ltd. v. Union Carbide Corp.,*
    4 F.3d 975 (Fed. Cir. 1993) ....................................................................................... 9

*CAE Screenplates, Inc. v. Beloit Corp.,*
    957 F. Supp. 784 (E.D. Va. 1997) ........................................................................... 12

*California Motor Transport Co. v. Trucking Unlimited,*
    404 U.S. 508 (1972) ................................................................................................. 25

*Capo, Inc. v. Dioptics Med. Prods., Inc.,*
    387 F.3d 1352 (Fed. Cir. 2004) ............................................................................... 15

*Cheminor Drugs, Ltd. v. Ethyl Corp.,*
    168 F.3d 119 (3d Cir. 1999) ..................................................................................... 26

*City of Columbia v. Omni Outdoor Advertising, Inc.,*
    499 U.S. 365 (1991) ....................................................................................... 25, 27, 28

*Cordis Corp. v. Medtronic, Inc.,*
    780 F.2d 991 (Fed. Cir. 1985) ............................................................................ 20, 21

Page(s)

*Cuddy v. Sweeney,*
    386 N.E.2d 805 (Mass. App. Ct. 1979) ................................................................... 17

*Cygnus Therapeutics Sys. v. ALZA Corp.,*
    92 F.3d 1153 (Fed. Cir. 1996)................................................................................ 12

*Darviris v. Petros,*
    795 N.E.2d 1196 (Mass. App. Ct. 2003) ............................................................... 39

*Davox Corp. v. Digital Sys. Int'l, Inc.,*
    846 F. Supp. 144 (D. Mass. 1993) ......................................................................... 15

*DeCapua v. Dine-A-Mate, Inc.,*
    744 N.Y.S.2d 417 (N.Y. App. Div. 2002) ............................................................. 20

*Dow Chemical Co. v. United States,*
    226 F.3d 1334 (Fed. Cir. 2000).............................................................................. 20

*Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,*
    365 U.S. 127 (1961).......................................................................................... passim

*Estate of Lennon v. Leggoons, Inc.,*
    No. 95 CIV. 8872 (HB), 1997 WL 346733 (S.D.N.Y. June 23, 1997) ................... 20

*F. Garofalo Elec. Co., Inc. v. Hartford Fire Ins. Co.,*
    799 F. Supp. 8 (E.D.N.Y. 1992) ............................................................................ 23

*Globetrotter Software, Inc. v. Elan Computer Group, Inc.,*
    362 F.3d 1367 (Fed. Cir. 2004)....................................................................... 26, 34

*Golan v. Pingel Enterprise, Inc.,*
    310 F.3d 1360 (Fed. Cir. 2002)....................................................................... 34, 35

*Grain Processing Corp. v. American Maize-Prods. Co.,*
    840 F.2d 902 (Fed. Cir. 1988)................................................................................ 11

*Guerini Store Co. v. P.J. Carlin Constr. Co.,*
    240 U.S. 264 (1916)............................................................................................... 23

*Gutierrez v. Massachusetts Bay Transp. Auth.,*
    772 N.E.2d 552  (Mass. 2002) ............................................................................... 16

*Henry v. National Geographic Society,*
    147 F. Supp. 2d 16 (D. Mass. 2001) ...................................................................... 37

*Honeywell Intern., Inc. v. Universal Avionics Systems Corp.,*
    No. 02-359-MPT, 2004 WL 2632938 (D. Del. Nov. 12, 2004) ............................. 30

Page(s)

*IGEN Intern., Inc. v. Roche Diagnostics GmbH,*
    335 F.3d 303 (4th Cir. 2003) ................................................................. 26

*In re Colonial Mortgage Bankers Corp.,*
    324 F.3d 12 (1st Cir. 2003) .................................................................... 31

*In re Columbia Univ. Patent Litig.,*
    313 F. Supp. 2d 1383 (J.P.M.L. 2004) ............................................... 6, 32

*In re Columbia Univ. Patent Litig.,*
    343 F. Supp. 2d 35 (D. Mass. 2004) .............................................. passim

*In re Gulf Oil/Cities Serv. Tender Offer Litig.,*
    725 F. Supp. 712 (S.D.N.Y. 1989) ........................................................ 23

*In re Sriberg,*
    49 B.R. 80 (Bankr. D. Mass. 1984) ................................................ 41, 42

*Indium Corp. of America v. Semi-Alloys, Inc.,*
    781 F.2d 879 (Fed. Cir. 1985).................................................................. 9

*Int'l Harvester Co. v. Deere & Co.,*
    623 F.2d 1207 (7th Cir. 1980) ............................................................... 12

*Int'l Med. Prosthetics Res. Assocs. v. Gore Enter. Holdings, Inc.,*
    787 F.2d 572 (Fed. Cir. 1986).................................................................. 8

*Intellectual Prop. Dev., Inc. v. TCI Cablevision of California, Inc.,*
    248 F.3d 1333 (Fed. Cir. 2001)........................................................ 9, 14

*Intermedics Infusaid, Inc. v. The Regents of the Univ. of Minn.,*
    804 F.2d 129 (Fed. Cir. 1986)................................................................ 21

*Interstate Brands Corp. v. Lily Transp. Corp.,*
    256 F. Supp. 2d 58 (D. Mass. 2003) ..................................................... 38

*Jarrow Formulas, Inc. v. International Nutrition Co.,*
    175 F.Supp.2d 296 (D. Conn. 2001)...................................................... 26

*Jones v. Brockton Pub. Mkts., Inc.,*
    340 N.E.2d 484 (Mass. 1975) .......................................................... 16, 17

*Kenda Corp. v. Pot O'Gold Money Leagues, Inc.,*
    329 F.3d 216 (1st Cir. 2003)................................................................... 35

*Kowalski v. Gagne,*
    914 F.2d 299 (1st Cir. 1990).................................................................. 31

Page(s)

*Kuwaiti Danish Computer Co. v. Digital Equip. Corp.*,
    781 N.E.2d 787 (Mass. 2003) ................................................................. 35

*Lear, Inc. v. Adkins*,
    395 U.S. 653 (1968)........................................................................ 20, 21

*Luke Bros., Inc. v. Krusell*,
    No. Civ. A. 94-11702-MLW, 1996 WL 50965 (D. Mass. Jan. 30, 1996) ................ 17

*Medford Co-op. Bank v. Skerry*,
    No. 9875, 2004 WL 1853343 (Mass. App. Div. Aug. 12, 2004)............................ 16

*Mine Workers v. Pennington*,
    381 U.S. 657 (1965)............................................................................... 26

*New York Univ. v. Continental Ins. Co.*,
    662 N.E.2d 763 (N.Y. 1995)..................................................................... 24

*Nobelpharma AB v. Implant Innovations, Inc.*,
    141 F.3d 1059 (Fed. Cir. 1998)................................................................. 13

*Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus.*,
    508 U.S. 49 (1993)........................................................................ passim

*Serpa Corp. v. McWane, Inc.*,
    199 F.3d 6 (1st Cir. 1999)................................................................. 38, 39

*Shell Oil Co. v. Amoco Corp.*,
    970 F.2d 885 (Fed. Cir. 1992)............................................................. 9, 12

*Shepard's Pharmacy, Inc. v. Stop & Shop Cos.*,
    640 N.E.2d 1112 (1994)......................................................................... 39

*Swierkiewicz v. Sorema N.A.*,
    534 U.S. 506 (2002)............................................................................... 41

*Town of Norwood, Mass. v. New England Power Co.*,
    202 F.3d 408 (1st Cir. 2000).................................................................... 31

*United States v. Bello*,
    194 F.3d 18 (1st Cir. 1999)..................................................................... 36

*United States v. Benson*,
    495 F.2d 475 (5th Cir. 1974) .................................................................. 36

*Waters Corp. v. Hewlett-Packard Co.*,
    999 F. Supp. 167 (D. Mass. 1998) ........................................................... 15

Page(s)

*Wilton v. Seven Falls Co.,*
    515 U.S. 277 (1995) ................................................................................. 15

**Statutes**

28 U.S.C. § 1404 ..................................................................................... 4, 5, 31

28 U.S.C. § 1407 ..................................................................................... 4, 5, 31

35 U.S.C. § 285 ............................................................................................. 43

Mass. Gen. Laws ch. 93A ..................................................................... passim

**Other Authorities**

5C Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure Civ.* § 1376
    (3d ed. 2004) ............................................................................................ 41

U.S. Const., Amdt. 1 ...................................................................................... 25

**Rules**

Fed. R. Civ. P. 12(b)(1) .................................................................................. 8

Fed. R. Civ. P. 12(b)(6) .............................................................. 16, 18, 19, 41

Fed. R. Civ. P. 12(e) ..................................................................................... 41

Fed. R. Civ. P. 15 ........................................................................................... 7

## PRELIMINARY STATEMENT

This action ("*Biogen II*") is follow-on litigation to *Biogen Idec MA, Inc., Genzyme Corp., and Abbott Bioresearch Center, Inc. v. Columbia Univ.*, Civil Action No. 03-CV-11329 MLW (D. Mass.) ("*Biogen I*"), one of eight consolidated actions in the multidistrict litigation, *In re Columbia University Patent Litig.*, MDL No. 04-1592 MLW (D. Mass.) (the "MDL proceedings").[1]  In *Biogen I*, Biogen and Genzyme sought declarations that Columbia's '275 patent is invalid and unenforceable.  After the Patent and Trademark Office ("PTO") decided to reexamine the '275 patent and the Court declined to stay the litigation pending the outcome of the PTO proceedings, Columbia extended to all plaintiffs in the MDL proceedings a binding covenant not to enforce the '275 patent as it currently reads.  Columbia's covenant not to sue relieved all plaintiffs from any obligation to pay royalties or any potential liability under the '275 patent as it currently reads.  Columbia granted this covenant in order to terminate the pending litigation over the '275 patent while the PTO decides whether Columbia is entitled to receive any further patent protection.  On November 5, 2004, this Court granted Columbia's motion to dismiss all of the declaratory relief claims in the MDL proceedings in light of the covenant.  *In re Columbia Univ. Patent Litig.*, 343 F. Supp. 2d 35 (D. Mass. 2004).

Columbia's covenant not to sue should have ended all hostilities over the '275 patent as it currently reads.  Regrettably, however, Biogen and Geznyme simply will not "take yes for an answer" (as the Court aptly put it at a recent hearing).  Instead, they have filed a new action whose transparent purpose is to overcome the covenant not to sue and continue to attack the validity and enforceability of the '275 patent in this Court.  The Amended Complaint in this

---

[1] We refer to Biogen Idec MA, Inc., one of the plaintiffs in *Biogen I*, as "Biogen."  We refer to Biogen Idec Inc., Biogen's parent and one of the plaintiffs in *Biogen II*, as "Biogen Idec."

action contains two groups of claims devoted to that purpose. First, Biogen Idec—Biogen's parent—purports to assert claims seeking a declaration that the '275 patent is invalid and unenforceable.[2] Those claims largely duplicate the declaratory relief claims asserted by Biogen and Genzmye in *Biogen I*, all of which were dismissed in light of the covenant not to sue. Second, Biogen and Genzyme purport to assert state-law claims for abuse of process, breach of contract, and violation of Mass. Gen. Laws ch. 93A ("G.L. 93A"). Biogen and Genzyme contend that these state-law claims require a determination of the validity and enforceability of the '275 patent.[3]

All of these claims have fundamental legal defects that require their dismissal.

- Biogen Idec's declaratory judgment claims regarding the '275 patent must be dismissed because Biogen Idec has no reasonable apprehension that it will be sued for infringement. Columbia has never asserted the '275 patent against Biogen Idec and has announced on multiple occasions that it has no intention of suing anyone for infringement of the '275 patent while proceedings in the PTO are ongoing.

- Biogen and Genzyme's abuse of process claim must be dismissed because Columbia never instituted process against either of them—an obvious predicate to such a claim.

- Biogen and Genzyme's claim that Columbia wrongfully terminated their license agreements must be dismissed because Columbia had the contractual right to terminate those agreements for nonpayment of royalties.

- Biogen and Genzyme's claim that Columbia breached Section 2(b) of their license agreements must be dismissed because this provision creates no contractual obligations

---

[2] Biogen and Genzyme also join in Count VII, which seeks a declaration that the '275 patent is unenforceable because of alleged patent misuse.

running from Columbia to these plaintiffs.  Section 2(b) simply reserves certain rights and obligations that Columbia owes to the United States Government.

- Biogen and Genzyme's claim for breach of the implied covenant of good faith and fair dealing must be dismissed because it is simply duplicative of their claims for breach of contract.

- Plaintiffs' G.L. 93A claim—which is largely based on Columbia's Congressional lobbying activities, Columbia's actions before the PTO, and Columbia's litigation conduct in the MDL proceedings—must be dismissed under the *Noerr-Pennington* doctrine, which immunizes petitioning activities before legislative bodies, administrative agencies, and the courts.  Moreover, wholly apart from *Noerr-Pennington* immunity, plaintiffs' G.L. 93A claim must be dismissed because it is not based on conduct that occurred "primarily and substantially within the commonwealth," and because the limited conduct that allegedly occurred within the Commonwealth was neither immoral, unethical, oppressive, or unscrupulous.

## PROCEDURAL HISTORY

The controversy surrounding the '275 patent began in April 2003, when Genentech, a licensee of the Axel family of patents, filed suit against Columbia in the Northern District of California, requesting declaratory judgments that the '275 patent is invalid and unenforceable. (*Genentech, Inc. v. Trustees of Columbia Univ.*, Case No. 04-CV-10741 MLW).  Over the following eight months, eleven additional licensees and their affiliates filed six separate suits in three other districts requesting essentially identical relief.[4]  One of those cases was filed by

---

[3] Biogen Idec also joins in Count III, which alleges that Columbia violated G.L. 93A.

[4] *Immunex Corp. and Amgen Inc. v. Trustees of Columbia Univ.*, Case No. 04-CV-10740 MLW; *Biogen I*; *Wyeth and Genetics Institute LLC v. Trustees of Columbia Univ.*, Case No 03-

Biogen and Genzyme in the District of Massachusetts (*Biogen I*).  Columbia also filed its own

suit against two licensees (Ares Trading S.A. and Johnson & Johnson) in which it sought a

declaration that the '275 patent is valid and enforceable—the converse of the actions filed by the

other licensees.  (*Trustees of Columbia Univ. v. Johnson & Johnson and Ares Trading S.A.*, Case

No. 04-CV-10742 MLW.)  That action has been voluntarily dismissed in its entirety.  (*Id.*,

Docket Nos. 59, 60.)

        At the outset of these cases, Columbia made clear to the licensees that it desired to

consolidate all of the actions in a single forum to prevent duplicative discovery, conserve judicial

resources, and avoid inconsistent rulings.  The licensees would not agree either to centralization

in a single district or to coordinated discovery among all cases.  As a result, Columbia began

filing motions to transfer the pending cases under 28 U.S.C. § 1404 to the Northern District of

California, the district in which the first action was filed.  Columbia initially moved to transfer

under 28 U.S.C. § 1404, instead of seeking centralization under 28 U.S.C. § 1407, the

multidistrict litigation statute, for an important reason:  Whereas transfer under section 1404

results in the transferee district acquiring jurisdiction for all purposes including trial, transfer

under section 1407 results in the transferee district acquiring jurisdiction only for pre-trial

purposes—with all cases ultimately returning to their transferor courts for separate trials.  Given

the importance of avoiding inconsistent rulings in multiple actions asserting the very same

claims for relief, Columbia desired to consolidate all actions in a single district where there

would be one trial.  Section 1404 was the only available mechanism to achieve that goal.

---

CV-11570 MLW; *Johnson & Johnson v. Trustees of Columbia Univ.*, Case No. 04-CV-10743
MLW; *Baxter Healthcare Corp. v. Trustees of Columbia Univ.*, Case No. 03-CV-12221 MLW;
*Serono, Inc. and Ares Trading S.A. v. Trustees of Columbia Univ.*, Case No. 03-CV-12401
MLW.

On November 13, 2003, Judge Pfaelzer denied Columbia's motion under section 1404 to transfer one of the cases from the Central District to the Northern District of California. (Ex. A.)[5] As a result, it became impossible for Columbia to rely upon section 1404 to achieve consolidation of, and a uniform trial for, all of the pending cases in a single district. Accordingly, two weeks later, on November 26, 2003, Columbia filed a motion under 28 U.S.C. § 1407 with the Judicial Panel on Multidistrict Litigation ("JPML") requesting centralization of all pending cases in the Northern District of California. (Ex. B.)

Every licensee filed an opposition to Columbia's motion. Moreover, many continued to insist on the right to conduct separate discovery on independent tracks in their own cases, even while Columbia's transfer motion was pending before the JPML. Columbia declined to allow duplicative discovery to proceed independently in each action, particularly given the likelihood that the JPML would order centralization. Ultimately, Biogen and Genzyme agreed to defer discovery until after the JPML had ruled on Columbia's motion to transfer. Genentech did not— thus requiring Columbia to secure an order from Judge Walker in the Northern District of California staying all discovery in that action pending a ruling from the JPML. (Ex. D.) Yet even that ruling did not dissuade other licensees from attempting to pursue their own discovery. Indeed, Amgen and Immunex filed an *ex parte* application with Judge Pfaelzer in the Central District of California to compel Columbia to proceed with discovery. (Ex. E.) Judge Pfaelzer denied the *ex parte* application and stayed all discovery pending a ruling from the JPML. (Ex. F.)

---

[5] All exhibits are attached to the Request for Judicial Notice in Support of Columbia University's Motion to Dismiss, filed concurrently with this Memorandum.

On April 8, 2004, the JPML granted Columbia's motion to consolidate the actions. *In re Columbia Univ. Patent Litig.*, 313 F. Supp. 2d 1383 (J.P.M.L. 2004). The JPML concluded that consolidation was "necessary in order to eliminate duplicative discovery[,] prevent inconsistent pretrial rulings . . . and conserve the resources of the parties, their counsel and the judiciary." *Id*. at 1385.

The day before the JPML's ruling, Biogen and Genzyme filed a motion for a TRO and preliminary injunction with this Court, seeking to enjoin Columbia from terminating their license agreements on account of nonpayment of royalties on products covered by the '275 patent. To facilitate a rational resolution of the dispute, Columbia agreed not to sue Biogen and Genzyme for infringement of the '275 patent or to seek a preliminary injunction restraining their sale of infringing products until the Court ruled on their motion. (*Biogen I*, Docket No. 43 at ¶ 5.) The court denied the motion on August 13, 2004, noting that "plaintiffs need not . . . pay royalties while challenging the '275 patent, but that it is consistent with the public interest to allow Columbia to terminate their licenses." *Biogen Idec MA Inc. v. Trustees of Columbia Univ.*, 332 F. Supp. 2d 286, 302 (D. Mass. 2004).

On May 6, 2004, the PTO granted a petition by the Public Patent Foundation (a third-party unrelated to Columbia or any of the licensees) to reexamine the '275 patent to determine whether it constituted prohibited double patenting. (MDL, Docket No. 8 at Ex. B.) In light of the reexamination order, as well as Columbia's decision to file an application for reissue of the '275 patent (which requires the PTO to reconsider anew *all* requirements of patentability), Columbia filed a motion to stay the litigation pending the outcome of the PTO proceedings. (MDL, Docket No. 6.) Columbia believed that it would be more efficient to allow the PTO to resolve the fundamental question of whether the '275 patent should have issued in the first

place—and, if so, with what claims—before the parties incurred any further expense in the litigation. To avoid any possible prejudice to the MDL plaintiffs as a result of the requested stay, Columbia committed not to seek a preliminarily injunction restraining the MDL plaintiffs from selling their products at any time before the conclusion of the litigation. (Ex. G at 81:19-24.)

The Court declined to grant a stay and instead set an expedited schedule on the issue of double patenting. (MDL, Docket Nos. 32, 79.) While proceeding with the double patenting phase of the case, Columbia remained concerned that it was inefficient, wasteful, and unduly expensive to continue the litigation in light of the PTO's concurrent review of the '275 patent. On September 1, 2004, fifteen days after the Court formally denied the motion to stay, Columbia filed a covenant not to sue any of the MDL plaintiffs with regard to the '275 patent and asked them to dismiss their claims in light of the covenant. (MDL, Docket No. 85.) All of the MDL plaintiffs refused to dismiss their claims, even after Columbia voluntarily agreed to expand the covenant at this Court's suggestion. (Ex. H at 15-22.)

On September 17, 2004, *Biogen II* was filed in an effort to overcome the covenant not to sue and to perpetuate litigation over the '275 patent as it currently reads. On October 1, 2004, Columbia moved to dismiss *Biogen II* on the ground that it represented an improper attempt to circumvent the procedures for amending and supplementing pleadings under Federal Rule of Civil Procedure 15. (*Biogen II*, Docket No. 6.) Plaintiffs opposed this motion—even though the Court had expressly admonished them to seek leave before attempting to amend or supplement their pleadings—and filed their own motion to consolidate *Biogen II* with the now-dismissed *Biogen I.* Those motions are still pending.

On November 5, 2004, this Court issued its decision granting Columbia's motion to dismiss the MDL plaintiffs' declaratory relief claims concerning the validity and enforceability

of the '275 patent.  *In re Columbia Univ. Patent Litig.*, 343 F. Supp. 2d 35 (D. Mass. 2004).

Notwithstanding the breadth and clarity of this decision, Biogen and Genzyme somehow believe

that Count I of their *Biogen I* complaint, which seeks a declaration that they owe no royalties

because the '275 patent is invalid and unenforceable, has not been dismissed because it is, in

reality, a claim for damages based on Columbia's termination of their license agreements.

(MDL, Docket No. 179 at 7-8.)  In contrast, Abbott, a co-plaintiff with Biogen and Genzmye in

*Biogen I*, agrees that the Court's decision disposed of all claims in *Biogen I*, including Count I.

(*Id.* at 9.)

## ARGUMENT

I.    **The Court Should Dismiss The Declaratory Relief Claims In Counts IV Through VII Pursuant To Rule 12(b)(1) For Lack Of Subject Matter Jurisdiction**

A.    **Columbia Has Not Engaged In Any Conduct Sufficient To Create A Reasonable Apprehension That Biogen Idec Will Face An Infringement Suit**

In Counts IV through VII, Biogen Idec seeks a declaratory judgment that the '275 patent

is invalid or unenforceable based on allegations of double-patenting, prosecution laches,

inequitable conduct, and patent misuse, respectively.  Because Biogen Idec has no reasonable

apprehension that it will be sued for infringement of the '275 patent, the Court should dismiss all

of these claims for lack of subject matter jurisdiction.[6]

The Federal Circuit has established a two-part test for determining the existence of

subject matter jurisdiction over a declaratory relief action concerning the validity, enforceability,

---

[6] On a motion to dismiss, plaintiffs have the burden of establishing that subject matter jurisdiction exists.  *See Int'l Med. Prosthetics Res. Assocs. v. Gore Enter. Holdings, Inc.*, 787 F.2d 572, 575 (Fed. Cir. 1986) (to meet its burden of establishing subject matter jurisdiction over a declaratory judgment action in response to a motion to dismiss, the plaintiff "must establish the existence of facts underlying an allegation that an actual controversy existed.") (citation and quotation marks omitted).

or infringement of a patent.  Under this two-part test, the declaratory judgment plaintiff has the

burden of establishing both:

> (1) *an explicit threat or other action* **by the patentee**, which creates a reasonable apprehension on the part of the declaratory judgment plaintiff that it will face an infringement suit, and (2) present activity which could constitute infringement or concrete steps taken with the intent to conduct such activity.

*Super Sack Mfg. Corp.*, 57 F.3d at 1058 (emphasis added).  The first part of the test—which is

the focus of this motion—involves a determination of whether the *patentee's conduct* creates a

reasonable apprehension that the plaintiff will face an infringement suit.  *Intellectual Prop. Dev.,*

*Inc. v. TCI Cablevision of California, Inc.*, 248 F.3d 1333, 1341 (Fed. Cir. 2001).  The plaintiff's

subjective state of knowledge is irrelevant to that determination.  *Indium Corp. of America v.*

*Semi-Alloys, Inc.*, 781 F.2d 879, 883 (Fed. Cir. 1985) ("subjective apprehension of an

infringement suit is insufficient to satisfy the actual controversy requirement").  When there is no

express charge of infringement by the patentee against the plaintiff, courts look to the "totality of

the circumstances" to determine whether there is a reasonable apprehension of suit.  *Shell Oil*

*Co. v. Amoco Corp.*, 970 F.2d 885, 888 (Fed. Cir. 1992).  The focus always remains, however,

on the conduct of the patentee, not the subjective belief of the plaintiff.  *See BP Chems. Ltd. v.*

*Union Carbide Corp.*, 4 F.3d 975, 979 (Fed. Cir. 1993) ("Indeed, it is the objective words and

actions of the patentee that are controlling.").

Columbia has never threatened Biogen Idec with an infringement suit or demanded that

Biogen Idec take a license to the '275 patent.  (Declaration of Scot G. Hamilton ¶¶ 2, 3.)  Nor

does Biogen Idec allege otherwise. (AC ¶ 14.)[7] Indeed, as this Court recognized in its order granting Columbia's motion to dismiss in the MDL proceedings:

> Some of the plaintiffs contend that an actual case or controversy exists because Columbia's covenant not to sue does not cover the independent legal entities that they call "affiliates." *Columbia has not, however, implicitly or explicitly threatened to sue those entities.*

*In re Columbia Univ. Patent Litig.*, 343 F. Supp. 2d at 48-49 (emphasis added). Accordingly, to sustain subject matter jurisdiction over its declaratory relief claims, Biogen Idec must point to other conduct *by Columbia* sufficient to create a reasonable apprehension that it will face a suit for infringement of the '275 patent.

There is no such conduct. Indeed, all of Columbia's conduct shows that Biogen Idec faces no real and immediate risk of a suit for infringement of the '275 patent. For example, at the telephonic hearing conducted in the multidistrict proceedings on September 9, 2004—before the filing of this action—Columbia's counsel clearly communicated that Columbia "desire[s] not to litigate [the] '275 patent while the Patent Office is determining what if any patent rights Columbia is entitled to have in the first place." (Ex. I at 33:11-14.) Columbia's counsel reiterated that commitment during the hearing on Columbia's motion to dismiss on October 6, 2004:

> I can also tell you that we don't understand the allegations of Mr. Ware and others that they are deeply concerned that we're going to file a lawsuit tomorrow or the next day or the next day on the '275 patent against their members of their corporate family. I think we've done everything to communicate that the last place we want to be right now is anywhere in court until the Patent Office finishes its job. The Patent Office decided it wants to reexamine the patent. We filed an application for reissue. It is Columbia's desire not to be in litigation over the '275 patent until that process

---

[7] Citations in this Memorandum to the *Biogen II* Amended Complaint are designated as: (AC ¶ __.)

> is over.  And even then, we would have to think hard about
> whether or not there will be any enforcement actions against
> anybody.

(Ex. H at 104:3-16.)  It could hardly be clearer that Columbia is not threatening an infringement

suit against anyone, let alone Biogen Idec.  *See Grain Processing Corp. v. American Maize-*

*Prods. Co.*, 840 F.2d 902, 906 (Fed. Cir. 1988) (finding no reasonable apprehension of suit

where patent holder "abandoned its [infringement] charge . . . prior to trial, . . . 'steadfastly

refused to assert infringement[,]'" and did nothing to suggest "a similar infringement suit in the

future").

  Moreover, as Biogen Idec well knows, Columbia cannot willy-nilly file suit against

unlicensed infringers of the Axel patents.  Rather, Columbia is obligated pursuant to the NIH

determination letter "to use all reasonable efforts to bring the invention to the commercial market

through licensing on a non-exclusive, royalty-free or reasonable royalty basis."  (Ex. J at 4.)

When the Court specifically asked at the October 6 hearing whether "Columbia would have to

offer [Biogen] Idec a license on reasonable terms or something to that effect before it could bring

suit[,]" Columbia's counsel responded, "Absolutely.  We have that obligation."  (Ex. H at

105:20-24.)  Biogen Idec can have no reasonable apprehension of suit when it has not even

approached Columbia to discuss licensing.

  In the Amended Complaint, Biogen Idec suggests that certain statements in Columbia's

covenant *not to sue* the MDL plaintiffs somehow serves to create a reasonable apprehension that

Columbia in fact *will sue* others.  (AC ¶ 14.)  Not so.  The very purpose of the covenant was to

*terminate* litigation over the '275 patent, not to threaten it.  Columbia's counsel made very clear

at the September 9 telephonic hearing that Columbia filed the covenant to allow the PTO to rule

upon the reissue application and the reexamination request before there are any infringement

suits based on the '275 patent.  It is true that the covenant includes a brief statement intended to

communicate that Columbia does not concede the merits of any of the *claims asserted by the MDL plaintiffs*. (Ex. K at 2.) ("In granting this covenant to plaintiffs, Columbia in no way concedes plaintiffs' allegations that the '275 patent is invalid, unenforceable, or not infringed. To the contrary, Columbia categorically rejects all such claims by plaintiffs."). Columbia included this statement to make clear that it was not conceding defeat in those actions—nothing more, nothing less. Columbia's denial of the merits of the MDL plaintiffs' claims says nothing about whether Columbia plans to take any action at any time in the future against any other party.[8]

Nor does the exclusion of "affiliates," such as Biogen Idec, from the covenant not to sue create any reasonable apprehension of suit. *See Int'l Harvester Co. v. Deere & Co.*, 623 F.2d 1207, 1214 (7th Cir. 1980) ("We have found no case in which a plaintiff demanded patent clearance from a competitor and was able to rely upon the refusal to grant it as a basis for its reasonable apprehension."); *CAE Screenplates, Inc. v. Beloit Corp.*, 957 F. Supp. 784, 791-92 (E.D. Va. 1997) ("[O]bjective, reasonable apprehension cannot be based upon the patentee's failure to provide binding and absolute reassurances. In other words, [patent holder's] refusal to acquiesce immediately to [alleged infringer's] demands for immunity and a royalty-free license does not create a justiciable controversy.")

Similarly, it is irrelevant that Biogen Idec alleges that it has never been party to any license agreement with Columbia covering cotransformation technology. (AC ¶ 14.) Even a *refusal* to license does not give rise to a reasonable apprehension of suit. *See Cygnus*

---

[8] Moreover, a patent holder's continued belief in the viability of its patent does not instill a reasonable apprehension of suit in an alleged infringer. *See Shell Oil Co.*, 970 F.2d at 889 (finding no reasonable apprehension of suit when, in response to statement of invalidity and noninfringement, patent holder "defended its patent" and "indicate[d] that [plaintiff's] activities 'fall within,' are 'covered by,' and are 'operations under' [defendant's] patent").

- 12 -

*Therapeutics Sys. v. ALZA Corp.*, 92 F.3d 1153, 1159 (Fed. Cir. 1996) (rejecting as basis for reasonable apprehension of suit defendant's "refusal to negotiate a licensing agreement for the subject matter of the … patent"), *overruled on other grounds by Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059 (Fed. Cir. 1998).

Finally, the Amended Complaint suggests that Columbia made "threats" to sue "various of its licensees" for infringement of the '275 patent.  (AC ¶ 14.)  These "threats" are, presumably, the same non-specific statements concerning the possibility of infringement counterclaims upon which Biogen and Genzyme unsuccessfully relied in opposing Columbia's motion to dismiss.  (Ex. L at 18.)  Of course, none of those "threats" were directed at Biogen Idec.  In any event, Columbia has since made absolutely clear that it will not initiate infringement suits based on the '275 patent while the PTO is considering the reissue application and the reexamination petition.  In light of those unequivocal and binding assurances, Biogen Idec can have no reasonable apprehension that it will face an infringement suit.

### B.   Biogen and Genzyme Cannot Pursue Count VII In Light Of The Covenant Not To Sue And The Court's Granting of Columbia's Motion To Dismiss

Count VII, which seeks a declaration that the '275 patent is "unenforceable" on account of "patent misuse," is the only declaratory relief claim in which Biogen and Genzyme are joined as plaintiffs.  Although Biogen and Genzyme were named as plaintiffs, along with Biogen Idec, in all of the declaratory relief claims asserted in the original Complaint, they were dropped from Counts IV, V, and VI in the Amended Complaint—presumably because those claims are identical to the declaratory relief claims that the Court dismissed in *Biogen I*.  There is no basis to distinguish Count VII.  That claim, too, should be dismissed as to Biogen and Genzyme.

Columbia's covenant not to sue eliminates any reasonable apprehension that Biogen or Genzyme will ever face a suit for infringement of the '275 patent as it currently reads.

Accordingly, there is no case or controversy with respect to any claim in which Biogen or

Genzyme seek a declaration that the '275 patent is invalid or unenforceable on any ground.  As

this Court succinctly explained in granting Columbia's motion to dismiss in the MDL

proceedings:

> However, Columbia's covenant not to sue . . . means that plaintiffs
> do not now have the required reasonable apprehension that they
> will face an infringement suit and possibly be required to pay
> damages for any of their current activities.  The plaintiffs are not
> now reasonably at legal risk because of an unresolved dispute.
> Therefore, no case or controversy now exists in any of these
> actions.

*In re Columbia Univ. Patent Litig.*, 343 F. Supp. 2d at 43 (citations and quotation marks

omitted).

Although the *Biogen I* complaint did not assert a claim seeking a declaration of

unenforceability based on alleged patent misuse, other complaints in the MDL proceedings did

assert such claims.  (Ex. N at ¶¶ 81-84; Ex. O at ¶¶ 79-85.)  The Court did not single out those

patent misuse claims as somehow jurisdictionally distinguishable from any of the other claims

seeking a declaration of invalidity or unenforceability.  Quite to the contrary, as the Court

acknowledged in its decision granting Columbia's motion to dismiss, the Federal Circuit has

rejected any attempt to draw a distinction between declaratory relief claims based on invalidity

or unenforceability when determining the existence of a case or controversy in light of a

covenant not to sue.  *In re Columbia Univ. Patent Litig.*, 343 F. Supp. 2d at 46 (quoting

*Intellectual Prop. Dev., Inc. v. TCI Cablevision of California, Inc.*, 248 F.3d 1333, 1342 n.9

(Fed. Cir. 2001), for the proposition that "[i]t is of no consequence to the case at issue that *Super

Sack* concerned a declaratory counterclaim for noninfringement and invalidity while TCI-

California counterclaimed for declaratory judgment on the issues of noninfringement, invalidity,

and *unenforceability*.")  Accordingly, the Court should dismiss Count VII as to Biogen and Genzyme.

C.    **Even If Subject Matter Jurisdiction Exists Over the Declaratory Judgment Claims, The Court Should Exercise Its Discretion To Decline To Hear Such Claims**

Even if this Court were to find that subject matter jurisdiction exists over any of the declaratory judgment claims, it should exercise its discretion to decline such jurisdiction.  *See Davox Corp. v. Digital Sys. Int'l, Inc.*, 846 F. Supp. 144, 147 (D. Mass. 1993) ("The finding that jurisdiction exists does not . . . end the court's inquiry.  The exercise of jurisdiction over declaratory judgment actions is left to the sound discretion of the district courts.").  As the Federal Circuit recently acknowledged in *Capo, Inc. v. Dioptics Med. Prods., Inc.*, 387 F.3d 1352 (Fed. Cir. 2004), "the Declaratory Judgment Act grants district courts discretion 'in the first instance, because facts bearing on the usefulness of the declaratory remedy, and the fitness of the case for resolution, are peculiarly within their grasp.'"  *Id.* at 1357 (quoting *Wilton v. Seven Falls Co.*, 515 U.S. 277, 289 (1995)).  A court can decline to hear declaratory judgment claims when the exercise of jurisdiction would not comport with the purposes of the Declaratory Judgment Act and would not further sound judicial administration.  *Waters Corp. v. Hewlett-Packard Co.*, 999 F. Supp. 167, 173 (D. Mass. 1998).

In dismissing plaintiffs' declaratory judgment claims in the multidistrict litigation, the Court found that "even if actual cases or controversies now existed, this court would exercise its discretion to dismiss the requests for declaratory judgment."  *In re Columbia Univ. Patent Litig.*, 343 F. Supp. 2d at 47 (citation omitted).  The Court noted that Columbia is not "now attempting to use the '275 patent to obtain some commercial advantage without filing suit."  *Id*. Accordingly, the Court concluded that the "cases do not now involve the type of situation that the Declaratory Judgment Act was intended to address."  *Id*.  Indeed, the Court held that "it is

most appropriate to dismiss the requests for declaratory judgment rather than devote scarce judicial resources to deciding hypothetical issues in anticipation of an actual dispute that is not likely to occur." *Id*. at 48.

The Court's reasoning applies equally here. Columbia has unequivocally announced that it will not sue anyone for infringement of the '275 patent while the PTO is considering the reexamination request and the reissue application. Any future dispute between Columbia and Biogen Idec is entirely speculative. Particularly given the significant commitment of time and resources that this Court has acknowledged would be required to resolve just the double-patenting issues, 343 F. Supp. 2d at 48, it would make little sense to devote scarce judicial resources to this hypothetical dispute.

## II.    The Court Should Dismiss Counts I, II, and III Pursuant to Rule 12(b)(6) For Failure To State A Claim

### A.    The Court Should Dismiss Count I For Abuse Of Process Because Columbia Has Never Used "Process" With Respect To Plaintiffs

Count I for abuse of process must be dismissed because plaintiffs do not and cannot allege the essential elements of the tort. "The essential elements of the tort are that '(1) process was used; (2) for an ulterior or illegitimate purpose; (3) resulting in damage.'" *Medford Co-op. Bank v. Skerry*, No. 9875, 2004 WL 1853343, at *3 (Mass. App. Div. Aug. 12, 2004) (quoting *Gutierrez v. Massachusetts Bay Transp. Auth.*, 772 N.E.2d 552, 563 (Mass. 2002)). Because Columbia has not used any "process" with respect to plaintiffs, their claim must fail as a matter of law.

In *Jones v. Brockton Pub. Mkts, Inc.*, 340 N.E.2d 484 (Mass. 1975), the Supreme Judicial Court of Massachusetts issued the definitive statement on the type of "process" required to support the abuse of process tort:

1237908

- 16 -

> [O]ur cases on abuse of process have been limited to three types of process: writs of attachment, . . . the process used to institute a civil action, . . . and, the process related to the bringing of criminal charges. . . . Thus, under our cases, in the context of an action for abuse of process, 'process' refers to the papers issued by a court to bring a party or property within its jurisdiction.

*Id.* at 486 (citations omitted). Plaintiffs do not and cannot allege that Columbia caused any court to issue process against them. Instead, they rely upon an entirely different definition of "process," alleging that Columbia "has manipulated and abused the judicial process for ulterior and illegitimate purposes[.]" (AC ¶ 75.) Under *Brockton*, this allegation is irrelevant to the abuse of process tort.

Nor can plaintiffs rely upon Columbia's institution of a lawsuit against *other* licensees of the '275 patent to support their abuse of process claim. This issue was squarely addressed in *Luke Bros., Inc. v. Krusell*, No. Civ. A. 94-11702-MLW, 1996 WL 50965, at *3 (D. Mass. Jan. 30, 1996), where this Court denied intervenor-defendant Wholesalers' motion for leave to amend its answer to include a counterclaim for abuse of process. The Court explained that amendment would be futile because Wholesalers was not a party to the previous action on which it sought to base the abuse of process claim. *Id.* (there is "no precedent in Massachusetts, or, evidently, elsewhere, for predicating an abuse of process claim on such circumstances"); *see also Cuddy v. Sweeney*, 386 N.E.2d 805, 806 (Mass. App. Ct. 1979) (rejecting plaintiff's abuse of process claim because plaintiff was never a party to the suit on which it was based and "[s]he, therefore, could not show under any set of facts that process issued against her.").

Finally, while irrelevant to the merits of this claim, plaintiffs' allegation that Columbia has "abused the judicial process" is both absurd and insulting. As discussed more fully in Section C(1)(c), *infra*, there was nothing wrongful about any of the litigation conduct referenced in the Amended Complaint. Plaintiffs do not and cannot allege that Columbia violated any legal

or ethical rules when successfully moving to consolidate the various cases in a single forum,

when successfully moving to prevent duplicative discovery before consolidation was achieved,

when successfully opposing Biogen and Genzyme's motion to enjoin the termination of their

license agreements, or when successfully moving to dismiss all of the declaratory relief claims

after granting a covenant not to sue.  In short, plaintiffs do not and cannot identify any litigation

conduct that was improper under any measurable standard.  Their inflammatory allegation that

Columbia's litigation conduct was "abusive" is utterly lacking in substance.

> **B.    The Court Should Dismiss Count II For Breach Of Contract And Breach Of The Implied Covenant, With The Sole Exception Of The Claim Based On Section 3(j) Of The License Agreements**

In Count II of the Amended Complaint, Biogen and Genzyme allege that Columbia

(1) wrongfully terminated their license agreements, (AC ¶ 81); and (2) breached section 2(b) of

their license agreements by engaging in "repressive licensing practices," (AC ¶ 82).  Plaintiffs

also purport to state a claim for breach of the implied covenant of good faith and fair dealing.

(AC ¶ 79.)  As discussed below, all of these claims should be dismissed pursuant to

Rule 12(b)(6).[9]

> **1.    Because Columbia Had The Right To Terminate Plaintiffs' License Agreements For Failure To Pay Royalties, The Court Should Dismiss Plaintiffs' Claim That Columbia Wrongfully Terminated Their License Agreements**

Plaintiffs allege that, "[i]n March 2004, Columbia wrongfully sent termination letters to

Biogen and Genzyme, and their licenses were terminated, based upon Columbia's assertion of an

invalid and unenforceable patent, the '275 patent."  (AC ¶ 81.)  Plaintiffs concede, however, that

---

[9] In their Amended Complaint, Biogen and Genzyme also allege for the first time that Columbia breached section 3(j) of their license agreements by failing to provide them with more favorable terms given to other licensees. (AC ¶¶ 83-84.)  This motion does not address that one claim (although Columbia in no way concedes the merits of that claim).

- 18 -

after Columbia filed the covenant not to sue with respect to the '275 patent as it currently

reads—thus giving up any right to recover royalties with respect to that patent—Columbia

subsequently "wrote to Genzyme and Biogen 'withdraw[ing] the notices of termination,'"

(AC ¶ 67).  While it is unclear how Biogen and Genzyme were damaged in any way as a result

of the seven-month termination of their license agreements—the Amended Complaint does not

identify any damages that possibly could be recovered in a breach of contract action—one thing

is very clear:  Columbia had every right to terminate their license agreements in March 2004 for

nonpayment of royalties owed on products covered by the '275 patent.[10]

The license agreements require the payment of royalties on "Licensed Products."  (Ex. M

at § 3(c); Ex. P at § 3(c).)  "Licensed Products" are "products . . . the manufacture, use or sale of

which is covered by a claim of Licensed Patent Rights which has neither expired nor been held

invalid by a court of competent jurisdiction from which no appeal has or may be taken."  (Ex. M

at § 1(d)(i); Ex. P at § 1(d)(i).)  As plaintiffs concede, "Licensed Patent Rights" include the '275

patent.  (AC ¶ 30; Ex. M at § 1(c); Ex. P at § 1(c).)  It is a "material breach" of the license

agreements if a licensee "fails to make all reports or pay all fees and royalties when due."  (Ex.

M at § 5(b); Ex. P at § 5(b).)  New York law governs the license agreements.  (Ex. M at § 10; Ex.

P at § 10.)

Plaintiffs had not paid any royalties on products covered by the '275 patent at the time

that Columbia terminated their license agreements.  *Biogen Idec MA Inc.*, 332 F. Supp. 2d at 294,

---

[10] Because Biogen and Genzyme repeatedly refer to and rely upon their license
agreements throughout the Amended Complaint, (AC ¶¶ 9, 11, 28-31, 33-35, 78-79, 81-83), the
Court may consider the license agreements when ruling on this motion to dismiss.  *See Beddall v.
State St. Bank & Trust Co.*, 137 F.3d 12, 17 (1st Cir. 1998) ("When, as now, a complaint's
factual allegations are expressly linked to—and admittedly dependent upon—a document (the
authenticity of which is not challenged), that document effectively merges into the pleadings and
the trial court can review it in deciding a motion to dismiss under Rule 12(b)(6).").

301.  Accordingly, because Biogen and Genzyme had committed a material breach of their

license agreements, Columbia's termination of those agreements was entirely proper under New

York law.  *Id.* at 293.  ("It is undisputed that failure to pay royalties that are due constitutes a

material breach under the license agreements."); *see also DeCapua v. Dine-A-Mate, Inc.*, 744

N.Y.S.2d 417, 421 (N.Y. App. Div. 2002) ("the termination of the agreement was proper since

the plaintiff breached the provision requiring him to pay royalties"); *Estate of Lennon v.

Leggoons, Inc.*, No. 95 CIV. 8872 (HB), 1997 WL 346733, at *1 (S.D.N.Y. June 23, 1997) ("It is

clear that Leggoons materially breached the Agreement by failing to make the required royalty

payments.").

        Plaintiffs' challenge to the '275 patent does not negate Columbia's contractual right to

terminate based on material breach.  That issue was addressed in *Cordis Corp. v. Medtronic,

Inc.*, 780 F.2d 991 (Fed. Cir. 1985).  There, Cordis sued to invalidate two patents that it had

licensed from Medtronic and then sought a preliminary injunction to prevent Medtronic from

terminating the license for non-payment of royalties.  The district court granted the injunction.

On appeal, Cordis argued that allowing termination would be inconsistent with the Supreme

Court's decision in *Lear, Inc. v. Adkins*, 395 U.S. 653 (1968), "encouraging vigorous and prompt

adjudication of invalid patents."  780 F.2d at 995.  The Federal Circuit rejected this argument

and vacated the injunction.  The court first acknowledged that under *Lear* "a licensee to a patent

license agreement is not estopped from contesting the validity of the patent subject to the

agreement."  *Id*. at 994.  The court further noted that *Lear* "permit[s] a licensee to cease

payments due under a contract while challenging the validity of a patent."  *Id.* at 995.  The court

concluded, however, that federal patent policy "*does not* permit the licensees to avoid facing the

consequences that such an action would bring."  *Id.* (emphasis in original).  As the court

explained, "[t]he holding of *Lear only* prevents the affirmative enforcement by the licensor of the royalty payment provisions of the license agreement while the patent's validity is being challenged by the licensee." *Id.* (emphasis added).  The court concluded that "we find no authority in *Lear* for . . . preliminarily enjoining a licensor from canceling the license agreement and, thus, from counterclaiming for patent infringement when this material breach of the license occurs." *Id.*

This Court applied these very principles when denying Biogen and Genzyme's motion to enjoin termination of their license agreements.  The Court concluded that, although Biogen and Genzyme "need not . . . pay royalties while challenging the '275 patent, . . . it is consistent with the public interest to allow Columbia to terminate their licenses." *Biogen Idec MA Inc.*, 332 F. Supp. 2d at 302.[11]  Accordingly, because Columbia had the contractual right to terminate the license agreements for failure to pay royalties, the Court should grant Columbia's motion to dismiss Biogen and Genzyme's wrongful termination claim.

> **2.    Because Section 2(b) Of The License Agreements Does Not Create Any Contractual Obligations Owed To Biogen And Genzyme, The Court Should Dismiss Plaintiffs' Claim For Breach of Section 2(b)**

Biogen and Genzyme allege that Columbia breached section 2(b) of their license agreements by engaging in "repressive licensing practices."  (AC ¶ 82.)  Section 2(b) does not, however, create any contractual obligation on the part of Columbia running to Biogen and Genzyme.

Section 2(b) provides:

---

[11] *See also Intermedics Infusaid, Inc. v. The Regents of the Univ. of Minn.*, 804 F.2d 129, 133 (Fed. Cir. 1986) ("This Court held in  [*Cordis*] that a licensee is not entitled . . . to preclude a licensor from terminating the License Agreement for breach by reason of non-payment of royalties.").

> All rights granted by Columbia under this agreement are subject to any rights required to be granted to the Government of the United States of America, including without limitation any rights reserved or obligations imposed by the Government pursuant to 35 U.S.C. §§ 200-211, regulations thereunder and the determination letter to Columbia from [the National Institutes of Health (the "NIH")] dated February 24, 1981, a copy of which is attached hereto as Appendix A.  Licensee will provide all information and assistance necessary to enable Columbia to comply with its obligations to the Government in connection with the subject matter of this Agreement.

(Ex. M at § 2(b); Ex. P at § 2(b).)  No language in section 2(b) creates a contractual obligation on the part of Columbia that plaintiffs are entitled to enforce.  Rather, section 2(b) merely reserves certain rights and obligations that Columbia owes to the United States Government, notwithstanding the licenses granted to Biogen and Genzyme under their respective agreements.  Biogen and Genzyme cannot point to any language in section 2(b) that would suggest or imply that they are entitled to enforce the rights "required to be granted [by Columbia] to the Government."

The source of the "repressive licensing practices" language on which Biogen and Genzyme rely is the NIH determination letter attached to the license agreements as Appendix A, which provides in part:  "Any license granted by the University under the U.S. patent application shall include adequate safeguards against unreasonable royalties and repressive practices."  (Ex. J at 5.)  Nothing contained in this sentence—or, for that matter, anyplace else in the NIH determination letter—purports to create an obligation running from Columbia to any prospective licensee of the Axel patents.  Rather, as made clear in the NIH determination letter, the sentence simply sets forth a *non-contractual obligation* that Columbia *owes to the Government* as a condition to receiving title to patent applications based on federally funded research.  (Ex. J at 2.) ("all right, title and interest in the invention is hereby left to the University for development and administration, subject to the following terms and conditions")

There is no authority supporting the proposition that the reference to the NIH determination letter in the license agreements in and of itself creates new obligations running from Columbia to Biogen and Genzyme.  Quite to the contrary, under long-standing Supreme Court precedent, "a reference by the contracting parties to an extraneous writing for a particular purpose makes it a part of their agreement only for the purpose specified."  *Guerini Store Co. v. P.J. Carlin Constr. Co.*, 240 U.S. 264, 277 (1916); *see F. Garofalo Elec. Co., Inc. v. Hartford Fire Ins. Co.*, 799 F. Supp. 8, 11 (E.D.N.Y. 1992) (applying principle set forth in *Guerini* to contract governed by New York law).

In re Gulf Oil/Cities Serv. Tender Offer Litig.*, 725 F. Supp. 712 (S.D.N.Y. 1989), provides a good example of this rule.  In that case, Gulf shareholders argued that certain obligations, particularly a "best efforts" clause, from Gulf Corporation's Merger Agreement with Cities, another corporation, ran to Gulf's shareholders as well.  *Id.* at 730.  Gulf had provided, in Section 11 of the Offer to Purchase agreement with the shareholders, a summary of certain provisions of the Merger Agreement, including that agreement's "best efforts" clause.  The court granted summary judgment for Gulf, holding that "[b]ecause plaintiffs are not parties to the Merger Agreement and the contract to which they are parties, the Offer to Purchase, contains no such 'best efforts' clause, plaintiffs' arguments fail."  *Id.*  The court explained that "the language of § 11 . . . makes it quite plain that the description of contract terms from the Merger Agreement was intended solely to provide full disclosure of material facts to shareholders, not to create new contractual rights."  *Id.*

As in *Gulf Oil*, Biogen and Genzyme cannot use section 2(b), which simply discloses and preserves Columbia's pre-existing obligations to the United States Government, "to create new

contractual rights" running to licensees.  Accordingly, their attempt to state a breach of contract claim based on section 2(b) fails as a matter of law.

> **3.**     **The Claim For Breach Of The Implied Covenant Of Good Faith And Fair Dealing Should Be Dismissed As Duplicative Of The Claim For Breach Of Contract**

Biogen and Genzyme rely upon the same allegations to support both their claim for breach of the implied covenant of good faith and fair dealing and their claim for breach of contract.  (AC ¶¶ 77-84.)  They do not identify any allegations specific to the implied covenant claim and do nothing whatsoever to differentiate that claim from their breach of contract claim. Under New York law, the duplicative implied covenant claim must be dismissed. *See, e.g., New York Univ. v. Continental Ins. Co.*, 662 N.E.2d 763, 770 (N.Y. 1995) (holding that claim based on alleged breach of the implied covenant of good faith and fair dealing was "duplicative of the first cause of action for breach of contract and should have been dismissed").

> **C.**     **Count III For Violation Of Mass. Gen. Laws Ch. 93A Should Be Dismissed Because It Is Barred By The *Noerr-Pennington* Doctrine And Fails To State A Claim For Which Relief Can Be Granted**

In Count III, plaintiffs do not identify any specific conduct on Columbia's part that was allegedly "unfair" or "deceptive" within the meaning of chapter 93A of the Mass. Gen. Laws ("G.L. 93A").  Rather, plaintiffs indiscriminately incorporate by reference the previous eighty-six paragraphs of their Amended Complaint into this claim.  Generally speaking, the allegations in those eighty-six paragraphs appear to fall into four categories:  (1) Columbia's efforts to persuade Congress to enact certain legislation, (AC ¶¶ 4, 38-41); (2) Columbia's conduct before the PTO (AC ¶¶ 3, 5, 17, 19-27, 42-48, 53-61, 71); (3) Columbia's actions in the course of

defending itself in *Biogen I*, (AC ¶¶ 2, 50-52, 55, 63-71); and (4) Columbia's efforts to "enforce" the '275 patent, (AC ¶¶ 49, 62).[12]

As discussed below, none of this conduct is actionable under G.L. 93A for two reasons. First, the *Noerr-Pennington* doctrine immunizes Columbia from any liability.  Second, wholly apart from the *Noerr-Pennington* doctrine, plaintiffs' allegations fail to state any cognizable claim for relief under G.L. 93A.

###### 1.    The *Noerr-Pennington* Doctrine Precludes Plaintiffs' G.L. 93A Claim

The *Noerr-Pennington* doctrine generally grants immunity from suit to "[t]hose who petition government for redress[.]"  *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 56 (1993).  The immunity has its source in the constitutional right of citizens to petition their government.  *City of Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365, 379 (1991) ("However, it is obviously peculiar in a democracy, and perhaps in derogation of the constitutional right 'to petition the Government for a redress of grievances,' U.S. Const., Amdt. 1, to establish a category of lawful state action that citizens are not permitted to urge.")

The United States Supreme Court first applied this doctrine to provide immunity from Sherman Act claims based on Congressional lobbying activities.  In *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961), a group of trucking companies sued a group of railroads to restrain them from attempting to persuade Congress to pass certain laws.  The plaintiffs alleged that the railroads' lobbying efforts were a conspiracy to monopolize the long-distance freight business in violation of the Sherman Act.  Reversing a judgment in

---

[12] Because of the difficulty in discerning the factual basis for plaintiffs' G.L. 93A claim, Columbia also moves, in the alternative, for a more definite statement of Count III pursuant to Rule 12(e).  *See infra* at Section III.

favor of the trucking companies, the Supreme Court held that "the Sherman Act does not prohibit . . . persons from associating together in an attempt to persuade the legislature or the executive to take particular action with respect to a law that would produce a restraint or a monopoly." *Id.* at 136.[13]

The *Noerr-Pennington* doctrine has since been expanded to encompass not just legislative lobbying, but the "'approach of citizens . . . to administrative agencies . . . and to courts.'" *Prof'l Real Estate Investors*, 508 U.S. at 57 (quoting *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508 (1972)). The doctrine has also been expanded to provide immunity from many state-law claims. In particular, *Noerr-Pennington* "has now universally been applied to business torts[,]" including unfair competition. *IGEN Int'l, Inc. v. Roche Diagnostics GmbH*, 335 F.3d 303, 310 (4th Cir. 2003); *see also Globetrotter Software, Inc. v. Elan Computer Group, Inc.*, 362 F.3d 1367, 1375 (Fed. Cir. 2004) (applying *Noerr-Pennington* to state unfair competition claim based on pre-litigation communication alleging patent infringement); *Cheminor Drugs, Ltd. v. Ethyl Corp.*, 168 F.3d 119, 128 (3d Cir. 1999) (affirming dismissal of claims for tortious interference with prospective economic advantages and unfair competition because "[w]e are persuaded that the same First Amendment principles on which *Noerr-Pennington* immunity is based apply to the New Jersey tort claims"); *Jarrow Formulas, Inc. v. Int'l Nutrition Co.*, 175 F. Supp. 2d 296, 310 n.12 (D. Conn. 2001) (stating that *Noerr-Pennington* applies to Connecticut Unfair Trade Practices Act claim alleging that defendant's prior patent infringement litigation violated that statute).

---

[13] The later case elaborating that same principle—and the reason the doctrine is referred to as *Noerr-Pennington*—was *United Mine Workers v. Pennington*, 381 U.S. 657, 669 (1965).

a.    **The *Noerr-Pennington* Doctrine Precludes Liability For Columbia's Alleged Lobbying Activities**

Plaintiffs allege that, shortly before the original Axel patents were due to expire, "Columbia embarked on an aggressive lobbying campaign to obtain special legislation from Congress extending the term of the '216 patent." (AC ¶ 38.) Under the *Noerr-Pennington* doctrine, Columbia can have no liability on account of this "lobbying campaign." In *Noerr*, the Supreme Court observed that it is "inevitable" that attempts to influence legislation could inflict damage on a competitor and that "those conducting the campaign would be aware of, and possibly even pleased by, the prospect of such injury." 365 U.S. at 143. Nevertheless, the Supreme Court concluded that:

> The right of the people to inform their representatives in government of their desires with respect to the passage or enforcement of laws cannot properly be made to depend upon their intent in doing so. It is neither unusual nor illegal for people to seek action on laws in the hope that they may bring about an advantage to themselves and a disadvantage to their competitors.

*Id.* at 139.

Plaintiffs may point out that *Noerr-Pennington* immunity does not apply to "sham" activities. These are "situations in which a publicity campaign, ostensibly directed toward influencing governmental action, is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor[.]" *Noerr*, 365 U.S. at 144. More specifically, "[t]he 'sham' exception . . . encompasses situations in which persons use the governmental *process*—as opposed to the *outcome* of that process—as an anticompetitive weapon." *City of Columbia*, 499 U.S. at 380 (emphasis in original). Thus, a billboard company that set out to obstruct a competitor's business by lobbying for certain zoning ordinances was not engaging in a "sham" unprotected by *Noerr-Pennington*, because "[a]lthough COA indisputably set out to disrupt Omni's business relationships, it sought to do so not through the very process

of lobbying, or of causing the city council to consider zoning measures, but rather through the ultimate *product* of that lobbying and consideration, viz., the zoning ordinances." *Id.* at 381.

Under these principles, plaintiffs' allegations regarding Columbia's lobbying activities fall squarely within the *Noerr-Pennington* doctrine. Plaintiffs do not allege that Columbia was attempting to use a governmental process (as opposed to the outcome of that process) to harass or damage plaintiffs, or that Columbia's lobbying activities were "'not genuinely aimed at procuring favorable government action' at all." *Id.* at 380 (quoting *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 500 n.4 (1988)). To the contrary, plaintiffs allege that the very purpose of Columbia's lobbying efforts was "to persuade Congress to extend the term of the '216 patent[.]" (AC ¶ 39.)

> **b.    The *Noerr-Pennington* Doctrine Precludes Liability Under G.L. 93A For Columbia's Alleged Conduct Before The PTO**

The vast majority of the allegations in the Amended Complaint relate to Columbia's filing and prosecution of the applications leading to the issuance of the original Axel patents and the '275 patent, as well as Columbia's filing and prosecution of its application to reissue the '275 patent. (AC ¶¶ 3, 5, 17, 19-27, 42-48, 53-61, 71.) These activities are protected under the *Noerr-Pennington* doctrine. *See Prof'l Real Estate Investors*, 508 U.S. at 56-57 (extending *Noerr-Pennington* to "the approach of citizens . . . to administrative agencies").

Plaintiffs do not and cannot allege that Columbia's patent prosecution activities fall within the "sham" exception to the *Noerr-Pennington* doctrine. As the Supreme Court has observed, "[a] 'sham' situation involves a defendant whose activities are not genuinely aimed at procuring favorable government action at all, not one who genuinely seeks to achieve his governmental result, but does so *through improper means*[.]" *City of Columbia*, 499 U.S. at 380 (citations and quotation marks omitted). Thus, a defendant whose activities are "directed toward

obtaining governmental action" is protected under the *Noerr-Pennington* doctrine, irrespective of "any anticompetitive purpose [the defendant] may have had." *Noerr*, 365 U.S. at 140.

Here, plaintiffs repeatedly allege that Columbia's patent prosecution activities were part of a "plan . . . to extend the patent monopoly on its cotransformation technology." (AC ¶¶ 42; *see also* AC ¶¶ 22, 43, 57.) Because Columbia's actions were "genuinely aimed at procuring favorable government action," *City of Columbia*, 499 U.S. at 380 (quotation marks omitted), plaintiffs cannot invoke the "sham" exception to *Noerr-Pennington* immunity. As *Noerr* itself makes clear, plaintiffs' allegations of subjective bad faith and anticompetitive purpose do not change this result.

      **c.**    **The *Noerr-Pennington* Doctrine Precludes Liability Under G.L. 93A For Columbia's Defense Of *Biogen I***

The *Noerr-Pennington* doctrine also protects the activities of litigants in the courts. *Prof'l Real Estate Investors*, 508 U.S. at 57. Accordingly, Columbia's conduct in defense of *Biogen I* is protected by the *Noerr-Pennington* doctrine, unless that conduct falls within the "sham" exception. We are not aware of a single case supporting the proposition that a party's *defense of litigation instituted by another* can ever fall within the "sham" exception to the *Noerr-Pennington* doctrine. Indeed, by their very nature, activities that fall within the "sham" exception are *offensive*: They involve petitioning activities that are not genuinely intended to procure a favorable outcome from a governmental entity. It is hard even to imagine a scenario in which a party would *defend* a lawsuit filed against it with utter indifference to its potential liability to the plaintiff.

Not even the Supreme Court envisioned that the "sham" exception would ever be applied to the defense of a lawsuit. When called upon to decide the scope of the "sham" exception "in the litigation context," *Prof'l Real Estate Investors*, 508 U.S. at 51, the Supreme Court

announced a two-part test applicable to the *filing and prosecution of a lawsuit*, not the defense of one. *Id.* at 60-61. The first part of the test addresses the objective merits of the lawsuit: "First, the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits. If an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under *Noerr* . . . ." *Id.* at 60. The second part of the test focuses on the litigant's subjective motivation: "Only if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation. Under this second part of our definition of sham, the court should focus on whether the baseless lawsuit conceals 'an attempt to interfere *directly* with the business relationships of a competitor,' through the 'use [of] the governmental *process*—as opposed to the *outcome* of that process—as an anticompetitive weapon." *Id.* at 60-61 (citations omitted).

Yet even if this two-part test were re-fashioned to apply to the defense of lawsuit, the *Noerr-Pennington* doctrine would still immunize Columbia's litigation conduct.[14] First, plaintiffs nowhere allege that Columbia's defense of *Biogen I* was "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits." 508 U.S. at 60. This is hardly surprising, for Columbia's defense of the '275 patent was supported by over fifty pages of detailed and thoughtful expert reports from Dr. Frances Ruddle, a distinguished professor at Yale University who cited over one hundred peer-reviewed articles in support of his opinion. (Exs. Q and R.) Dr. Ruddle was uniquely qualified to offer an expert opinion on this subject given that, unlike the expert proffered by Biogen and Genzyme, he was working in direct competition with Dr. Axel and his colleagues during the relevant time period. (Ex. Q at 2.) In

---

[14] This test has been applied to state-law tort claims alleging that a patent infringement suit was brought in bad faith. *See, e.g., Honeywell Int'l, Inc. v. Universal Avionics Sys. Corp.*, 343 F. Supp. 2d 272, 324 (D. Del. 2004).

contrast, Biogen and Genzyme offered as an "independent" expert Professor Harvey Lodish, *a founder of Genzyme and a former member of its scientific advisory board*, a critical fact that the plaintiffs carefully concealed from the Court. (Ex. S at 4.)

Instead of alleging that Columbia's defense of *Biogen I* was objectively baseless—i.e., that no objective litigant could conclude that Columbia's defense was "reasonably calculated to elicit a favorable outcome"—plaintiffs take issue with various actions that Columbia took during the course of the litigation. As discussed below, plaintiffs do not and cannot allege that any of those individual actions was objectively baseless:

- Stay of Discovery: Plaintiffs allege that, after they filed suit, Columbia "stalled," "refused to permit discovery," and "sought to stay various cases" while it moved to transfer all of the pending actions to a single district. (AC ¶ 51.) As shown by three judicial opinions entered during that period by two judges, however, Columbia's reluctance to engage in wasteful and duplicative proceedings in seven pending actions was well-founded.[15] In the case initiated by Genentech in the Northern District of California, Judge Walker stayed discovery and administratively terminated a substantive motion brought by Genentech pending a decision on consolidation by the JPML. (Exs. D and T.) Similarly, in the case initiated by Amgen and Immunex in the Central District of California, Judge Pfaelzer denied the plaintiffs' ex parte

---

[15] On a motion to dismiss, a court is "require[d] . . . to consider not only the complaint but also matters fairly incorporated within it and matters susceptible to judicial notice." *In re Colonial Mortgage Bankers Corp.*, 324 F.3d 12, 15 (1st Cir. 2003). Court records and orders entered in a previous related case are properly subject to judicial notice. *Town of Norwood, Mass. v. New England Power Co.*, 202 F.3d 408, 412 n.1 (1st Cir. 2000) (considering court and administrative records in related case on motion to dismiss); *Kowalski v. Gagne*, 914 F.2d 299, 305 (1st Cir. 1990) ("It is well-accepted that federal courts may take judicial notice of proceedings in other courts if those proceedings have relevance to the matters at hand.").

request to initiate their own duplicative discovery in advance of a decision by the JPML on Columbia's motion to transfer.  (Ex. F.)[16]

- Consolidation of All Pending Cases:  Plaintiffs allege that, after filing motions to transfer under 28 U.S.C. § 1404, Columbia "reversed course, abandoned its venue motions, and moved for multidistrict transfer" pursuant to 28 U.S.C. § 1407.  (AC ¶ 51.)  Of course, Columbia "reversed course" only after Judge Pfaelzer in the Central District of California denied Columbia's motion to transfer under section 1404, thus preventing Columbia from achieving consolidation of all cases under that statute.  (Ex. A.)  While plaintiffs appear to suggest otherwise, there was nothing improper about Columbia's motion for centralization of all cases under 28 U.S.C. § 1407.  Indeed, the JPML concluded that centralization was "necessary in order to eliminate duplicative discovery; prevent inconsistent pretrial rulings . . . and conserve the resources of the parties, their counsel and the judiciary."  *In re Columbia Univ. Patent Litig.*, 313 F. Supp. 2d at 1385.

- Motion for Preliminary Injunction:  Biogen and Genzyme appear to take issue with Columbia's filing "numerous papers opposing" their motion to enjoin the termination of their license agreements for non-payment of royalties.  (AC ¶ 2.)  Given that the Court *denied* plaintiffs' motion, *Biogen Idec MA Inc.*, 332 F. Supp. 2d at 302, Columbia clearly did nothing wrong by opposing it.  *Id.*

- Covenant Not to Sue:  Plaintiffs complain about Columbia's filing of a covenant not to sue on the '275 patent as it currently reads, (AC ¶¶ 2, 65, 66), which this Court found eliminated the existence of an actual case or controversy concerning the validity, enforceability

---

[16] Biogen and Genzyme fail to mention that they themselves agreed to stay discovery during the period in which Columbia was seeking centralization of the lawsuits in a single district.

or infringement of the '275 patent.  *In re Columbia Univ. Patent Litig.*, 343 F. Supp. 2d at 47.

No case law suggests that there is anything wrongful about Columbia's decision to abandon any

claim to collect royalties on the '275 patent as it currently reads—and this Court's decision

granting Columbia's motion to dismiss does not suggest otherwise.

- Settlement Discussions:  Plaintiffs allege that Columbia acted improperly "by

attempting to extract settlements from several plaintiffs[.]"  (AC ¶¶ 68, 69.)  There is nothing

improper about engaging in settlement discussions; indeed, this Court has on several occasions

requested that the parties confer to discuss the possibility of settlement.  (Ex. Y at 2; Ex. C at 2;

Ex. G at 199-200; Ex. I at 34-35.)

Second, plaintiffs nowhere allege facts satisfying the second part of the "sham" litigation

test:  Columbia's defense activities were in reality "'an attempt to interfere *directly* with the

business relationships of a competitor,' through the 'use [of] the governmental *process*—as

opposed to the *outcome* of that process—as an anticompetitive weapon[.]"  *Prof'l Real Estate

Investors*, 508 U.S. at 60-61.  Plaintiffs' main complaint is that the conduct described above was

allegedly part of "an ongoing strategy to delay court proceedings that plaintiffs brought to

remedy Columbia's abusive conduct in the Patent Office . . . ."  (AC ¶ 71.)  An alleged strategy

to delay court proceedings—which was not Columbia's strategy at all—comes nowhere close to

meeting the second part of the "sham" litigation test.  Plaintiffs do not and cannot allege that

Columbia intended to harm them through the 'use [of] the governmental *process*—as opposed to

the *outcome* of that process—as an anticompetitive weapon."  Indeed, to make such an

allegation, plaintiffs would need to take the outrageous position that all of Columbia's court

filings in *Biogen I* were made with complete indifference to the merits of the issues in dispute

and, instead, were intended to exploit the litigation process as "an anticompetitive weapon"

solely to harm plaintiffs.   Not even plaintiffs can bring themselves to level such an incredible allegation against Columbia.  Moreover, plaintiffs do not and cannot allege that any of Columbia's litigation conduct was intended to "*interfere directly*" with any of plaintiffs' business relationships.   The Amended Complaint does not identify any litigation conduct that was purportedly intended to harm—or in fact harmed—any of Biogen and Genzyme's business relationships.

In sum, plaintiffs cannot meet either part of the test for "sham" litigation—assuming that the defense of a lawsuit can even fall within the "sham" exception.  Accordingly, Columbia's actions in defending the claims asserted in *Biogen I* are protected by the *Noerr-Pennington* doctrine.

### d.    The *Noerr-Pennington* Doctrine Precludes Liability for Columbia's Alleged Efforts to "Enforce" The '275 Patent

Biogen and Genzyme allege that Columbia sought to "enforce" the '275 patent by notifying them that the "issuance of the '275 patent had triggered the obligation to pay royalties under their License Agreements," (AC ¶ 49), and by sending letters to them "asserting that they were in breach of their License Agreements and stating its intention to terminate the licenses for non-payment of royalties under the '275 patent," (AC ¶ 62).  These actions, too, are protected by the *Noerr-Pennington* doctrine.

The patent laws grant Columbia a right to inform parties of the existence of its patent rights and their obligations thereunder, *Golan v. Pingel Enter., Inc.*, 310 F.3d 1360, 1370 (Fed. Cir. 2002), unless the positions asserted in those communications are objectively baseless. *Globetrotter Software*, 362 F.3d at 1377.  Plaintiffs do not and cannot allege that the positions asserted in Columbia's communications were objectively baseless.  Indeed, to the contrary, Columbia's communications were entirely accurate.  The first communication (AC ¶ 49)

accurately informed Biogen and Genzyme that the '275 patent had issued and that it was a

"Licensed Patent Right" under their license agreements.  (Exs. U and V.)   The second

communication (AC ¶ 62) accurately informed Biogen and Genzyme that they had failed to pay

royalties under the '275 patent and that their license agreements were subject to termination for

this material breach.  (Exs. W and X.)[17]  This Court has itself confirmed that the '275 patent is a

"Licensed Patent Right," that the plaintiffs' license agreements required them to pay royalties

thereunder, and that the nonpayment of royalties constitutes material breach.  *In re Columbia*

*Univ. Patent Litig.,* 332 F. Supp. 2d at 293.  Because a patentee's objectively accurate statements

are immune from suit, *Golan,* 310 F.3d at 1371, plaintiffs cannot rely upon Columbia's

communications in support of their G.L. 93A claim.

> **2.     Wholly Apart From *Noerr-Pennington* Immunity, Plaintiffs' Allegations Do Not State A Claim Under G.L. 93A**

>> **a.     The Court Should Dismiss Plaintiffs' G.L. 93A Claim Because It Is Not Based On Conduct That Occurred "Primarily And Substantially" Within Massachusetts**

"No action shall be brought or maintained under [G.L. 93A] unless the actions and

transactions constituting the alleged unfair method of competition or the unfair or deceptive act

or practice occurred primarily and substantially within the commonwealth."  G.L. 93A, § 11.

When applying this statutory requirement, a court must "determine whether the center of gravity

of the circumstances that give rise to the claim is primarily and substantially within the

Commonwealth."  *Kuwaiti Danish Computer Co. v. Digital Equip. Corp.*, 781 N.E.2d 787, 799

(Mass. 2003); *see also Kenda Corp. v. Pot O'Gold Money Leagues, Inc.*, 329 F.3d 216, 235 (1st

Cir. 2003) (quoting *Kuwaiti Danish*, 781 N.E.2d at 799.  Plaintiffs' G.L. 93A claim must be

---

[17] Because plaintiffs rely upon these documents in their Amended Complaint, they are
properly subject to judicial notice.  *See infra* at n. 10.

dismissed because the "center of gravity of the circumstances" alleged in plaintiffs' Amended Complaint did not occur "primarily and substantially" within Massachusetts.

Plaintiffs' G.L. 93A claim is principally based on (1) Columbia's activities while prosecuting the applications that matured into the original Axel patents, the '275 patent, and the '636 patent, as well as Columbia's actions with respect to the request for reexamination and the reissue application; and (2) Columbia's lobbying activities before Congress. Plaintiffs' description of these activities—which spanned nearly twenty-two years—comprises the vast majority of the factual allegations in the Amended Complaint. (*See* AC ¶¶ 3-5, 17, 19-27, 38-48, 53-61, 71.)

None of those activities occurred in Massachusetts. They occurred either in New York, where Columbia is located, Virginia, where the PTO is located, or Washington, D.C., where Congress is located. While the Amended Complaint includes a single-sentence allegation that "Columbia's unfair and deceptive acts and practices occurred primarily and substantially within Massachusetts," (AC ¶ 90), plaintiffs offer no factual support for this proposition. This Court, of course, can take judicial notice of the location of Columbia, the PTO, and Congress, and can disregard a contrary, unsupported allegation when ruling on this motion to dismiss. *See United States v. Bello*, 194 F.3d 18, 23-24 (1st Cir. 1999) (court took judicial notice of prison location, despite disputed testimony, because "[g]eography has long been peculiarly susceptible to judicial notice for the obvious reason that geographic locations are facts which are not generally controversial") (quotation marks omitted); *see also United States v. Benson*, 495 F.2d 475, 481 n.8 (5th Cir. 1974) (finding that locations of government buildings and institutions are subject to judicial notice).

The conduct that plaintiffs suggest took place in Massachusetts relates to a narrow series of events leading to, or occurring during, the litigation of *Biogen I*. In total, that conduct amounts to (1) Columbia's correspondence notifying plaintiffs of the existence of the '275 patent, (AC ¶ 49), informing plaintiffs that their license agreements would be terminated for non-payment of royalties, (AC ¶ 62), and subsequently withdrawing the notices of termination, (AC ¶ 67); and (2) Columbia's filing of various papers in the District of Massachusetts (AC ¶¶ 51, 55, 63, 65-66, 70.). Plaintiffs' allegations regarding this litigation-related conduct hardly could be characterized as the "center of gravity" of plaintiffs' G.L. 93A claim. This conduct spans a short period of less than three years, in contrast to the twenty-four years of patent prosecution activities upon which plaintiffs rely to support their claim that the '275 patent is invalid and unenforceable (as well as Columbia's continuing activities with respect to the '159 application, the reexamination request, and the reissue application). Moreover, all of the allegations regarding this litigation-related conduct derive from—and are asserted to be wrongful only because of—plaintiffs' claim that the '275 patent is invalid and unenforceable. Indeed, Count III expressly recites the allegation that the '275 patent is invalid and unenforceable, (AC ¶ 88), and relies upon that allegation when describing the manner in which plaintiffs' rights were purportedly impaired, (*id*. ¶ 89).

It is irrelevant that plaintiffs allege that they suffered unspecified harm in Massachusetts from Columbia's out-of-state activities. It is the locus of the conduct, not the location of the alleged harm, that counts. *Henry v. Nat'l Geographic Soc'y*, 147 F. Supp. 2d 16, 22-23 (D. Mass. 2001) (no basis for G.L. 93A claim where location of deceptive conduct was Washington, D.C. and only nexus to Massachusetts was that plaintiff resided in Massachusetts and allegedly

suffered damages there).  Because the conduct upon which Count III is based did not occur

"primarily and substantially" within Massachusetts, Count III must be dismissed.

> **b.**      **The Only Alleged Conduct That Occurred "Primarily And Substantially" Within Massachusetts Is Insufficient To State A Claim Under G.L. 93A**

While Columbia believes that plaintiffs' entire G.L. 93A claim should be dismissed

because it is not based upon conduct occurring "substantially and primarily" within

Massachusetts, Columbia respectfully submits that, at the very least, the Court should dismiss the

G.L. 93A claim to the extent it is based on conduct that plainly occurred outside of the

Commonwealth—namely, Columbia's actions before the PTO, and Columbia's lobbying efforts

before Congress.  It would be improper to extend the reach of G.L. 93A to regulate a New York

citizen's conduct before an administrative agency located in Virginia and a legislative body

located in Washington, D.C.

If the non-Massachusetts conduct is eliminated from the G.L. 93A claim, the only

remaining allegations supporting this claim are (1) Columbia's "enforcement" of the '275 patent

through its correspondence with Biogen and Genzyme; and (2) Columbia's litigation conduct

within the District of Massachusetts.  As discussed below, those allegations are plainly

inadequate as a matter of law to state a claim for relief under G.L. 93A.

> **(1)**      **Plaintiffs' Allegations That Columbia Wrongfully Terminated Their License Agreements Cannot Support Their G.L. 93A Claim**

Plaintiffs allege that Columbia wrongfully asserted that they owed royalties under the

'275 patent and then wrongfully terminated their license agreement for non-payment of those

royalties.  (AC ¶ 62.)  For conduct to violate G.L. 93A, "it must . . . be immoral, unethical,

oppressive, or unscrupulous[.]"  *Serpa Corp. v. McWane, Inc.*, 199 F.3d 6, 15 (1st Cir. 1999)

(quotation marks omitted).  "It is well established that the 'simple fact that a party knowingly

breached a contract does not raise the breach to the level of a Chapter 93A violation,'" *Interstate Brands Corp. v. Lily Transp. Corp.*, 256 F. Supp. 2d 58, 61 (D. Mass. 2003) (quoting *Ahern v. Scholz*, 85 F.3d 774, 798 (1st Cir. 1996)), even if the breach was "deliberate and for reasons of self-interest." *Atkinson v. Rosenthal*, 598 N.E.2d 666, 670-71 (Mass. App. Ct. 1992).

The only breach of contract claim that will survive this motion to dismiss is the allegation that Columbia breached section 3(j) of the license agreements by not offering Biogen and Genzyme more favorable terms purportedly given to other licensees. That allegation is nothing more than a garden-variety contract claim. It depends upon the interpretation of section 3(j) and an analysis of the license agreements signed with other companies. The remedy sought is money damages—the benefit of the more favorable terms allegedly given to other licensees. The claim utterly lacks the "immoral, unethical, oppressive, or unscrupulous" conduct necessary to bring it within the ambit of G.L. 93A.

### (2) Plaintiffs' Allegations Regarding Columbia's Litigation Conduct Cannot Support Their G.L. 93A Claim

To establish liability under G.L. 93A, plaintiffs must establish that Columbia engaged in "an unfair or deceptive act or practice." G.L. 93A, § 11. "'Although whether a particular set of acts, in their factual setting, is unfair or deceptive is a question of fact, . . . the boundaries of what may qualify for consideration as a c. 93A violation is a question of law.'" *Darviris v. Petros*, 795 N.E.2d 1196, 1200 (Mass. App. Ct. 2003) (quoting *Shepard's Pharmacy, Inc. v. Stop & Shop Cos.*, 640 N.E.2d 1112, 1115 (Mass. App. Ct. 1994)). Plaintiffs' allegations concerning Columbia's defense of *Biogen I* fall far outside the boundaries of a G.L. 93A claim.

In order to demonstrate "unfair" or "deceptive" acts under G.L. 93A, plaintiffs must show that Columbia's conduct "(1) [fell] within the penumbra of some common-law, statutory, or other established concept of unfairness; (2) [was] immoral, unethical, oppressive, or

unscrupulous; and (3) cause[d] substantial injury to [other businessman]." *Serpa Corp.*, 199 F.3d at 15 (quotation marks omitted). Moreover, an even higher threshold applies where, as here, plaintiffs are sophisticated commercial entities. *Anthony's Pier Four, Inc. v. HBC Assocs.*, 583 N.E.2d 806, 822 (Mass. 1991) ("[A] claimant [experienced in business] would have to show greater rascality than would a less sophisticated party.")

Columbia's efforts to defend itself in *Biogen I* cannot as a matter of law meet this standard. As discussed in Section C(1)(c), *supra*, there was nothing wrongful—let alone "immoral, unethical, oppressive, or unscrupulous"—about any of Columbia's litigation conduct in *Biogen I*. The crimes of which Columbia is accused amount to no more than successfully moving to prevent wasteful and duplicative discovery while awaiting a ruling on its motion to transfer, successfully moving to consolidate seven related actions in a single forum (over the strong objections of every plaintiff in every case), successfully opposing Biogen and Genzyme's motion to enjoin the termination of their license agreements, and successfully moving to dismiss plaintiffs' declaratory relief claims after granting them a covenant not to sue that relieved them of any obligation to pay royalties under the '275 patent as it currently reads. It would be absurd to describe these litigation successes as "unfair" or "deceptive" acts.

While plaintiffs accuse Columbia of "manipulat[ing] the court system for the purpose of delaying judicial scrutiny of its new patent," (AC ¶ 2), in truth plaintiffs have only themselves to blame for any delay in these proceedings. Between April and November 2003, twelve parties filed seven separate actions spread among four judicial districts. From the outset, Columbia sought to centralize all of the related cases in a single district for consolidated proceedings to avoid duplicative discovery, conserve judicial resources, and prevent potentially inconsistent rulings. Instead of cooperating with these efforts, every plaintiff—including Biogen and

Genzyme—fought those efforts, preferring instead to fragment the litigation among multiple

lawsuits in multiple forums—thereby multiplying the burden and cost of litigation for Columbia.

As a result, Columbia was forced to engage in expensive motion practice to centralize these

actions in a single forum, a process that plaintiffs bitterly fought over a number of months.

There is no basis in law or logic for plaintiffs' attempt to rely upon Columbia's defense

of *Biogen I* to manufacture a claim under G.L. 93A.  Count III should be dismissed with

prejudice.

### III.    As An Alternative To Dismissal Of Count III, The Court Should Require Plaintiffs To Provide A More Definite Statement Pursuant to Rule 12(e)

If the Court finds it virtually impossible (as does Columbia) to discern from the Amended

Complaint the specific conduct that allegedly constitutes the "unfair" or "deceptive" acts that

purportedly violate G.L. 93A, Columbia respectfully requests that, in the alternative, the Court

require plaintiffs to amend Count III to provide a more definite statement.  Under Rule 12(e) of

the Federal Rules of Civil Procedure, "[i]f a pleading . . . is so vague or ambiguous that a party

cannot reasonably be required to frame a responsive pleading, the party may move for a more

definite statement before interposing a responsive pleading."  Fed. R. Civ. P. 12(e).  *See also*

*Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002) ("If a pleading fails to specify the

allegations in a manner that provides sufficient notice, a defendant can move for a more definite

statement under Rule 12(e) before responding.").[18]

One particular vice that renders a complaint subject to a Rule 12(e) motion is the

indiscriminate incorporation of all preceding paragraphs of a complaint into each claim for relief,

---

[18] It is permissible (and, indeed, quite common) for a defendant to move in the alternative for relief under Rule 12(b)(6) or Rule 12(e).  5C Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure Civ.* § 1376 (3d ed. 2004) ("[C]hallenges to a pleading often request relief under Rule 12(b)(6) and 12(e) in the alternative.")

irrespective of whether those paragraphs in any way support that particular claim.  Such

scattershot pleading makes it "virtually impossible to know which allegations of fact [were]

intended to support which claim(s) for relief."  *Anderson v. Dist. Bd. of Trustees of Cent. Florida*

*Comm. Coll.*, 77 F.3d 364, 366 (11th Cir. 1996).  Accordingly, "a defendant faced with a

complaint such as Anderson's is not expected to frame a responsive pleading.  Rather, the

defendant is expected to move the court, pursuant to Rule 12(e), to require the plaintiff to file a

more definite statement."  *Id.*; *see also In re Sriberg*, 49 B.R. 80, 81 (Bankr. D. Mass. 1984)

(granting motion for a more definite statement where the portion of the complaint elaborating the

claims recited only general grounds for relief and there was no indication of which occurrences

recounted in the "Background" section were intended to support the individual claims).

      Plaintiffs' G.L. 93A claim is just as imprecise as the claims in *Anderson* and *Sriberg*.

The claim does not allege any specific conduct on Columbia's part that was purportedly "unfair"

or "deceptive" within the meaning of G.L. 93A; it merely incorporates every preceding

paragraph by stating that "Columbia's acts, as described [in paragraphs 1 through 86 of the

Amended Complaint], constitute unfair and deceptive acts and practices."  (AC ¶ 87.)  There is

no indication of what particular allegations in those eighty-six paragraphs support this claim, nor

any explanation about why any particular allegations in those paragraphs constitute "unfair" or

"deceptive" conduct within the meaning of G.L. 93A.  Moreover,  as in *Anderson*, the G.L. 93A

claim inexplicably incorporates the allegations of all preceding claims—here, abuse of process

and breach of contract—without any indication why those claims are a predicate to G.L. 93A

liability.  As in *Anderson* and *Sriberg*, Columbia is "not expected to frame a responsive

pleading" in these circumstances, even if the Court declines to dismiss that claim.  *Anderson*, 77

F.3d at 366.  At the very least, Rule 12(e) requires plaintiffs to specify which of their allegations

constitute "unfair" or "deceptive" practices for purposes of G.L. 93A.

## <u>CONCLUSION</u>

For the foregoing reasons, Columbia respectfully requests that the Court grant this

motion to dismiss.[19]

January 14, 2005                                     Respectfully submitted,

                                                     THE TRUSTEES OF COLUMBIA
                                                     UNIVERSITY IN THE CITY OF NEW YORK

                                                     By its attorneys,

                                                      /s/ David I. Gindler_____
                                                     David I. Gindler
                                                     Irell & Manella LLP

---

[19] Count VIII seeks a declaration of exceptional case pursuant to 35 U.S.C. § 285.
Because all of plaintiffs' patent-related claims must be dismissed, plaintiffs can no longer
maintain their § 285 claim.  *See  In re Columbia Univ. Patent Litig.*, 343 F. Supp. 2d at 49
(dismissing § 285 claim upon dismissal of patent-related claims).   The court should therefore
dismiss this claim.

1237908                                        - 43 -