UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

BIOGEN IDEC INC., BIOGEN IDEC MA,
INC. and GENZYME CORPORATION,

                    Plaintiffs,

         v.                                        CIVIL ACTION No. 04-CV-12009-MLW

THE TRUSTEES OF COLUMBIA
UNIVERSITY IN THE CITY OF NEW
YORK,

                    Defendant.

**PLAINTIFFS' OPPOSITION TO COLUMBIA'S (1) PARTIAL MOTION TO DISMISS
UNDER RULE 12(B)(1) FOR LACK OF SUBJECT MATTER JURISDICTION
AND (2) PARTIAL MOTION TO DISMISS UNDER RULE 12(B)(6)
FOR FAILURE TO STATE A CLAIM**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ iii

INTRODUCTION ............................................................................................................. 1

ARGUMENT ................................................................................................................... 2

I.    THIS COURT HAS JURISDICTION TO HEAR BIOGEN IDEC'S
DECLARATORY JUDGMENT CLAIMS. .............................................................. 3

    A.    Factual Background. ...................................................................................... 3

    B.    Columbia's Conduct Creates An Actual Controversy. ................................. 7

        1.    Columbia Concedes That Biogen Idec Has Engaged In Activity That
Potentially Infringes The '275 Patent. ........................................... 8

        2.    Columbia's Suggestion That It Does Not Want To Sue Biogen Idec
For Patent Infringement Until A Later Date Does Not Eliminate The
Actual Controversy. ........................................................................ 8

        3.    The Totality of Columbia's Conduct Has Created A Reasonable
Apprehension Of Suit. ................................................................... 15

    C.    This Court Should Exercise Its Jurisdiction To Resolve This Actual
Controversy. ............................................................................................. 18

    D.    Plaintiffs' Claim Of Patent Misuse Should Not Be Dismissed, Because
Plaintiffs May Be Entitled To Relief Beyond A Declaratory Judgment On
That Claim. ............................................................................................... 19

II.    COLUMBIA'S MOTION TO DISMISS UNDER RULE 12(b)(6) MUST BE
DENIED. ............................................................................................................. 20

    A.    Plaintiffs Have Stated A Claim For Abuse Of Process. ............................ 21

    B.    Plaintiffs Have Stated Claims For Breach Of Contract. ........................... 24

        1.    Plaintiffs Have Adequately Pleaded Wrongful Termination Of The
License Agreements. ..................................................................... 24

        2.    Columbia's Termination Of The Licenses Was A Violation Of The
Implied Covenant Of Good Faith And Fair Dealing. ..................... 26

        3.    Plaintiffs Have Sufficiently Pleaded Breach Of Columbia's
Obligation Not To Engage In Repressive Tactics. ......................... 29

C.     Plaintiffs Have Stated A Claim Under M.G.L. Chapter 93A.............................. 32

    1.    Plaintiffs Allege Facts Sufficient To Make Out A Claim That Columbia's Conduct Was Unfair Or Deceptive. ..................................... 33

    2.    The *Noerr-Pennington* Antitrust Immunity Doctrine Does Not Shield Columbia From c. 93A Liability............................................................. 34

         a.    **Noerr-Pennington Immunity Is Not Available As A Defense To A Claim Under M.G.L. c. 93A.** ............................ 35

         b.    **The Conduct That Columbia Claims Is Immunized From Suit Does Not Fall Within the Scope of Noerr-Pennington Doctrine.** ................................................................................... 37

    3.    Columbia's Alleged Conduct Occurred Primarily And Substantially In Massachusetts. .................................................................... 40

    4.    Columbia's Motion For A More Definite Statement Of Plaintiffs' M.G.L. c. 93A Claim Should Be Denied. ................................................ 42

CONCLUSION ............................................................................................... 44

# TABLE OF AUTHORITIES

## Cases

*Adirondack Cmty. Coll.,* 784 N.Y.S 2d 663 (N.Y. App. Div. 2004) ...........................................27

*Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227 (1939)....................................................................7

*Analog Devices, Inc. v. Allied Van Lines, Inc.*, C.A. No. 95-10879, 1996 WL 208463
   (D. Mass. Mar. 21, 1995) ...................................................................................... 20, 21

*Anderson v. Dist. Bd. of Trustees of Cent. Fl. Comm. College*, 77 F.3d 364
   (11th Cir. 1996).................................................................................................................44

*Anthony's Pier Four, Inc. v. HBC Assocs.*, 583 N.E.2d 806 (Mass. 1991) .............. 27, 28, 29, 34

*Arrowhead Indus. Water, Inc. v. Ecolochem, Inc.*, 846 F.2d at 731 (Fed. Cir. 1988) ........... passim

*B. Braun Medical, Inc. v. Abbott Labs.*, 124 F.3d 1419 (Fed. Cir. 1997)....................................20

*Beery v. Hitachi Home Elecs. (Am.), Inc.*, 157 F.R.D. 477 (C.D. Cal. 1993)..............................43

*Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found.*, 402 U.S. 313 (1971) ...................................12

*Brooks v. Harding*, C.A. No. IP98-1200-C-T/G, 2001 WL 548098 (S.D. Ind.
   Mar. 30, 2001) ...................................................................................................................22

*BP Chemicals Ltd. v. Union Carbide Corp.*, 4 F.3d 975 (Fed. Cir. 1993) ...................................17

*C.R. Bard, Inc. v. Schwartz*, 716 F.2d 874 (Fed. Cir. 1983) ......................................... 11, 15, 16

*Cablevision of Boston, Inc. v. Public Improvement Comm'n of the City of Boston.*,
   38 F. Supp. 2d 46 (D. Mass. 1999) ................................................................................ 33, 34

*CAE Screenplates, Inc. v. Beloit Corp.*, 957 F. Supp. 784 (E.D. Va. 1997)................................17

*California Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508 (1972) ...............................36

*Capo, Inc. v. Dioptics Med. Prods. Inc.*, 387 F.3d 1352 (Fed. Cir. 2004)...................................18

*Cardtoons, L.C. v. Major League Baseball Players Assoc.*, 208 F.3d 885
   (10th Cir. 2000) .................................................................................................................41

*Centronics Corp. v. Genicom Corp.*, 562 A.2d 187 (N.H. 1989)..........................................27, 28

*Christopher v. Glen-Mor Fuel Oil Co.*, 1996 WL 1185129 (Mass. Super. Ct.
   Nov. 8, 1996).....................................................................................................................29

*Ciardi v. Hoffman-La Roche, Ltd.*, 762 N.E.2d 303 (Mass. 2002)...............................................37

*Cignetti v. Healy*, 967 F. Supp. 10 (D. Mass. 1997)....................................................22

*Clinton Hospital Ass'n v. Corson Group, Inc.*, 907 F.2d 1260 (1st Cir. 1990).....................41, 42

*In re Columbia Univ. Patent Litig.*, 343 F. Supp. 2d 35 (D. Mass. 2004)..............................5, 19

*In re Columbia Univ. Patent Litig.*, 330 F. Supp. 2d 12 (D. Mass. 2004).....................................6

*Conley v. Gibson*, 355 U.S. 41 (1957) ...................................................................20

*Cordis Corp. v. Medtronic, Inc.*, 780 F.2d 991 (Fed. Cir. 1985) ...............................26

*Davox Corp. v. Digital Sys. Int'l, Inc.*, 846 F Supp. 144 (D. Mass. 1993) ...................................19

*DeCapua v. Dine-A-Mate, Inc.*, 292 A.D.2d 489 (N.Y. App. Div. 2002) ...................................26

*Dewey & Almy Chem. Co. v. Am. Anode*, 137 F.2d 68 (3d Cir. 1943)....................................6, 17

*Dr. Reddy's Labs., Ltd. v. aaiPharma Inc.*, No. 01 Civ. 10102(LAP), 2002
     WL 31059289 (S.D.N.Y Sept. 13, 2002)...............................................................17

*Eastern R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961).....................36

*Electronics for Imaging, Inc. v. Coyle*, 394 F.3d 1341 (Fed. Cir. 2005) ...................11, 14, 18, 19

*EMC Corp. v. Norand Corp.*, 89 F.3d 807 (Fed. Cir. 1996)...............................................10, 18

*Estate of Lennon v. Leggoons, Inc.*, No. 95 Civ. 8872 (HB), 1997 WL 346733
     (S.D.N.Y. June 23, 1997)..............................................................................26

*F. Garofalo Electric Co., Inc. v. Hartford Fire Ins. Co.*, 799 F. Supp. 8
     (E.D.N.Y. 1992)........................................................................................31

*Fina Research, S.A. v. Baroid Ltd.*, 141 F.3d 1479 (Fed. Cir. 1998) .......................................7, 10

*Genentech, Inc. v. Eli Lilly & Co.*, 998 F.2d 931 (Fed. Cir. 1993) .......................................18, 19

*General Elec. Co. v. Lyon*, 894 F. Supp. 544 (D. Mass. 1995) .............................................24

*General Refractories Co. v. Fireman's Fund Ins. Co.*, 337 F.3d 297 (3d Cir. 2003) .................22

*Glaxo Wellcome, Inc. v. Pharmadyne Corp.*, Civ. No. AMD-96-455, 1996 WL 432290
     (D. Md. Apr. 4, 1996) ................................................................................11

*Goodyear Tire & Rubber Co. v. Releasomers*, 824 F.2d 953 (Fed. Cir. 1987).....................11, 15

*Guckenberger v. Boston Univ.*, 957 F. Supp. 306 (D. Mass. 1997) .............................................24

*Guerini Stone Co. v. P.J. Carlin Construction Co.*, 240 U.S. 264 (1916) .................................31

*In re Gulf Oil/Cities Serv. Tender Offer Litig*, 725 F. Supp. 712 (S.D.N.Y. 1989) ....................31

*Gutierrez v. Mass. Bay Transp. Auth.*, 772 N.E.2d 552 (Mass. 2002) .........................................21

*Harmon v. Adirondack Cmty. Coll.*, 784 N.Y.S.2d 663, 664 (N.Y. App. Div. 2004)..................27

*Hendrickson v. Sears*, 310 N.E.2d 131 (Mass. 1974) ...................................................................29

*Ingram v. Rencor Controls, Inc.*, 217 F. Supp. 2d 141 (D. Me. 2002).........................................20

*Int'l Harvester Co. v. Deere & Co.*, 623 F.2d 1207 (7th Cir. 1980) .....................................17, 18

*Ion Beam Applications*, 156 F. Supp. 2d 552 (E.D. Va. 2000) ....................................................16

*Israel v. Alexander*, 50 F. Supp. 1007 (S.D.N.Y 1942) ...............................................................29

*Jones v. Brockton Pub. Mkts.*, 340 N.E.2d 484 (Mass. 1975).....................................................22

*Kattar v. Demoulas*, 739 N.E.2d 246 (Mass. 2000) .....................................................................36

*Kirke La Shelle Co. v. Paul Armstrong Co.*, 188 N.E. 163 (N.Y. 1933) .....................................27

*Kuwaiti Danish Computer Co. v. Digital Equip. Corp.*, 781 N.E.2d 787
    (Mass. 2003) .........................................................................................................................41, 42

*Lawson v. Affirmative Equities Corp.*, 341 F. Supp. 2d 51 (D. Mass. 2004).............................44

*Luckett v. Bure,* 290 F.3d 493 (2d Cir. 2002).................................................................................8

*Luke Bros., Inc. v. Krusell*, C.A. No. 94-11701, 1996 WL 50965 (D. Mass.
    Jan. 30, 1996)..............................................................................................................................22

*Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270 (1941) ...................................................7, 12

*Minn. Mining & Mfg. Co. v. Norton Co.*, 929 F.2d 670 (Fed. Cir. 1991)................................9, 18

*National Westminster Bank, PLC v. Grant Prideco, Inc.*, 261 F. Supp. 2d 265
    (S.D.N.Y. 2003).........................................................................................................................31

*New Amsterdam Cas. Co. v. Stecker*, 143 N.E.2d 357 (N.Y. 1957 .............................................30

*Newell Cos., Inc. v. Kenney Mfg. Co.*, 864 F. 2d 757 (Fed. Cir. 1988) .......................................13

*Newin Corp. v. Hartford Accident & Indemnity Co.*, 333 N.E.2d 163 (N.Y. 1975) ...................32

*In re Network Equip. Tech., Inc. Litig.*, 762 F. Supp. 1359 (N.D. Cal. 1991) ......................39, 40

*Nienstedt v. Wetzel*, 651 P.2d 876 (Ariz. Ct. App. 1982) ........................................... 22

*Pelham Parkway Corp. v. Rusciano & Son Corp.*, 565 N.Y.S.2d 843
   (N.Y. App. Div. 1991) ........................................................................................ 33

*Pepsi-Cola Metro. Bottling Co. v. Checkers, Inc.*, 754 F.2d 10 (1st Cir. 1985) .......... 34

*Professional Real Estate Investors Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49
   (1993) .................................................................................................................. 37

*Quaker State Oil Refining Corp. v. Garrity Oil Co.*, 884 F.2d 1510 (1st Cir. 1989) .................. 34

*Raytheon Co. v. Continental Cas. Co.*, 123 F. Supp. 2d  22 (D. Mass. 2000) ...................... 43, 44

*Rehart v. Clark*, 448 F.2d 170 (9th Cir. 1971) .......................................................... 30

*Robinson v. Union Pac. R.R.*, 245 F.3d 1188 (10th Cir. 2001) .................................... 8

*Roeder v. Alpha Indus., Inc.*, 814 F.2d 22 (1st Cir. 1987) .......................................... 20

*Roma Constr. Co. v. aRusso*, 96 F.3d 566 (1st Cir. 1996) ........................................ 20

*Scarfato v. Nat'l Cash Register Corp.*, 830 F. Supp. 1441 (M.D. Fla. 1993) .............................. 43

*Schubach v. Household Fin. Corp.*, 375 Mass. 133, 137 (1978) ........................................... 34, 37

*Schubach v. Household Finance Corp.*, 376 N.E.2d 140 (Mass. 1978) ......................... 34, 36, 37

*Seaver v. Ransom*, 120 N.E. 639 (N.Y. 1918) .......................................................... 31

*Sebago, Inc. v. Beazer East, Inc.*, 18 F. Supp. 2d 70 (D. Mass. 1998) ........................... 35, 38, 39

*Shell Oil Co. v. Amoco Corp.*, 970 F.2d 885 (Fed. Cir. 1992) .................................... 17

*Shore v. Cornell-Dubilier Elec. Corp.* 33 F.R.D. 5 (D. Mass. 1963) .......................... 43

*Sierra Applied Scis., Inc. v. Energy Indus., Inc.*, 363 F.3d 1361 (Fed. Cir. 2004) .................. 8, 12

*Simon v. Navon*, 71 F.3d 9 (1st Cir. 1995) ................................................................ 22

*Skandia Am. Reinsurance Corp. v. Schenk*, 441 F. Supp. 715 (S.D.N.Y. 1977) ......................... 30

*Skinder-Strauss Assocs. v. Mass. Continuing Legal Ed., Inc.*, 870 F. Supp. 8
   (D. Mass. 1994) ...................................................................................... 37, 38, 40

*In re Sriberg*, 49 B.R. 80 (Bankr. D. Mass. 1984) .................................................... 44

*Sutton v. United States*, 819 F.2d 1289 (5th Cir. 1987) ............................................. 40

*Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002)...............................................................43, 44

*Telectronicsm Pacing Sys., Inc. v. Ventritex, Inc.*, 982 F.2d 1520 (Fed. Cir. 1992) ....................12

*Teva Pharmaceuticals USA, Inc. v. Pfizer, Inc.*, No. 04-1186, 2005 WL 119890
    (Fed. Cir. Jan. 21, 2005)...................................................................................................11-12

*Texas Instruments, Inc. v. Cypress Semiconductor Corp.*, 90 F.3d 1558
    (Fed. Cir. 1993)........................................................................................................................13

*Treemond Co. v. Schering Corp.*, 122 F.2d 702 (3d Cir. 1941)....................................................17

*Trs. of Columbia Univ. v. Roche Diagnostics GmbH*, 272 F. Supp. 2d 90
    (D. Mass. 2002) ...................................................................................................................4, 13

*Trs. of Columbia Univ. v. Roche Diagnostics GmbH*, 126 F. Supp. 2d 16
    (D. Mass. 2000) .......................................................................................................................13

*United Mine Workers v. Pennington*, 381 U.S. 657 (1965) ........................................................36

*United Sweetener USA, Inc. v. Nutrasweet Co.*, 760 F. Supp. 400 (D. Del. 1991).................9, 10

*Vanguard Research, Inc. v. Peat, Inc.*, 304 F.3d 1249 (Fed. Cir. 2002) .....................................10

*Viking Injector Co. v. Chemtron, Inc.*, No. 3:CV-93-0791, 1993 WL 625543
    (M.D. Pa. Nov. 9, 1993)..........................................................................................................17

*Wilton v. Seven Falls Co.*, 515 U.S. 277 (1995).........................................................................18

*Workgroup Tech. Corp. v. MGM Grand Hotel, LLC.*, 246 F. Supp. 2d 102
    (D. Mass. 2003) .......................................................................................................................42

## Statutes

45 C.F.R. § 8.1(b) (1980)..............................................................................................................30

45 C.F.R. § 8.2(b) (1980)..............................................................................................................30

M.G.L. chapter 93A ..............................................................................................................passim

## Rules

Fed. Cir. R. 35(a)(2)......................................................................................................................13

Fed. R. Civ. P. 12(e) ...............................................................................................................43, 44

Fed. R. Civ. P. 9(b) .......................................................................................................................44

Fed. R. Evid. 201(b).................................................................................................9

Rule 12(b)(1) .........................................................................................................2

Rule 12(b)(6) ...................................................................................................passim

 Fed. R. Civ. P. 33(c) .............................................................................................43

## Treatises

Charles Alan Wright et al., *Federal Practice and Procedure* (3d ed. 1998) ...............................11

## INTRODUCTION

Over the past two decades, Columbia University collected hundreds of millions of dollars from patents covering recombinant DNA technology developed in the 1970s by Richard Axel and others. When Columbia's patent rights expired in 2000, it sought continued leverage to maintain the royalty stream on which it had come to rely, first by lobbying Congress for a patent extension, then – when that plan failed – by fraudulently prosecuting to issuance another patent on its decades-old technology, U.S. Patent No. 6,455,275 (the "'275 patent").

Leading biotechnology companies from around the country, including plaintiffs Biogen Idec MA, Inc. ("Biogen") and Genzyme Corporation ("Genzyme"), sought a declaration of the '275 patent's invalidity and unenforceability. These cases were consolidated in a single multidistrict proceeding in this Court. Faced with plaintiffs' challenge to its patent, Columbia put minimal effort into defending the patent on its merits and instead devoted its energies to filing claims and counterclaims for breach of contract, terminating licenses, attempting to delay the judicial proceedings indefinitely, and other tactics designed to extract every last dollar from the patent before it could be adjudged invalid and unenforceable.

When it became clear that this Court was likely to invalidate the '275 patent, Columbia abruptly reversed course and produced a covenant not to sue in which it ultimately gave up most of its rights vis-à-vis the plaintiff companies in order to obtain dismissal of their declaratory judgment claims and avoid having to defend the '275 patent before this Court. However, Columbia expressly excluded from its covenant the plaintiffs' corporate affiliates, such as Biogen Idec, Inc. ("Biogen Idec"), many of which were selling the very same products that Columbia had accused of infringement.

Biogen Idec, Biogen, and Genzyme filed this new suit to redress the harm caused by Columbia's improper attempts to extract royalties from the '275 patent, as well as to resolve the

substantial uncertainty remaining in light of Columbia's pointed refusal to include Biogen Idec in its covenant not to sue. In its motion to dismiss, Columbia challenges all but one of plaintiffs' claims, arguing that the declaratory judgment counts lack subject matter jurisdiction and that all but one of the remaining counts fail to state claims upon which relief can be granted. As demonstrated below, there is an actual controversy as to the validity and enforceability of the '275 patent, and plaintiffs have sufficiently pleaded their claims for abuse of process, breach of contract, and unfair and deceptive trade practices. Columbia's motion to dismiss should be denied.

## ARGUMENT

Columbia moves to dismiss portions of plaintiffs' amended complaint on two distinct legal theories that carry different burdens and evidentiary standards. First, Columbia presents a Rule 12(b)(1) motion to dismiss Counts IV through VII for lack of subject matter jurisdiction. On this motion, the Court must consider whether plaintiffs have shown by a preponderance of the evidence that there is an actual controversy with respect to the validity and enforceability of the '275 patent. Plaintiffs oppose this motion in Section I, which is supported by the Declarations of Ramsey R. Stewart and Carla M. Levy and accompanying exhibits.[1]

Second, Columbia presses a Rule 12(b)(6) motion to dismiss all but one of Biogen's and Genzyme's claims of abuse of process, breach of contract, and unfair and deceptive trade practices. On the Rule 12(b)(6) motion, the Court must look to the allegations of the amended complaint to determine whether they state a claim, assuming all facts are as alleged and drawing

---

[1] Citations to new record sources are to either the Declaration of Ramsey R. Stewart or to materials appearing behind a tab attached to the Declaration of Carla M. Levy filed herewith. In the latter case, the material will be cited only by tab number.

all reasonable inferences in plaintiffs' favor. Plaintiffs address Columbia's Rule 12(b)(6) motion in Section II.

**I.    THIS COURT HAS JURISDICTION TO HEAR BIOGEN IDEC'S DECLARATORY JUDGMENT CLAIMS.**

**A.    Factual Background.**

Biogen Idec, previously known as IDEC Pharmaceuticals Corporation ("IDEC"), has been the corporate parent of Biogen since the merger of Biogen and IDEC in November 2003.[2] (Stewart Decl. ¶ 3.) Before the merger, Biogen Idec worked to develop and market recombinant drugs manufactured using CHO cells cotransformed with a gene or genes encoding a therapeutic protein and a gene encoding a selectable marker. Biogen Idec developed Rituxan®, a drug made using recombinant DNA technology that it has co-promoted with Genentech since before the 2003 merger. Pursuant to a collaboration agreement, Genentech is responsible for the manufacture and sale of Rituxan®, and the two companies share the profits. (*Id.*) Biogen Idec also developed and currently markets Zevalin®, also made using recombinant DNA technology, which was launched in the spring of 2002. Prior to the merger, Biogen Idec did not have the benefit of any license to the Axel patents. (Stewart Decl. ¶ 6.)

On September 1, 2004, Columbia filed its first, and very limited, Covenant Not to Sue ("Covenant") (Tab 1) in *In re Columbia Univ. Patent Litigation*, No. 04-MDL-01592 (D. Mass.) ("multidistrict litigation"). Because Columbia's covenant was ambiguous, counsel for the multidistrict litigation plaintiffs sought clarification as to its scope. Columbia's counsel attempted to provide clarification by citing examples in a letter to plaintiffs' counsel:

---

[2] On November 12, 2003, a wholly-owned subsidiary of IDEC was merged with and into Biogen, Inc., with Biogen, Inc. continuing as the surviving corporation and a wholly-owned subsidiary of IDEC. At the same time IDEC changed its name to Biogen Idec Inc. and Biogen, Inc. was renamed Biogen Idec MA, Inc. Declaration of Ramsey Stewart ("Stewart Decl.") ¶ 3.

> Rituxan is a product currently made and sold by Genentech. Columbia will not sue Genentech for infringement of the '275 patent as it currently reads … with respect to Rituxan at any time now or in the future.

(Tab 2, ¶ 2.). Both the initial and the final versions of the covenant made clear that Columbia "categorically reject[ed]" plaintiffs' claims that the '275 patent was "not infringed" by their products, or that the '275 patent was invalid or unenforceable. (Tab 1, at 1; Tab 3, at 2.) Thus, of all the recombinant drugs manufactured by the multidistrict litigation plaintiffs – products that included some of the top-selling therapeutic drugs in the United States – Columbia singled out Rituxan® as an example of a product that infringed the '275 patent. (Tab 2.) By selecting Rituxan® as the exemplary product, Columbia demonstrated that it had Biogen Idec in its sights.

In the very same letter, Columbia made clear that its covenant not to sue "does not apply" to the "affiliates or customers" of the plaintiffs in the multidistrict litigation. (Tab 2, ¶ 3.) Thus, although Biogen, Genzyme, and Genentech received the benefit of the covenant, Biogen Idec did not.

Columbia's communications about Rituxan® were made against the backdrop of Columbia's zealous and continuing effort to maximize its revenue from the Axel patents. Columbia has vigorously enforced the Axel patents through litigation. Within months after entering into a license agreement with Genetics Institute ("GI") in 1990, Columbia sued GI for infringing the Axel patents, arguing that it was making a product (erythropioetin, or "EPO"), that was not covered by the license. (Tab 6, at 1.) Three years later, Columbia filed suit against Roche Diagnostics, which was collaborating with GI with respect to EPO but did not have a license. *See Trs. of Columbia Univ. v. Roche Diagnostics GmbH*, 272 F. Supp. 2d 90, 116 (D. Mass. 2002) ("*Roche I*"). Columbia pursued the Roche case for **ten years**, eventually obtaining a judgment against Roche for $1.2 million dollars. *See id.* at 120–21.

When the Axel patents were set to expire, Columbia lobbied Congress for an extension. When that failed, it relentlessly pursued illegitimate continuation applications in the Patent and Trademark Office until the PTO finally issued one of them as the '275 patent in 2002. In 2004, not content with the claims it had obtained in the '275 patent, Columbia filed a broadening reissue application. In addition, "Columbia explicitly informed [Biogen and other licensees] that they were required to pay royalties under the '275 patent." (Tab 10, at 20.) It sent license termination notices to Biogen and others based upon a failure to pay royalties under the '275 patent. (Tab 11.) It also filed a reissue application seeking to broaden the scope of the '275 patent.

In 2003, Columbia sued two of its licensees, Johnson & Johnson and Ares Trading, S.A., in the Northern District of California, for failure to pay royalties to Columbia under the '275 patent. *See In re Columbia Univ. Patent Litig.*, 343 F. Supp. 2d 35, 37 n.1 (D. Mass. 2004) ("*Columbia III*"). In February 2004, Columbia filed breach of contract counterclaims against two more licensees, Amgen Inc. and Immunex Corp., for royalties allegedly due under the '275 patent. (Tab 9, ¶¶ 13–28.)

Columbia's counsel has repeatedly stated that Columbia believed Biogen, Genentech, and others were infringing, and that Columbia would likely assert infringement claims, including the following statements:

- "I think they infringe…." (Tab 12, at 57.)

- "[W]ill there be claims by Columbia back against the biotech companies for infringement or for breach of contract? And the answer is, probably." (Tab 13, at 4.)

- "If the case were simply to go forward without any staging, we would likely be filing infringement counterclaims." (Tab 12, at 54.)

- "[Biogen and Genzyme] face the risk that Columbia will sue them for patent infringement." (Tab 10, at 11.)

- "[I]f Columbia prevails [in the challenge to the '275 patent], plaintiffs' exposure to the '275 patent will continue until 2019…."  (Tab 14, at 9.)

- "Columbia has the right to assert counterclaims for patent infringement, and if warranted seek injunctive relief …."  (Tab 10, at 9.)

- "[I]f these actions proceed apace, plaintiffs will unnecessarily risk exposure to any counterclaims that Columbia may assert for infringement of the '275 patent."  (Tab 15, at 2.)

*See In re Columbia Univ. Patent Litig.*, 330 F. Supp. 2d 12, 18 (D. Mass. 2004).  (Tab 10, at 2; Tab 12, at 84; Tab 14, at 10; Tab 15, at 10, 16, 17; Tab 16, at 5.)

The combined effect of Columbia's conduct was acutely appreciated by the management of Biogen Idec, including experienced in-house counsel, Ramsey Stewart.  Mr. Stewart was alarmed by Columbia's singling out of Biogen Idec's product and its refusal to include affiliates in the covenant, particularly in light of Columbia's history of enforcing the Axel patents.  Stewart Decl. ¶¶ 7-8.  Biogen Idec was concerned that, as an affiliate not protected by the covenant not to sue, it would be sued for infringement, and that Columbia would attempt to bring that suit in its highly preferred forum, the Northern District of California, in the hopes of avoiding the prompt resolution on the merits that this Court was willing to provide.  Stewart Decl. ¶¶ 9-10.

As Mr. Stewart was aware, Columbia had gone to extreme lengths to transfer to the Northern District of California all litigation over the '275 patent, without success.  First, Columbia filed motions under 28 U.S.C. § 1404 to transfer the venue of each case to the Northern District of California.  (*See* Tab 17; Tab 18.)  While some of those motions were pending, Columbia moved for multidistrict transfer of all pending cases to the Northern District of California under 28 U.S.C. § 1407.  (*See* Tab 20.)  Columbia also initiated lawsuits against its licensees Johnson & Johnson and Ares Trading S.A. in the Northern District of California.  (Tab 8.)  Biogen Idec reasonably feared that Columbia would leap at the chance to initiate a first-filed

- 6 -

action against Biogen Idec in the Northern District of California in hopes of cementing its preferred district as the locus for all future litigation over the '275 patent.  Stewart Decl. ¶ 10.

   **B.    Columbia's Conduct Creates An Actual Controversy.**

   Columbia's vigorous pursuit of revenue from the Axel patents, its enforcement of those patents, its targeting of Rituxan®, and its insistence on excluding all affiliates from its covenant not to sue all demonstrate that there is "a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."  *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941); *see also Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 239–42 (1939).  The Federal Circuit has adopted a two-prong test to assess whether the requisite "case" or "controversy" exists when a patent is challenged.[3] *See Arrowhead Indus. Water, Inc. v. Ecolochem, Inc.*, 846 F.2d 731, 736 (Fed. Cir. 1988).  The test requires that there be both: (1) an explicit threat or other action by the patentee, which creates a reasonable apprehension on the part of the declaratory judgment plaintiff that it will face an infringement suit, and (2) present activity which could constitute infringement or concrete steps taken with the intent to conduct such activity.  *See Fina Research, S.A. v. Baroid, Ltd.*, 141 F.3d 1479, 1481 (Fed. Cir. 1998).  Ultimately, the existence of a "case" or "controversy" turns upon the "totality of the circumstances."  *See Arrowhead*, 846 F.2d at 736; *Md. Cas. Co.*, 312 U.S. at 273.  Subject matter jurisdiction may be found upon proof by a preponderance of the evidence, and a Court may refer to evidence outside of the pleadings when determining whether subject matter jurisdiction exists.  *See Luckett v. Bure,* 290 F.3d 493, 496–97 (2d Cir. 2002); *Robinson v. Union Pac. R.R.*, 245 F.3d 1188, 1191 (10th Cir. 2001).

_____

[3] While meeting this two-prong test is sufficient to establish jurisdiction, it is not the only means by which one can establish subject matter jurisdiction over a declaratory judgment action.  *Aetna*, 300 U.S. at 239–42.

The situation now before the Court amply meets all requirements for a "case" or "controversy."

### 1.    Columbia Concedes That Biogen Idec Has Engaged In Activity That Potentially Infringes The '275 Patent.

First, Columbia **concedes** that Biogen Idec has engaged in activity that potentially infringes the '275 patent, the second prong of the test.  (Def. Mem. at 9.)  This admission means that Biogen Idec's potential liability under the '275 patent is accruing day by day.  By contrast, when Columbia first moved to dismiss the declaratory judgment claims of Biogen, Genzyme, and the other multidistrict litigation plaintiffs based upon Columbia's initial, limited covenant, it argued that the multidistrict litigation plaintiffs no longer had any fear of being held liable for their current activities.  (Tab 4, at 7-8.)  Once it became clear that, despite the covenant, the specter of liability for ongoing and future activities remained – the element Columbia concedes here – Columbia was forced to expand its covenant.  (Tab 3.)

With Columbia's concession that Biogen Idec has engaged in potentially infringing activity, the *only* question before the Court is whether Columbia has indicated an intent to enforce its patent and thereby created in Biogen Idec an objectively reasonable apprehension of suit.  *Arrowhead*, 846 F.2d at 737.  *See generally Sierra Applied Scis., Inc. v. Energy Indus., Inc.*, 363 F.3d 1361, 1373-80 (Fed. Cir. 2004) (first prong focuses on the activity of the patentee, while second prong focuses on the activity of the plaintiff).

### 2.    Columbia's Suggestion That It Does Not Want To Sue Biogen Idec For Patent Infringement Until A Later Date Does Not Eliminate The Actual Controversy.

Columbia's primary argument against declaratory judgment jurisdiction is that it does not want to sue Biogen Idec **at this time**.  Lest there be any mistaking Columbia's position, it has **not** disclaimed an intent to sue Biogen Idec for infringement of the '275 patent.  What Columbia

says is that it has no present intention of suing anyone "**while** [reexamination and reissue] proceedings in the PTO are ongoing." (Def. Mem. at 2.) It claims that "the last place [it] wants to be **right now** is anywhere in court **until** the Patent Office finishes its job."[4] (Def. Mem. at 10 (emphasis added).) Thus even Columbia's litigation counsel cannot bring themselves to deny Columbia's intent to sue Biogen Idec to enforce the '275 patent. Columbia expressly retains the right to sue and to seek damages from Biogen Idec for activity that is taking place **today**. *See Minn. Mining & Mfg. Co. v. Norton Co.*, 929 F.2d 670, 673 (Fed. Cir. 1991) ("*3M*") ("As 3M continues to sell products it believes do not infringe, its potential liability grows. These are among the problems the Declaratory Judgment Act sought to alleviate."); *Dewey & Almy Chem. Co. v. Am. Anode*, 137 F.2d 68, 69 (3d Cir. 1943) (noting that before the passage of the Declaratory Judgment Act, "the patentee might, in his own good time, sue the alleged infringer for an accounting, after large damages on account of a possible infringement had accrued").

Columbia's argument was considered and rejected in *United Sweetener USA, Inc. v. Nutrasweet Co.*, 760 F. Supp. 400, 407 (D. Del. 1991). There, the patentee promised not to sue on the patent pending the outcome of a reexamination, but neither "abandoned its interest in protecting the patent" nor "promised to hold the plaintiffs harmless" in the meantime. *Id.* The court denied a motion to dismiss for lack of subject matter jurisdiction, explaining that, "[r]ather than extinguishing the threat to the plaintiffs, Nutrasweet's promise merely suspends it." *Id.* The court noted that, "[e]ven if Nutrasweet keeps its promise, the reexamination proceeding,

---

[4] Columbia's attempted use of judicial notice to put its arguments on this point before the Court is highly improper. Columbia asks the Court to take judicial notice of – i.e., to accept as **fact** – its protestations that it is not interested in enforcing the '275 patent at this time. (Request for Judicial Notice, Exs. H & I.) Of course, while Columbia may present **evidence** to the Court on its Rule 12(b)(1) motion, it may not ask the Court to recognize its self-serving statements as "fact[s] not subject to reasonable dispute." Fed. R. Evid. 201(b).

now underway, could end next year, but it could also end next week." *Id.* As a result, it could not be said "that the plaintiffs are imagining the threat of a suit or fabricating their worries." *Id.* As *United Sweetener* illustrates, Columbia's alleged preference to file suit at a later date (and, implicitly, in a district more to its liking) does not eliminate the actual controversy arising from the fact that Columbia believes Biogen Idec is currently infringing the '275 patent and therefore accruing damages.

As the Federal Circuit has also recognized, it "would obviously be unrealistic to limit the required apprehension to one of imminent suit against plaintiff when defendant is exhibiting an intent to delay that suit until … a trial date more convenient for defendant has arrived." *Arrowhead*, 846 F.2d at 733-34, 736 (denying motion to dismiss where patentee sought to delay suit by making carefully worded implicit threats in hopes of avoiding jurisdiction); *see also Vanguard Research, Inc. v. Peat, Inc.*, 304 F.3d 1249, 1255 (Fed. Cir. 2002) ("[A] patentee's present intentions do not control whether a case or controversy exists.  The appropriate inquiry asks whether [plaintiff] had a reasonable apprehension that [defendant] would sue it **in the future**.") (internal citations omitted; emphasis added); *Fina*, 141 F.3d at 1484 (reasonable apprehension is not destroyed by patentee's statement "disavowing" present intent to sue, because Declaratory Judgment Act was intended to forestall "scare-and-run tactics"); *EMC Corp. v. Norand Corp.*, 89 F.3d 807, 811 (Fed. Cir. 1996) (plaintiff "is not required to wait for the patentee to decide **when** and where to sue") (emphasis added); *Goodyear Tire & Rubber Co. v. Releasomers*, 824 F.2d 953, 956 (Fed. Cir. 1987) (the fact that patentee's president had not "at this particular moment authorized a patent infringement action" did not remove apprehension of suit because "a reasonable party could easily infer that [defendant] would **at some time**, bring a patent infringement suit against [plaintiff]").

Columbia's argument runs contrary to the very purpose of the Declaratory Judgment Act, which is to "minimize the danger of avoidable loss and the unnecessary accrual of damages and to afford one threatened with liability an early adjudication **without** waiting until an adversary should see fit to begin an action after the damage has accrued." Charles Alan Wright et al., *Federal Practice and Procedure* § 2751, at 457 (3d ed. 1998) (emphasis added); *see also Elecs. for Imaging, Inc. v. Coyle*, 394 F.3d 1341, 1346-47 (Fed. Cir. 2005) (fact that defendant had promised not to sue while negotiating a license did not deprive plaintiff of the right to sue before negotiations concluded); *Goodyear*, 824 F.2d at 956 (even though the defendant might not bring suit immediately, that is not dispositive of future intentions); *Glaxo Wellcome, Inc. v. Pharmadyne Corp.*, Civ. No. AMD-96-455, 1996 WL 432290 (D. Md. Apr. 4, 1996) (statement that there were no current plans to bring suit did not divest the court of jurisdiction); *C.R. Bard, Inc. v. Schwartz*, 716 F.2d 874, 876, 881 (Fed. Cir. 1983) (patentee's affidavit stating that it had no intention of terminating license and bringing suit insufficient to remove licensee's reasonable apprehension of suit).

In its reply brief on its motion to dismiss Amgen's new complaint, Columbia cites *Teva Pharmaceuticals USA, Inc. v. Pfizer, Inc.*, No. 04-1186, 2005 WL 119890 (Fed. Cir. Jan. 21, 2005), for the proposition that "a declaratory judgment plaintiff must be able to demonstrate that it has a reasonable apprehension of **imminent** suit." (Tab 5, at 2.) Columbia cites no other support for this rule, which it dubiously describes as a "well-established, bedrock principle of justiciability." (*Id.*) This is because there is no support for this statement as a general proposition of law divorced from its factual context. At the time Teva filed its declaratory judgment complaint, Teva legally could not have sold the potentially infringing product for years, due to statutory restrictions upon when it could seek FDA approval. As a result, there

- 11 -

were **no** potentially infringing sales, and damages were not accruing.  *See Teva*, 2005 WL

119890, slip op. at 1, 16.  Jurisdiction has been denied in the past on similar facts.  *See, e.g.*,

*Telectronics Pacing Sys., Inc. v. Ventritex, Inc.*, 982 F.2d 1520, 1527 (Fed. Cir. 1992) (no

jurisdiction where, due to a need for FDA approval, *inter alia*, sales of potentially infringing

product *would not begin for years* after the filing of the complaint); *see also Sierra*, 363 F.3d at

1374-77, 1379 (no jurisdiction over potentially infringing product that *was not built until a year*

after filing the complaint, but declaratory judgment could be obtained for another product that

was being sold).

       If, as Columbia proposes, *Teva* were extended to a plaintiff like Biogen Idec, which is

**currently** engaged in potentially infringing activity, and read to hold that such a plaintiff has no

reasonable apprehension of suit until the patentee has announced a plan to sue, it would fly in the

face of decades of case law and, indeed, the very purpose of the Declaratory Judgment Act.  *See*

*Arrowhead*, 846 F.2d at 735 (a putative infringer should not be "rendered helpless and immobile

so long as the patent owner refused to grasp the nettle and sue"); *see also Blonder-Tongue Labs.,*

*Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 344 (1971) ("[A] manufacturer of a device need not

await the filing of an infringement action in order to test the validity of a competitor's patent, but

may institute his own suit under the Declaratory Judgment Act.").  There would be no purpose at

all to the Declaratory Judgment Act if it only applied when a suit was "imminent."  The

Declaratory Judgment Act was designed to provide a remedy that would allow a party to obtain

judicial resolution of a dispute **before** its adversary chose to bring its own suit.  Notwithstanding

the isolated sentence from *Teva* upon which Columbia relies, it is plain that what must be imminent is the potential **infringement**, not the adversary's future lawsuit.[5]

Further, if *Teva* went as far as Columbia suggests it does, this Court would be bound not to follow it. The panel decision in *Teva* cannot overrule earlier Federal Circuit cases, discussed above, finding declaratory judgment jurisdiction even when the patentee was not marching up the courthouse steps. *See Trs. of Columbia Univ. v. Roche Diagnostics GmbH*, 126 F. Supp. 2d 16, 32 (D. Mass. 2000) ("When confronted with two panel opinions [of the Federal Circuit] in direct conflict, the earlier decision is controlling."); *see also* Fed. Cir. R. 35(a)(2) ("[O]nly the court en banc may overrule a binding precedent"); *Tex. Instruments, Inc. v. Cypress Semiconductor Corp.*, 90 F.3d 1558, 1567 (Fed. Cir. 1993) ("This court has adopted the rule that prior decisions of a panel at the court are binding precedent … unless and until overturned in banc.") (quoting *Newell Cos., Inc. v. Kenney Mfg. Co.*, 864 F. 2d 757, 765 (Fed. Cir. 1988)).

Finally, Columbia's statement that it must offer Biogen Idec a license prior to bringing suit (Def. Mem. at 11) does not defeat jurisdiction. Columbia's new-found commitment to this obligation is doubtful and very likely litigation-inspired, since Columbia has not complied with it in the past. On the contrary, the record suggests that Columbia in fact has brought infringement suits without first offering a license.[6] Biogen Idec reasonably fears that it will do so again.

---

[5] Columbia's reliance upon the term "imminent" begs the question in any event. As the Supreme Court said in *Md. Cas. Co.*, the question is whether the controversy is of "**sufficient**" immediacy to warrant a declaratory judgment. *Teva* does not provide a clear definition of "imminent"; the decision is merely the application of law to a specific set of facts.

[6] In *Roche I*, for example, it appears that Columbia did not offer Roche a license prior to bringing suit. 272 F. Supp. 2d at 97-100. Although it had once offered a license, it was, upon information and belief, nine years before the suit was filed. *Id.* at 114; Def. Mem. at 11. Similarly, it is unclear whether Columbia offered Genetics Institute a license that covered erythropioetin (EPO) before suing it for infringement based on its manufacture of EPO. (Tab 6; Tab 24 § 1(b), (d)(i).)

Moreover, to deny jurisdiction on this ground would effectively permit Columbia (and any other institution subject to similar government requirements) to prevent almost **any** declaratory judgment action, even if based on express threats of infringement litigation, merely by refraining from offering a license. Indeed, the Federal Circuit recently rejected a similar argument in *Electronics for Imaging*, 394 F.3d at 1347, when it held that the patentee's promise not to sue while negotiating a license did not deprive plaintiff of the right to bring a declaratory judgment action before negotiations concluded. Finally, the choice of when to make an offer of a license is completely in Columbia's control. There is nothing stopping Columbia from offering a license tomorrow, then instituting an infringement action the next day, and Columbia does not suggest that it would have to wait until negotiations were completed. In any event, given Biogen Idec's well-founded belief that the '275 patent is invalid and unenforceable, it is not likely to agree to anything other than a royalty-free license, and negotiations would be short.

Columbia's misleading attempts to deny that there is any risk of litigation over the '275 patent must be understood for what they are – thinly veiled threats to enforce the '275 patent at a time and place of its own choosing, while resting assured that it can always reach back and obtain accrued damages, with interest, for Biogen Idec's current activities. Faced with a high probability of suit and potentially accruing damages, Biogen Idec is not required to wait indefinitely while Columbia sits on its claim. Biogen Idec must resolve this burgeoning exposure without further delay, not only to remove the cloud of uncertainty but also to ensure that, if it is wrong in its assessment of the merits, it may take steps now to minimize the amount of accrued damages. The acute uncertainty that Biogen Idec currently faces is exactly the kind of situation that the Declaratory Judgment Act was intended to remedy.

3.    **The Totality of Columbia's Conduct Has Created A Reasonable Apprehension Of Suit.**

Columbia's protests notwithstanding, this is hardly a story of a unwitting patent holder dragged into Court by a competitor that desires an advisory opinion before launching a new business venture. Columbia argues that it wishes to file suit only at a later date because that is the only argument it can muster. If Columbia's conduct over the past few years shows anything, it is that Columbia will stop at nothing to squeeze additional income out of the Axel patents. Columbia's conduct has created in Biogen Idec an objectively reasonable apprehension of suit.

As described above, Columbia has expressly targeted Rituxan®, which Biogen Idec co-markets with Genentech. Columbia's covenant not to sue extends only to Genentech, not to Biogen Idec. In addition to setting its sights specifically on Biogen Idec's Rituxan®, Columbia has gone to great lengths to extract further financial benefit from the Axel patents, including lobbying Congress for an extension of the original Axel patents in the face of widespread public outcry, pursuing numerous continuation applications over decades of patent prosecution, bringing infringement suits, threatening infringement, terminating licenses, applying for broadening reissue claims, and coercing settlements from companies whose need for business certainty outweighed their willingness to await judicial action. This aggressive patent strategy translates into a near certainty that Columbia will seek to enforce the '275 patent.

The combined impact of Columbia's conduct goes well beyond the requisite reasonable apprehension of suit. *See, e.g., Bard*, 716 F.2d at 881 n.6 (lawsuits against other manufacturers of similar products contributes to reasonable apprehension of infringement); *Goodyear*, 824 F.2d at 956 (reasonable apprehension based upon separate trade secret litigation involving the same technology as recently issued patent); *Ion Beam Applications, S.A. v. Titan Corp.*, 157 F. Supp. 2d. 552, 557 (E.D. Va. 2000) ("[T]he fact that [the patentee] has already initiated suit against a

company that engages in activities very similar to those of [the plaintiff] is relevant" to the issue
of jurisdiction.).

Columbia attempts to minimize its prior conduct by arguing that Biogen Idec here relies
only on "the same non-specific statements concerning the possibility of infringement
counterclaims upon which Biogen and Genzyme unsuccessfully relied on opposing Columbia's
motion to dismiss." (Def. Mem. at 13.) Columbia's argument on this point is disingenuous. The
threats on which Biogen and Genzyme previously relied were rendered inapplicable when
Columbia amended and restated its covenant, which it did several weeks after Biogen and
Genzyme filed the brief Columbia has attached as Exhibit L to its Request for Judicial Notice.[7]
Columbia's argument might make some sense if Columbia had offered a covenant not to sue to
Biogen Idec, but it has conspicuously refused to do so.

Columbia claims that it "has never asserted the '275 patent against Biogen Idec." (Def.
Mem. at 2.) Even if it had not expressly targeted Biogen Idec by setting its sights on Rituxan®,
however, express threats are not required. *See, e.g., Dewey & Almy*, 137 F.2d at 69–70
(reasonable apprehension arising from fact that patentee had "asserted such a scope for its patent
claims as to embrace the similar methods" practiced by plaintiff). Courts have found a
reasonable apprehension of suit in the absence of *any* communication from the patentee, and
even "when a patentee first learns of [the declaratory judgment] plaintiff's conduct upon receipt
of the complaint." *Arrowhead*, 846 F.2d at 736, 738 (emphasis added) (citing *Dewey & Almy*,

---

[7] Further, Columbia's reliance on its Request for Judicial Notice in support of this argument is
improper, and the matters it seeks to have the Court take notice of should be disregarded. It is
not entirely clear what "facts" Columbia wants the Court to take notice of, but the implication of
Columbia's brief is that the Court should accept as a fact both (1) that the threats Biogen Idec
relies on here are the same ones on which Biogen and Genzyme relied in a prior brief and (2)
that those threats were insufficient to vest subject matter jurisdiction in the Court. Of course,
neither of these arguments is a "fact" of which the Court may take judicial notice.

137 F.2d at 71).  Threats like Columbia's, "against an entire product industry," have the capacity to create a reasonable apprehension of suit "among all individual members of that industry."  *See Dr. Reddy's Labs., Ltd. v. aaiPharma Inc.*, No. 01 Civ. 10102(LAP), 2002 WL 31059289, at *7 (S.D.N.Y Sept. 13, 2002); *see also Treemond Co. v. Schering Corp.*, 122 F.2d 702, 705 (3d Cir. 1941) (patentee's notice in trade journal giving notice to industry of the "exclusiveness of [its] rights" held to create a reasonable apprehension of infringement suits).

If Columbia truly did not intend to enforce the '275 patent against Biogen Idec, it could easily dispose of this suit by granting Biogen Idec a covenant not to sue.  Instead, Columbia has steadfastly refused to extend its covenant to Biogen Idec.  Columbia argues that its refusal to covenant is irrelevant, citing two cases holding only that a refusal to promise not to sue is not enough *by itself* to establish a reasonable apprehension.  *See Int'l Harvester Co. v. Deere & Co.*, 623 F.2d 1207, 1214 (7th Cir. 1980); *CAE Screenplates, Inc. v. Beloit Corp.*, 957 F. Supp. 784, 791–92 & n.25 (E.D. Va. 1997).[8]  Columbia, however, completely ignores binding Federal Circuit case law on this point.  In *BP Chemicals, Ltd. v. Union Carbide Corp.*, 4 F.3d 975 (Fed. Cir. 1993), the Federal Circuit held that a "patentee's refusal to give assurances that it will not enforce its patent is relevant to the determination [of a putative infringer's reasonable apprehension]."  *Id.* at 980 (citation omitted); *see also Viking Injector Co. v. Chemtron, Inc.*, No. 3:CV-93-0791, 1993 WL 625543, at *2 (M.D. Pa. Nov. 9, 1993) (noting that "the absence of satisfactory assurances not to sue" is a factor in determining a party's reasonable apprehension).

---

[8] Columbia also cites *Shell Oil Co. v. Amoco Corp.*, 970 F.2d 885 (Fed. Cir. 1992), which merely stands for the proposition that, in the context of license negotiations, a patentee is given more leeway with regard the types of "charges" of infringement that will trigger a putative infringer's reasonable apprehension of suit.  *See id.* at 888–89.

Biogen Idec has a reasonable apprehension that Columbia will charge it with infringement based upon its current activity, and thus this Court has subject matter jurisdiction to resolve its declaratory judgment claims.

### C.    This Court Should Exercise Its Jurisdiction To Resolve This Actual Controversy.

Upon determining that there is an actual "case" or "controversy," the Court should exercise jurisdiction over this action, because doing so will relieve Biogen Idec from uncertainty and delay regarding its legal rights and comport with the principles of sound judicial administration.  It is generally an abuse of discretion for a court to decline jurisdiction where it finds that a "case" or "controversy" exists in a patent dispute and where the putative infringer will be harmed by delay in adjudication.  *See Elecs. for Imaging*, 394 F.3d at 1345–47; *Capo, Inc. v. Dioptics Med. Prods., Inc.*, 387 F.3d 1352, 1357-58 (Fed. Cir. 2004); *Genentech, Inc. v. Eli Lilly & Co.*, 998 F.2d 931, 937 (Fed. Cir. 1993), *abrogated in part on other grounds by Wilton v. Seven Falls Co.*, 515 U.S. 277 (1995).

Here, potential damages and interest would accrue day to day if Biogen Idec were forced to sit on its hands and await suit from Columbia.  *See 3M*, 929 F.2d at 673–74.  Meanwhile, Biogen Idec would also be faced with the uncertainties of whether it would have to budget for and incur the expense and inconvenience of litigation and how the litigation would affect its customers, suppliers, and shareholders.  *See Electronics for Imaging*, 394 F.3d at 1346–47.

Further, this case does not present any of the concerns that have been held to justify the discretionary dismissal of a declaratory judgment action.  *Cf. EMC*, 89 F.3d at 815 (party brought declaratory judgment action to use as leverage in licensing negotiations with patentee); *Davox Corp. v. Digital Sys. Int'l, Inc.*, 846 F Supp. 144, 148 (D. Mass. 1993) (competitor

immediately filed a preemptive suit after promising patentee that it would enter into discussions regarding infringement claims).

When this Court noted in the multidistrict litigation that it would use its discretion not to exercise jurisdiction even if actual "cases" or "controversies" existed, it was because:

> *As a result of the covenant not to sue*, the plaintiff drug companies have no potential liability for their current activities. They are not now threatened with suit. Nor is Columbia now attempting to use the '275 patent to obtain some commercial advantage without filing suit.

*Columbia III*, 343 F. Supp. 2d at 47 (emphasis added). Here, although Columbia opens its brief with a lengthy discussion of the covenant (Def. Mem. at 10-13), Biogen Idec is **not protected by the covenant**. Unlike the plaintiffs in the multidistrict litigation, Biogen Idec is potentially liable for its activities and is now threatened with suit. By refusing to grant a covenant to affiliates, Columbia is transparently "attempting to use the '275 patent to obtain some commercial advantage without filing suit," activity that the Declaratory Judgment Act was enacted to prevent. The combined effect of Columbia's conduct is that, unless and until Columbia grants Biogen Idec the protection of a covenant, Biogen Idec is entitled to have its rights determined by way of declaratory judgment.

**D.    Plaintiffs' Claim Of Patent Misuse Should Not Be Dismissed, Because Plaintiffs May Be Entitled To Relief Beyond A Declaratory Judgment On That Claim.**

Columbia also argues that plaintiffs' patent misuse claim (Count VII) should be dismissed as to Biogen and Genzyme because it is indistinguishable from the declaratory judgment counts that will be dismissed pursuant to the Court's order in *Biogen I*. (Def. Mem. at 13.) Upon entering a declaratory judgment finding patent misuse, however, a district court has the power to entertain a hearing for various forms of legal or equitable relief "as needed based on the circumstances of the case." *B. Braun Medical, Inc. v. Abbott Laboratories*, 124 F.3d 1419,

1428 (Fed. Cir. 1997).  Because Biogen and Genzyme have asserted in this action claims for

various forms of relief in addition to entry of a declaratory judgment, their patent misuse claims

should stand.

## II.    COLUMBIA'S MOTION TO DISMISS UNDER RULE 12(b)(6) MUST BE DENIED.

Columbia also moves to dismiss all or part of Counts I, II, and III for failure to state a

claim upon which relief may be granted.  In making its arguments under Rule 12(b)(6),

Columbia completely ignores the legal requirement that, in considering a Rule 12(b)(6) motion, a

court must take the allegations of the complaint as true and must construe the complaint in the

light most favorable to the plaintiffs.  *Roma Constr. Co. v. a Russo*, 96 F.3d 566, 568 (1st Cir.

1996); *Analog Devices, Inc. v. Allied Van Lines, Inc.*, C.A. No. 95-10879, 1996 WL 208463, at

*1 (D. Mass. Mar. 21, 1995) (Wolf, J.).  The motion may be granted only if "it appears to a

certainty that the plaintiff would be unable to recover under any set of facts."  *Ingram v. Rencor

Controls, Inc.*, 217 F. Supp. 2d 141, 147 (D. Me. 2002) (Carter, J.) (quoting *Roma*, 96 F.3d at

569); *Roeder v. Alpha Indus., Inc.*, 814 F.2d 22, 25 (1st Cir. 1987) (court may grant a Rule

12(b)(6) motion only if "it appears beyond doubt that the plaintiff can prove no set of facts in

support of his claim which would entitle him to relief").  Finally, all that must be pleaded is "'a

short and plain statement of the claim' that will give the defendant fair notice of what the

plaintiff's claim is and the grounds upon which it rests."  *Conley v. Gibson*, 355 U.S. 41, 47

(1957); *see also Analog Devices*, 1996 WL 208463 at *3 ("[A]ll that is necessary, under Fed. R.

Civ. P. 8, is that the plaintiff set forth 'sufficient factual allegations to state a claim showing that

he is entitled to relief under some viable legal theory.'") (citation omitted).

Instead of challenging the sufficiency of the pleadings, Columbia offers its own counter-statement of facts. This strategy is tantamount to conducting a trial by attorney argument. Under the Federal Rules, however, it must be assumed, as alleged:

- that the '275 patent is invalid and unenforceable (Am. Compl. ¶¶ 41-48, 71, 89, 114, 119, 124);

- that Columbia has known throughout the relevant time period that the patent was invalid and unenforceable (*id.* ¶¶ 41, 71, 114, 119, 124); and

- that Columbia fraudulently obtained the '275 patent, sought to enforce the '275 patent against numerous companies, and vigorously fought to forestall final adjudication of the validity and enforceability of the '275 patent in the hopes of extracting maximum revenue from the biotechnology industry (*id.* ¶¶ 42-48, 50-72, 74-76, 107-111, 114, 119, 124).

Plaintiffs have amply pleaded their claims of abuse of process, breach of contract, and violations of c. 93A, and Columbia's motion to dismiss Counts I through III of plaintiffs' amended complaint for failure to state a claim must be denied.[9]

### A.    Plaintiffs Have Stated A Claim For Abuse Of Process.

Columbia's litigation conduct, which was intended to avoid or delay the inevitable invalidation of its fraudulently obtained '275 patent, amounts to abuse of process. To state a claim for abuse of process, a plaintiff must allege that (1) the defendant used lawful process (2) to accomplish an ulterior or illegitimate purpose (3) causing damage to the plaintiff. *Gutierrez v. Mass. Bay Transp. Auth.*, 772 N.E.2d 552, 563 (Mass. 2002).

Columbia argues that plaintiffs' pleading is defective only with respect to element (1), the use of process. (Def. Mem. at 16.) In particular, Columbia argues that its judicial filings and

---

[9] Indeed, Columbia concedes that plaintiffs' breach of contract claim cannot be dismissed entirely and admits that certain aspects of that claim will survive even if this Court grants Columbia all the relief it seeks: "The Court Should Dismiss Count II For Breach of Contract And Breach Of The Implied Covenant, **With The Sole Exception Of The Claim Based On Section 3(j)** Of The License Agreements[.]" Def. Mem. at 18 (emphasis added).

litigation conduct were not "process."  In making this argument, Columbia relies on cases, including one from this Court, defining "process" as only writs of attachment, process used to institute a civil action, or process related to the bringing of criminal charges.  Def. Mem. at 16-17 (citing *Jones v. Brockton Pub. Mkts.*, 340 N.E.2d 484, 486 (Mass. 1975); *Luke Bros., Inc. v. Krusell*, C.A. No. 94-11701, 1996 WL 50965, at * 2 (D. Mass. Jan. 30, 1996) (Wolf, J.)).

Since these cases were decided, however, a broader definition of "process" has evolved in the case law, so that the tort of abuse of process now encompasses precisely the sort of abusive litigation conduct that Columbia exemplifies.  *See*, *e.g.*, *Cignetti v. Healy*, 967 F. Supp. 10, 18 (D. Mass. 1997) (Lasker, J.) (under Massachusetts law, abuse of process may include testimony in connection with Civil Service Commission proceeding to which plaintiff had agreed to refer dispute); *General Refractories Co. v. Fireman's Fund Ins. Co.*, 337 F.3d 297, 308-309 (3d Cir. 2003) (allegations that defendants abused the discovery and litigation process stated abuse of process claim); *Brooks v. Harding*, C.A. No. IP98-1200-C-T/G, 2001 WL 548098, at *5 (S.D. Ind. Mar. 30, 2001) ("process" not limited to the "strict sense of the term" but rather "broadly interpreted to encompass the entire range of 'procedures' incident to litigation"); *see also Nienstedt v. Wetzel*, 651 P.2d 876, 880-81 (Ariz. Ct. App. 1982) (process includes "the noticing of depositions, the entry of defaults, and the utilization of various motions such as motions to compel production, for protective orders, for change of judge, for sanctions and for continuances").  *See generally Simon v. Navon*, 71 F.3d 9, 15 (1st Cir. 1995) ("Typical abuse of process cases involve misuse of such procedures as discovery, subpoenas, and attachment.") (citations omitted).

Columbia's litigation over the validity of the '275 patent and the termination of Biogen's and Genzyme's licenses fits squarely within this understanding of "process."  The amended

complaint alleges that Columbia, while "[r]ecognizing that the '275 patent is invalid and unenforceable" (Am. Compl. ¶ 71; *see also id.* ¶¶ 89, 114, 119, 124), used the judicial process to extract money from plaintiffs based on the '275 patent (*id.* at ¶¶ 50-72), thus causing plaintiffs to incur damages, including unnecessary legal fees (*id.* at ¶¶ 71-72).  For example, in court filings and at oral argument, Columbia vigorously opposed Biogen's and Genzyme's attempts to enjoin Columbia from terminating their license agreements based upon an alleged failure to pay royalties on an invalid and unenforceable patent, forcing plaintiffs to incur substantial legal expense and devote considerable company resources to opposing Columbia's course of action. Soon thereafter, when the exigencies of litigation made it convenient to do so, Columbia abruptly reversed course and **reinstated** the licenses.  (*Id.* at ¶¶ 65-67.)  Similarly, Columbia represented to this Court that it would seek to merge the reissue and reexamination of the '275 patent in order to obtain the most efficient resolution of plaintiffs' claims (*id.* at ¶ 59), only to later request, without informing the Court, that the PTO **stay** the reexamination pending the completion of the reissue proceeding.  (*Id.* at ¶ 60.)  Had the PTO followed Columbia's suggested course of action, it would have afforded Columbia the opportunity to delay the resolution of the parties' dispute still further.

While Columbia takes issue with plaintiffs' allegation that its conduct served an ulterior and improper purpose (Def. Mem. at 17), it does not identify any shortcomings in the pleadings setting forth these allegations, nor could it.  Instead, Columbia attempts to counter plaintiffs' allegations by introducing "facts" outside the four corners of the Complaint.  (Def. Mem. at 17, 29-34.)  Indeed, Columbia goes so far as to attack plaintiffs' expert's integrity while trying to shore up the credibility of its own expert.  None of this material can be considered in a Rule 12(b)(6) motion.  *Guckenberger v. Boston Univ.*, 957 F. Supp. 306, 317 (D. Mass. 1997) (Saris,

J.) (matters "outside the four corners of the complaint … must await the summary judgment stage"); *see also* Opposition to Columbia's Request for Judicial Notice (filed herewith). Plaintiffs have alleged an ulterior purpose:  that Columbia sought to force plaintiffs to pay royalties and incur excessive litigation expenses in order to exact tribute for patent rights after they had expired and to discourage any challenge to the validity or enforceability of the '275 patent.  (Am. Compl. ¶¶ 68-71.)  This allegation is all that is needed to survive Columbia's motion to dismiss for failure to state a claim.  *See General Elec. Co. v. Lyon*, 894 F. Supp. 544, 552 (D. Mass. 1995) (Ponsor, J.) (plaintiff "must simply plead some set of facts that would support its contention" that an ulterior motive existed).

**B.      Plaintiffs Have Stated Claims For Breach Of Contract.**

Columbia erroneously contends that certain of plaintiffs' breach of contract claims should be dismissed.  In particular, while Columbia does not seek to dismiss Count II(C), which alleges a failure to give plaintiffs the benefit of more favorable royalty rates given to third parties as required under section 3(j) of the license agreements (Am. Compl. ¶¶ 33-37), Columbia has moved to dismiss Count II(A), which alleges wrongful termination of license agreements (*id*. at ¶¶ 62-64), and Count II(B), which alleges that Columbia engaged in repressive licensing practices (*id*. at ¶ 47).  Columbia's motion should be denied because plaintiffs' pleading is more than adequate to state claims for breach of contract.

**1.      Plaintiffs Have Adequately Pleaded Wrongful Termination Of The License Agreements.**

Biogen and Genzyme allege that Columbia, after fraudulently obtaining the '275 patent, and while recognizing that the patent was invalid and unenforceable, terminated Biogen's and Genzyme's license agreements based upon an alleged failure to pay royalties on the '275 patent.

- 24 -

(*Id*. ¶¶ 62-64.)  For purposes of the Rule 12(b)(6) analysis, plaintiffs' allegations must be assumed to be true.

Columbia argues that the amended complaint fails to state a claim for breach of contract based upon the termination of Biogen's and Genzyme's license agreements because Columbia "had every right to terminate their license agreements in March 2004 for nonpayment of royalties owed on products covered by the '275 patent."  (Def. Mem. at 19.)  Columbia thus argues that it was entitled to terminate the license agreements for nonpayment of royalties even if the demand for royalties was based upon a patent Columbia knew to be invalid and unenforceable.

As Columbia points out, the license agreements require payment of royalties only for products "covered by a claim of Licensed Patent Rights which has neither **expired** nor been held invalid."  (Def. Mem. at 19, emphasis added.)  For purposes of this motion it must be assumed, as alleged in the amended complaint, that the claims of the '275 patent merely duplicate claims of the '216, '665 and '017 patents, **all of which expired in August 2000**.  (Am. Compl. ¶¶ 42-48.)  Because all of these claims expired in 2000, no royalties were due after that date, and Columbia had no right to terminate the license agreements on grounds of nonpayment.

It must also be assumed, as alleged, that the '275 patent is not only invalid but also unenforceable by reason of prosecution laches and inequitable conduct.  Even if the contract is construed to permit exaction of royalties on an invalid patent until it is adjudged invalid, there is no language permitting Columbia to require royalty payments on a patent that, as a matter of U.S. patent law, is legally unenforceable.  Plaintiffs' allegation that the patent was unenforceable suffices to plead their claim for wrongful termination.

To support its contention that it had an absolute and unfettered right to terminate plaintiffs' license agreements, Columbia relies on *Cordis Corp. v. Medtronic, Inc.*, 780 F.2d 991

(Fed. Cir. 1985). Columbia argues that *Cordis* stands for the proposition that a licensor is entitled to terminate a patent license where the licensee fails to make royalty payments, regardless of the facts and circumstances. In fact, however, *Cordis* merely represents an application of the traditional four factors affecting preliminary injunctions to a dispute between Cordis and Medtronic. In *Cordis,* the Federal Circuit held that, in the circumstances of that case, the patent challenger was not entitled to **injunctive** relief in the form of an escrow account set up to avoid termination of a license agreement. That case neither presented nor resolved the question whether a licensor could terminate for a licensee's failure to pay royalties on an invalid and unenforceable patent or whether the patentee could ultimately be held liable for damages caused by the wrongful termination of the license agreement.[10]

### 2. Columbia's Termination Of The Licenses Was A Violation Of The Implied Covenant Of Good Faith And Fair Dealing.

Columbia's termination of the license agreements was also a violation of the implied covenant of good faith and fair dealing. Indeed, to grant Columbia's Rule 12(b)(6) motion, this Court would have to hold that Columbia was free to obtain an invalid patent through fraudulent representations to the Patent and Trademark Office, deliberately delay the issuance of the patent in order to extend its term, strong-arm its licensees by demanding payment of royalties under a

---

[10] The same is true of this Court's ruling on Biogen's and Genzyme's motion for preliminary injunction in *Biogen*, on which Columbia also relies heavily. There, this Court held that the showing of irreparable harm was insufficient to warrant the grant of an injunction against termination of the license agreements – not that plaintiffs could never prove any facts in support of a claim for breach of contract and damages arising from the termination. *DeCapua v. Dine-A-Mate, Inc.*, 292 A.D.2d 489 (N.Y. App. Div. 2002), and *Estate of Lennon v. Leggoons, Inc.*, No. 95 Civ. 8872 (HB), 1997 WL 346733 (S.D.N.Y. June 23, 1997), on which Columbia also relies, are similarly inapposite. In *DeCapua*, the licensee argued that the licensor's breach of a non-competition clause excused the nonpayment of royalties that it otherwise agreed were due; similarly, in *Lennon* the licensee that the licensor's breach of an exclusivity provision excused the nonpayment of royalties. *DeCapua,* 292 A.D.2d at 491-92; *Lennon*, 1997 WL 346733 at *1.

patent it knew to be invalid and unenforceable, intentionally delay the inevitable court determination of invalidity, and terminate license agreements for failure to pay royalties on the knowingly invalid patent, all without incurring contract liability for the harm caused by that termination.[11]  This is not the law.

Implied in every contract is a covenant of good faith and fair dealing that is breached when a party to a contract acts in a manner that, even if not expressly forbidden by the contract, would deprive the other party of the right to receive the benefits of the agreement.  *See, e.g.*, *Kirke La Shelle Co. v. Paul Armstrong Co.*, 188 N.E. 163, 167 (N.Y. 1933) (even if defendant's interpretation of copyright license was correct, actions breached the implied covenant by diminishing the value of the license in a way not foreseen at the time of contracting); *Harmon v. Adirondack Cmty. Coll.*, 784 N.Y.S.2d 663, 664 (N.Y. App. Div. 2004) (party breached implied covenant in an employment contract by taking job with a third party despite lack of express prohibition against accepting other employment); *accord Anthony's Pier Four, Inc. v. HBC Assocs.*, 583 N.E.2d 806, 820 (Mass. 1991); *Centronics Corp. v. Genicom Corp.*, 562 A.2d 187 (N.H. 1989) (Souter, J.) (New Hampshire and New York law).  According to Justice Souter, the obligation of good faith and fair dealing means that

> under an agreement that appears … to invest one party with a degree of discretion in performance sufficient to deprive another party of a substantial proportion of the agreement's value, the parties' intent to be bound by an enforceable contract raises an implied obligation of good faith to observe reasonable limits in exercising that discretion ….

---

[11] Columbia makes passing reference to Biogen's and Genzyme's damages allegations, but does not argue that any claim should be dismissed for failure to allege damages, much less provide any support for such an argument.  (Def. Mem. at 19.)  Plaintiffs properly allege that Columbia's wrongful termination caused them to suffer damages, including the incurring of substantial attorneys' fees.  (Am. Compl. ¶¶ 71-72.)

*Centronics*, 562 A.2d at 193.  Here, the license agreements gave Columbia discretion in the prosecution of the Axel patents – discretion that Columbia abused to "game" the patent system, obtain an invalid and unenforceable patent, and exploit that patent as leverage to extract royalties from its licensees.  Columbia's termination of the license agreements to coerce payments for its fraudulently procured patent represented a fundamental violation of its obligation of good faith.

Massachusetts' seminal good faith case affirms these principles.  In *Anthony's Pier Four, Inc. v. HBC Associates*, 583 N.E.2d 806, the Massachusetts Supreme Judicial Court held that Anthony's Pier Four ("Anthony's"), had violated the implied covenant of good faith and fair dealing.  *Id.* at 821.  In 1983, the plaintiff, HBC Associates ("HBC") and Anthony's had engaged in a cooperative project to develop the adjacent parcels of Pier Four and Fan Pier (where this Court now sits).  The agreements, among other things, conferred on Anthony's limited rights of approval of changes in HBC's development plan.  In 1986, Anthony's discovered that another development deal in the area had been more lucrative for the landlord than the Fan Pier deal promised to be for Anthony's.  Accordingly, Anthony's withheld approval for the Fan Pier development to coerce HBC into sweetening Anthony's return.  According to the SJC, "Anthony's use of a discretionary right under the agreements as a pretext justifies the judge's ruling that Anthony's breached the covenant of good faith and fair dealing."  *Id.* at 820.

Accordingly, even if the terms of the license agreements technically permitted Columbia to obtain a patent it knew to be invalid and extract payments from licensees because the patent had not yet been held invalid, such conduct would unquestionably violate the implied covenant of good faith and fair dealing.  *See Centronics*, 562 A.2d at 191.[12]

---

[12] Contrary to Columbia's specious argument (Def. Mem. at 24), the implied covenant of good faith and fair dealing is a separate theory of recovery and not duplicative.  Plaintiffs are permitted to "set forth two or more statements of a claim … alternatively or hypothetically…."

**3.    Plaintiffs Have Sufficiently Pleaded Breach Of Columbia's Obligation Not To Engage In Repressive Tactics.**

As set forth in Count II(B), Columbia's "efforts to enforce and extend the life of an invalid and unenforceable patent, its demands for royalties and fees under the License Agreements, its attempts to prolong its patent monopoly beyond the statutory term, and its efforts to prevent a judicial determination of the validity and enforceability of its patent" violate Columbia's obligation to refrain from engaging in repressive licensing practices.  (Am. Compl. ¶ 82.)  Columbia now moves to dismiss this claim on the ground that section 2(b) of the license agreements does not create a right enforceable by plaintiffs. (Def. Mem. at 22.)  This argument misses the mark.

Section 2(b) of the license agreements provides, in relevant part, that:

All rights granted by Columbia under this Agreement are subject to any rights required to be granted to the Government of the United States of America, including without limitation any rights reserved or obligations imposed by the Government pursuant to 35 U.S.C. §200-211, regulations thereunder and the determination letter to Columbia from the Department of Health and Human Services dated February 24, 1981, a copy of which is attached hereto as Appendix A.

(Tab 21, § 2(b); Tab 22, § 2(b).)  This section of the license agreements expressly provides that Columbia's rights under the agreements are subject to Columbia's obligations to the National Institutes of Health ("NIH"), through which the Department of Health and Human Services ("HHS") funded the research.  Moreover, Columbia was **required**, as a condition of receiving rights in the Axel patents, to incorporate in all license agreements each of the obligations it

---

Fed. R. Civ. P. 8(e)(2) (2004); *see also Israel v. Alexander*, 50 F. Supp. 1007, 1009 (S.D.N.Y 1942) ("Federal Rules of Civil Procedure permit alternative … claims to be stated in one complaint, regardless of whether based upon legal or equitable grounds"); *Hendrickson v. Sears*, 310 N.E.2d 131, 132 (Mass. 1974) ("a plaintiff may elect to bring either an action of contract or an action of tort, … but he need not choose between the two labels"); *Christopher v. Glen-Mor Fuel Oil Co.*, 1996 WL 1185129, at *3 (Mass. Super. Ct. Nov. 8, 1996) (same).

assumed in the NIH determination letter.  According to the determination letter, "[a]ll licenses issued by [Columbia] University shall be subject to the conditions of this determination, and **shall specifically incorporate by reference** all applicable provisions contained herein."  (Tab 23, § 2(*l*) (emphasis added).)

Section 2(j) of the determination letter itself provides that the prohibition on "unreasonable royalties and repressive practices" must be incorporated into each license agreement:

> **Any license granted** by [Columbia] University under the U.S. patent application **shall include** adequate safeguards against unreasonable royalties and repressive practices.  Royalties shall not in any event be in excess of normal trade practice.

(Tab 23, § 2(j) (emphasis added).)  In addition, the prohibition against Columbia's repressive licensing is also imposed by federal regulations.  45 C.F.R. § 8.2(b) (1980) (Tab 7) (refrain from "unreasonable royalties and repressive practices"); 45 C.F.R. § 8.1(b) (1980) (Tab 7) (same).  These laws are part of the contract as fully as if expressly incorporated therein.  *See, e.g.*, *Rehart v. Clark*, 448 F.2d 170, 173 (9th Cir. 1971) ("existing laws are read into contracts in order to fix the rights and obligations of the parties ….  [T]his is also true of valid regulations having the force and effect of laws of general application") (citations omitted); *Skandia Am. Reinsurance Corp. v. Schenk*, 441 F. Supp. 715, 724 (S.D.N.Y. 1977) ("[T]he law in force at the time [the contract] is entered into becomes a part of the contract."); *New Amsterdam Cas. Co. v. Stecker*, 143 N.E.2d 357, 359 (N.Y. 1957) (applicable New York insurance law is "mandated into and made a part of every policy of automobile liability insurance issued in [New York]").  Thus, the

license agreements themselves require Columbia to avoid unreasonable royalties and repressive practices, a contractual obligation that Biogen and Genzyme may enforce.[13]

Even if plaintiffs' license agreements did not explicitly incorporate the conditions in the NIH determination letter, Biogen and Genzyme have the right to sue as intended third-party beneficiaries of the NIH determination letter, which is in the form of a letter agreement and is countersigned by Columbia.  A third party is an intended beneficiary if "recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and … the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance."  *Nat'l Westminster Bank, PLC v. Grant Prideco, Inc.*, 261 F. Supp. 2d 265, 272 (S.D.N.Y. 2003) (intent for plaintiff to be third party beneficiary of a financing agreement was inferred because performance by defendant was the only mechanism by which plaintiff would be repaid funds it had advanced to the other contracting party); *see also Seaver v. Ransom*, 120 N.E. 639, 640-41 (N.Y. 1918) (recognizing right of third parties to sue on a contract despite not furnishing consideration); *Newin Corp. v. Hartford Accident & Indemnity Co.,* 333 N.E.2d 163, 168 (N.Y. 1975); *see also 6-8 Pelham Parkway Corp. v. Rusciano & Son Corp.*, 565 N.Y.S.2d 843, 844 (N.Y. App. Div. 1991) (plaintiffs not party to a contract between

---

[13] The cases cited by Columbia do not suggest otherwise.  In *Guerini Stone Co. v. P.J. Carlin Construction Co.*, 240 U.S. 264 (1916), the disputed agreement contained no clause incorporating, or even referring to the extraneous writing.  *Id.* at 277.  Similarly, the court in *F. Garofalo Electric Co., Inc. v. Hartford Fire Insurance Co.*, 799 F. Supp. 8 (E.D.N.Y. 1992), declined to incorporate an extraneous writing into a contract provision where there was no language referring to the instrument.  *Id.* at 10-11.  *In re Gulf Oil/Cities Serv. Tender Offer Litig*, 725 F. Supp. 712 (S.D.N.Y. 1989), does not help Columbia either.  In that case, on a motion for summary judgment after full discovery, the court held that a clause in an offer to purchase, to which plaintiffs were parties, explicitly disclaimed the separate obligation that the plaintiffs were trying to enforce.  *Id.* at 730.  In light of several unambiguous disclaimers, the Court held that plaintiffs had no claim for breach under either agreement.

defendant and a municipality could sue for breach because they were among the class of third parties intended to be benefited).[14]

Columbia's assertion that the NIH determination letter does not create any obligation running to licensees is flatly contradicted by the very terms of the determination letter. The very first provision states that "[t]he public interest will be best served by the expeditious development of the invention." NIH granted Columbia its rights in the Axel patents "[t]o **encourage** the above development"; otherwise the NIH would have retained all rights to the patents. (Tab 23, § 2 (emphasis added).) Accordingly, the determination letter included several provisions intended to increase the likelihood that companies such as Biogen and Genzyme would have the incentive to develop and commercialize therapeutic drugs using the technology disclosed in the Axel patents. NIH even reserved for itself the right to grant a license under the Axel patents to a "responsible applicant or applicants" such as Biogen and Genzyme "to practice the invention on terms that are reasonable in the circumstances, if the University and/or any of its licensees fail to comply with any of the provisions of this determination."

Plaintiffs have adequately pleaded their claims for breach of contract. Columbia's motion to dismiss these claims should be denied.

### C.    Plaintiffs Have Stated A Claim Under M.G.L. Chapter 93A.

Columbia raises several spurious arguments in seeking dismissal of plaintiffs' claims under M.G.L. c. 93A. First, it attempts to invoke the *Noerr-Pennington* doctrine, which does not apply to c. 93A claims. Second, it introduces factual arguments going well beyond the pleadings in claiming that its conduct did not occur "primarily and substantially in Massachusetts."

---

[14] Should the Court determine that plaintiffs are required to plead separately Columbia's liability to them resulting from Columbia's commitments to the NIH, plaintiffs respectfully request leave to amend.

Columbia does not directly challenge the plaintiffs' allegation that its conduct was unfair and deceptive – but it does attempt to excuse its conduct while discussing its other two arguments. Accordingly, plaintiffs briefly address the unfairness of Columbia's conduct first.

> **1.     Plaintiffs Allege Facts Sufficient To Make Out A Claim That Columbia's Conduct Was Unfair Or Deceptive.**

Under M.G.L. chapter 93A, a practice is unfair or deceptive where it (1) falls within the penumbra of some common law, statutory, or other established concept of unfairness (without regard to whether it is unlawful under some other theory); (2) is immoral, unethical, oppressive or unscrupulous; or (3) causes substantial injury to plaintiffs. *Cablevision of Boston, Inc. v. Public Improvement Comm'n of the City of Boston.*, 38 F. Supp. 2d 46, 60 (D. Mass. 1999) (Wolf, J.). "The objectionable conduct must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce." *Id.* (quoting *Quaker State Oil Refining Corp. v. Garrity Oil Co*., 884 F.2d 1510, 1513 (1st Cir. 1989)).

A wide variety of acts can fall within the ambit of unfair and deceptive practices actionable under M.G.L. c. 93A. For example, in *Pepsi-Cola Metro. Bottling Co. v. Checkers, Inc.*, the First Circuit affirmed the District Court's finding that a defendant had violated the statute by withholding payments owed to plaintiff wholesaler, as a "wedge" to enhance the defendant's bargaining position with plaintiff. 754 F.2d 10, 18 (1st Cir. 1985). The District Court concluded that the defendant had withheld payment "as a form of extortion, to force [plaintiff] to do what it otherwise could not be legally required to do." *Id.* Similarly, in *Anthony's Pier Four*, discussed above, the Supreme Judicial Court of Massachusetts held that the "knowing use of a pretext to coerce HBC into paying more than the contract required" was a violation of c. 93A. 583 N.E.2d at 822. Litigation conduct can also be predicate activity forming the basis of a c. 93A claim. *See*, *e.g.*, *Schubach v. Household Fin. Corp.*, 375 Mass.

133, 137 (1978) (complaint alleging that defendant finance company engaged in practice of intentionally filing collection actions in inconvenient courts to secure default judgments stated cause of action under c. 93A).

Here, plaintiffs have alleged facts similar to the circumstances that gave rise to violations of M.G.L. c. 93A in other cases.  Plaintiffs allege that Columbia, in an effort to extort money from plaintiffs and others in the biotechnology industry (Am. Compl. ¶¶ 49, 68-71), acted deceptively in gaming the patent system through its use of "submarine" patent applications (*id.* at ¶¶ 19-26, 42-48), wrongfully terminated plaintiffs' license agreements for non-payment of royalties for a patent that Columbia knew was invalid and unenforceable (*id.* at ¶¶ 62-64, 71), and tried to wear down plaintiffs' resistance by forcing them to incur costs from unnecessary and vexatious litigation (*id.* at ¶¶ 70-72).  These manipulations amounted to a knowing effort to leverage an invalid patent to "force [Plaintiffs] to do what [they] otherwise could not be legally required to do" – pay royalties for years beyond the expiration of Columbia's original patents.  Taking these allegations as true (as the Court must at the 12(b)(6) stage), it is apparent that Columbia's conduct was at the very least unscrupulous and unethical and has caused substantial harm to plaintiffs.  Because plaintiffs have properly pleaded their c. 93A claim, Columbia's motion to dismiss their claim under Rule 12(b)(6) must be denied.  *See Sebago, Inc. v. Beazer East, Inc.*, 18 F. Supp. 2d 70 (D. Mass. 1998) (Wolf, J.) (denying 12(b)(6) motion to dismiss claims under c. 93A where complaint alleged sufficient facts).

### 2.    The *Noerr-Pennington* Antitrust Immunity Doctrine Does Not Shield Columbia From c. 93A Liability.

Columbia argues that plaintiffs have failed to state a claim under M.G.L. c. 93A because some of the conduct at issue is privileged under the so-called *Noerr-Pennington* doctrine.  In particular, Columbia argues that its lobbying activities, its conduct in prosecuting its patents, its

conduct in the multidistrict litigation, and its efforts to enforce the '275 patent are all immunized from liability under c. 93A. These arguments distort plaintiffs' c. 93A claim and misleadingly focus on only a few aspects of Columbia's overall unfair dealings regarding the '275 patent.

Plaintiffs' c. 93A claim is not, as Columbia argues, based solely or primarily upon Columbia's interactions with the government, such as patent prosecution and Congressional lobbying activity. Rather, plaintiffs' c. 93A claim is based on a long-term pattern of deceitful and unscrupulous conduct designed to extract revenue from invalid patents, including wrongfully terminating plaintiffs' licenses (Am. Compl. ¶¶ 71-72, 81) and wielding a patent it knew was invalid and unenforceable in an attempt to extort settlement agreements from licensees under no obligation to pay (*id.* at ¶¶ 68-71). Even with respect to Columbia's activities before government agencies and conduct before this Court, however, Columbia's claim to *Noerr-Pennington* immunity fails.

a.    ***Noerr-Pennington* Immunity Is Not Available As A Defense To A Claim Under M.G.L. c. 93A.**

Columbia boldly proposes that "*Noerr-Pennington* doctrine **generally** grants immunity from suit to those who petition government for redress." Def. Mem. at 25 (emphasis added; internal quotation omitted). This sweeping overstatement of the reach of the *Noerr-Pennington* immunity provides a telling measure of the lengths to which Columbia believes it must go to secure dismissal of plaintiffs' c. 93A claims.

As a threshold matter, *Noerr-Pennington* immunity simply does not exist as a cognizable defense to an action under M.G.L. c. 93A. *Noerr-Pennington* doctrine originated as an **antitrust** immunity doctrine, and has traditionally been used as a shield from liability under the Sherman Act where the anticompetitive activity alleged to violate that statute consists of petitioning the government. *See Eastern R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127

(1961) (petitions to legislature); *United Mine Workers v. Pennington*, 381 U.S. 657 (1965)

(same); *see also California Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972)

(petitioning of agencies and courts).  Columbia cites **no case** – and indeed, plaintiffs know of no

case – applying *Noerr-Pennington* immunity to deflect an action under M.G.L. c. 93A.

Although the *Noerr-Pennington* doctrine has been applied to state law antitrust actions in some

jurisdictions, M.G.L. c. 93A is designed to have a broader reach than antitrust law.  *See*, *e.g.*,

*Kattar v. Demoulas*, 739 N.E.2d 246, 257 (Mass. 2000) (noting that "relief available under c.

93A is sui generis [and] not subject to the traditional limitations of pre-existing causes of action"

and that c. 93A "makes conduct unlawful which was not unlawful under the common law or any

prior statute"); *Schubach v. Household Finance Corp.*, 376 N.E.2d 140, 142 (Mass. 1978)

(noting that determination of whether conduct is actionable under c. 93A does not turn merely on

whether conduct is lawful apart from c. 93A); *see also Ciardi v. Hoffman-La Roche, Ltd.*, 762

N.E.2d 303, 306 (Mass. 2002) (holding that plaintiffs who would not have had standing to sue

for price fixing under state antitrust act had cause of action under c. 93A).

Indeed, in one exemplary case in which a party was charged with both Sherman Act and

M.G.L. c. 93A violations, it moved to dismiss the Sherman Act claim on grounds of *Noerr-*

*Pennington* immunity, but did not attempt to apply that defense to the c. 93A allegation; nor did

the court suggest that *Noerr-Pennington* immunity might be applicable.  *Skinder-Strauss Assocs.*

*v. Mass. Continuing Legal Ed., Inc.*, 870 F. Supp. 8, 10 (D. Mass. 1994) (Saris, J.) (denying Rule

12(b)(6) motion to dismiss Sherman Act claims on *Noerr-Pennington* grounds and ruling that

allegations stated c. 93A claim); *see also Schubach*, 375 Mass. at 137 (complaint alleging that

initiating of collections suits with intention of securing default stated claim under c. 93A).

        **b.**      **The Conduct That Columbia Claims Is Immunized From Suit Does Not Fall Within the Scope of *Noerr-Pennington* Doctrine.**

The Supreme Court has held that litigation conduct is exempted from *Noerr-Pennington* immunity where it is a sham, i.e. where it is (a) "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits;" and (b) merely an attempt to interfere with the business of others. *See*, *e.g.*, *Prof'l Real Estate Investors Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60-61 (1993) ("*PRE*"). In its brief, Columbia argues that the sham exception cannot be applied to "a party's defense of litigation instituted by another." Def. Mem. at 29-30. Columbia cites no authority in support of this erroneous proposition, and there is none. Indeed, plaintiffs' amended complaint expressly alleges that Columbia has taken the baseless position that its patent is valid and enforceable merely for the purpose of using protracted litigation to extort payments from plaintiffs and the other licensees. Thus, even if Columbia could invoke the *Noerr-Pennington* doctrine to defend a charge of unfair business practices under M.G.L. c. 93A, the plaintiffs' amended complaint sufficiently pleads the "sham" exception to the *Noerr-Pennington* doctrine.

Although Columbia devotes seven pages of its brief to arguments purporting to show that its conduct of the MDL litigation has been legitimate, here, at the motion to dismiss stage, the Court must take all the allegations in the amended complaint as true and draw all reasonable inferences in favor of the plaintiffs, asking only whether plaintiffs' allegations state a cause of action. *See*, *e.g.*, *Sebago*, 18 F. Supp. 2d at 78-79 (allowing c. 93A claims to proceed). That standard is unquestionably satisfied. *See Skinder-Strauss,* 870 F. Supp. at 10 (denying Rule 12(b)(6) motion to dismiss Sherman Act claims on *Noerr-Pennington* grounds because allegation of sham litigation was sufficient).

Plaintiffs have alleged a variety of dilatory and manipulative tactics that Columbia employed during the multidistrict litigation. *E.g.*, Am. Compl. ¶¶ 50-52, 68-72, 75. Plaintiffs allege that Columbia manipulated the court system for the purpose of delaying judicial scrutiny of its patent and extracting settlements from plaintiffs – rather than for the purpose of defending the validity of its patent. *E.g.*, *id.* at ¶ 2. That Columbia could not have had a realistic expectation that this Court would uphold its patent is shown by Columbia's unabashed failure to offer a word in defense of the '275 patent during the briefing and argument on plaintiffs' preliminary injunction motion. *E.g.*, *id.* at ¶ 63. Moreover, when it began to fare badly in the litigation, Columbia reversed its earlier positions and covenanted not to sue – hardly the conduct of a party with faith in the merits of its position. *E.g.*, *id.* at ¶¶ 65-67.

In arguing that its litigation conduct has not been a sham, Columbia relies on a wide range of extra-record "facts" extraneous to those alleged in the amended complaint, which it has improperly submitted to the Court in its Request for Judicial Notice and presented at pages 30-33 of its brief and in the brief's "Procedural Background" section. For example, Columbia argues that, contrary to plaintiffs' allegations, it did not seek to stall and manipulate litigation in an attempt to extract settlements from licensees with no obligation to pay royalties. Def. Mem. at 31-33. It also argues that its abrupt changes in tactics and reversals of position, such as those engendered by its transfer motions and the covenant not to sue, were legitimate. Def. Mem. at 32-33. These arguments fail to support Columbia's Rule 12(b)(6) motion, because they are inappropriate and irrelevant at the Rule 12(b)(6) stage. Here, the Court must take as true all allegations in plaintiffs' amended complaint and determine whether those allegations state a claim upon which relief may be granted. *See, e.g., Sebago*, 18 F. Supp. 2d at 78. Columbia's arguments, by contrast, raise factual issues properly determined at a later stage, not on a Rule

12(b)(6) motion to dismiss.  *See In re Network Equip. Tech., Inc. Litig.*, 762 F. Supp. 1359, 1363 (N.D. Cal. 1991) ("While defendants' arguments on the facts [of which defendants sought judicial notice] may ultimately prevail upon a motion for summary judgment or at trial, they do not create a basis for dismissing plaintiffs' complaint.").

Columbia also argues that the expert reports it commissioned from Dr. Francis Ruddle show that its defense of its patent is not meritless.  Def. Mem. at 30.  This erroneous argument is simply irrelevant to a Rule 12(b)(6) motion.  The document on which Columbia relies would not be before the Court at all had Columbia not attempted to turn Federal Rule of Evidence 201 on its head.  As shown in plaintiffs' opposition to Columbia's "Request for Judicial Notice," filed herewith, the contents of Dr. Ruddle's reports and the legitimacy or bases of his opinions are not properly subject to judicial notice.[15]  Because Columbia's argument for dismissal relies upon the legitimacy of Dr. Ruddle's reports – a disputed issue wholly inappropriate for either judicial notice or consideration on a Rule 12(b)(6) motion to dismiss – Columbia's motion to dismiss plaintiffs' c. 93A claim for failure to state a claim should be denied.  *In re Network Equip. Tech.*, 762 F. Supp. at 1363 ("[Courts] should not use judicial notice to generate an evidentiary record

---

[15] If the credibility of Dr. Ruddle were a proper consideration in a Rule 12(b)(6) motion – which it plainly is not – the evidence would not favor Columbia.  Asked at his deposition why the disclosure of CHO cells in the '017 patent did not render obvious the use of CHO cells as claimed in the '275 patent, Dr. Ruddle noted that he had actually "asked the attorneys why the mention of CHO cells in these particular claims in the '017 patent was not redundant . . . with regard to the claims in the '275 patent, and they indicated that there was no legal -- there was no legal relationship for comparison in this particular case."  He admitted that that he "didn't understand the legality of it, exactly," and summed up as follows:  "I could obviously see that CHO cells were mentioned in both sets of claims, but **I was instructed that for legal reasons that that was not to be considered** as a -- as a point of comparison with '275."  Deposition of Francis Ruddle, pp. 209-10 (emphasis added).  Immediately after this testimony, after only about four and a half hours on the record, Columbia's counsel suspended the deposition, claiming that Columbia's expert witness was too fatigued to continue.  Thus, the Court should not be concerned that Dr. Ruddle's testimony might ultimately put Columbia outside the "sham litigation" exception.

and then weigh evidence -- which plaintiffs have not had the opportunity to challenge -- to dismiss plaintiffs' complaint.").

The most that can be required under 12(b)(6) is that plaintiffs plead facts sufficient to place Columbia's litigation conduct within the sham exception to *Noerr-Pennington* doctrine. Plaintiffs have done so. *Skinder-Strauss,* 870 F. Supp. at 10; *cf. Sutton v. United States*, 819 F.2d 1289, 1299 (5th Cir. 1987) ("Trial courts ought not try to deal with [governmental immunity] on motions under [Rule] 12(b), when the proper disposition of the case requires some factual development by the parties.").

Columbia raises the puzzling contention that its letters to Biogen and Genzyme seeking royalty payments upon issuance of the '275 patent and, later, terminating their licenses are immunized under the *Noerr-Pennington* doctrine. The basis for this argument is a mystery. Communications between private parties are not immune under the *Noerr-Pennington* doctrine. *Cardtoons, L.C. v. Major League Baseball Players Assoc.*, 208 F.3d 885, 887 (10th Cir. 2000). This is so even when the communications threaten litigation that might itself be protected by *Noerr-Pennington*. *See id.* The *Noerr-Pennington* doctrine does not defeat plaintiffs' chapter 93A claim.

### 3. Columbia's Alleged Conduct Occurred Primarily And Substantially In Massachusetts.

Finally, despite plaintiffs' allegations that Columbia accepted $60 million originating in Massachusetts (Am. Compl. ¶ 12), enforced the original Axel patents in Massachusetts, and directed substantial and regular communications to Massachusetts plaintiffs concerning their license agreements and the Axel patents, *id.*, Columbia argues that the actions giving rise to plaintiffs' M.G.L. c. 93A claim did not occur "primarily and substantially in Massachusetts" as required by c. 93A. Def. Mem. at 35-38. Columbia misstates the law, however, in asserting that

"it is the locus of the conduct, not the location of the alleged harm, that counts." Def. Mem. at 37. Although the place of injury is not the determinative factor, "[t]he situs of the loss may, nevertheless, be considered in the determination." *Kuwaiti Danish Computer Co. v. Digital Equip. Corp.*, 781 N.E.2d 787, 798 n.13 (Mass. 2003).

In *Clinton Hospital Association v. Corson Group, Inc.*, 907 F.2d 1260 (1st Cir. 1990), the First Circuit affirmed Chief Judge Young's determination that the defendant, Corson Group, was subject to c. 93A liability despite the fact that, like Columbia, it was located in New York. *Id.* at 1267. Corson Group had negotiated a contract with Clinton Hospital, the Massachusetts-based plaintiff, primarily by telephone, and it had conducted almost all of its activities in New York. *Id.* at 1262. In his decision, Judge Young considered the place of contracting; the place of negotiation of the contract; the place of performance; the location of the subject matter of the contract; and the domicile, residence, nationality, place of incorporation, and place of business of the parties. *Id.* at 1263. Like Columbia, Corson Group argued that the place of conduct should be determinative of whether its activities occurred primarily and substantially in Massachusetts. *Id.* at 1263-64.

Rejecting the Corson Group's argument, the First Circuit explained that although the locus of the conduct was in New York, "the defendant's offensive conduct did not expire at the perimeters of New York," and the conduct was intended to influence the plaintiff's behavior in Massachusetts. *Clinton Hosp.*, 907 F.2d. at 1265. According to the court: "The victim's ingestion of a deceptive statement and the subsequent effects from reliance on it are what give the deceptive statement its venomous sting. The site of the victim's ingestion is therefore critical to a determination of whether the deceptive or unfair acts were committed primarily and substantially in the Commonwealth." *Id.* at 1266.

Moreover, the multi-factor analysis necessary to determine whether conduct occurred primarily and substantially in Massachusetts should not be undertaken at the pleading stage. According to the Supreme Judicial Court of Massachusetts, a judge should, "**after making findings of fact** . . . , determine whether the center of gravity of the circumstances that give rise to the claim is primarily and substantially within the Commonwealth." *Kuwaiti Danish Computer*, 781 N.E.2d at 799 (emphasis added); *accord Workgroup Tech. Corp. v. MGM Grand Hotel, LLC.*, 246 F. Supp. 2d 102, 118 (D. Mass. 2003) (Collings, M.J.).

**4.    Columbia's Motion For A More Definite Statement Of Plaintiffs' M.G.L. c. 93A Claim Should Be Denied.**

As an alternative to dismissal of plaintiffs' c. 93A claim, Columbia asserts that the Court should order plaintiffs to provide a more definite statement of this count under Fed. R. Civ. P. 12(e).  Because plaintiffs' pleading is more than adequate to provide notice of plaintiffs' claim, Columbia's motion should be denied.

Federal R. Civ. P. 12(e) provides that a motion for more definite statement is proper only where a pleading is "so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading."  Fed. R. Civ. P. 12(e); *Raytheon Co. v. Continental Cas. Co.*, 123 F. Supp. 2d 22, 33 (D. Mass. 2000) (Saris, J.).  Motions for a more definite statement are viewed with disfavor and should be denied unless the complaint is so indefinite that it is virtually impossible for the defendant to craft a response.  *See*, *e.g.*, *Scarfato v. Nat'l Cash Register Corp.*, 830 F. Supp. 1441, 1442 (M.D. Fla. 1993); *see also Shore v. Cornell-Dubilier Elec. Corp.* 33 F.R.D. 5, 7 (D. Mass. 1963) (motions for more definite statement generally disfavored).

The notice pleading standard of the Federal Rules of Civil Procedure requires only that the complaint "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002).  The pleading

system "relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims." *Id.* If Columbia is uncertain precisely which alleged facts form the basis of plaintiffs' claim under c. 93A, it may employ the procedural tools of discovery, such as contention interrogatories, to request further information from plaintiffs. *See* Fed. R. Civ. P. 33(c) (authorizing contention interrogatories); *Raytheon*, 123 F. Supp. 2d at 33 (denying motion under Rule 12(e) where "the information [movant] is seeking is more appropriately obtained through discovery"); *see also Beery v. Hitachi Home Elecs. (Am.), Inc.*, 157 F.R.D. 477, 480 (C.D. Cal. 1993) ("If the detail sought by a motion for more definite statement is obtainable through discovery, the motion should be denied.").

Here, Columbia's disingenuous assertion that the amended complaint fails to provide it with sufficient notice of the basis of plaintiffs' M.G.L. c. 93A claims against it is belied by the 16-plus pages of briefing that Columbia has devoted to arguing that plaintiffs have failed to state a claim under M.G.L. c. 93A. Indeed, Columbia understood plaintiffs' allegations sufficiently to assert that none of the conduct complained of amounted to a violation of the statute, to argue that the accused conduct did not occur primarily and substantially in Massachusetts, and to concoct a defense based upon the *Noerr-Pennington* doctrine. In short, plaintiffs' amended complaint provided Columbia with more than enough information to frame a defense. The Federal Rules of Civil Procedure do not require more.[16]

---

[16] The principal case relied upon by Columbia, *Anderson*, does not even decide a motion under Fed. R. Civ. P. 12(e). Rather, the court merely took an opportunity, in deciding an appeal from a grant of summary judgment, to express frustration at what it viewed as sloppy and improper litigation conduct on behalf of both parties. *Anderson v. Dist. Bd. of Trustees of Cent. Fl. Comm. College*, 77 F.3d 364, 366-367 (11th Cir. 1996). While the court was evidently of the view that the defendants could not reasonably have filed a responsive pleading and should therefore have moved for a more definite statement under Fed. R. Civ. P. 12(e), defendants clearly did not find it so, as they duly answered the complaint in that case. In the other case relied upon by Columbia, *In re Sriberg*, 49 B.R. 80, 81 (Bankr. D. Mass. 1984), which was not a c. 93A case,

Columbia complains that it cannot "discern from the Amended Complaint the specific conduct that allegedly constitutes the 'unfair' or 'deceptive' acts that purportedly violate [M.G.L. c. 93A]." All that is required under Fed. R. Civ. P. 12(b)(6), however, is that plaintiffs allege facts sufficient to make out a claim for relief. As shown in the previous section, plaintiffs have done so.

For these reasons, Columbia's alternative demand for a more definite statement should be denied.

## CONCLUSION

Plaintiffs' declaratory judgment claims are ripe for adjudication by this Court. In addition, plaintiffs have sufficiently pleaded their contract, abuse of process, and M.G.L. c. 93A claims. Columbia's motion to dismiss plaintiffs' claims should be denied.

Dated: February 11, 2005                    Respectfully submitted,

---

four of the six counts in the complaint alleged fraud "but [did] not state with particularity the circumstances constituting fraud as required by Fed. R. Civ. P. 9(b)." Sriberg was thus required to identify which of her background allegations corresponded to the underlying acts of fraud. In contrast, no Rule 9(b) heightened pleading requirement applies here, nor has Columbia argued that it does. *See Lawson v. Affirmative Equities Corp.*, 341 F. Supp. 2d 51, 67 & n.25 (D. Mass. 2004) (Stearns, J.) (holding that c. 93A count need not conform to Rule 9(b), because *Swierkiewicz* "sounded the death knell for the imposition of a heightened pleading standard" in c. 93A cases).

/s/ Claire Laporte
Donald R. Ware (BBO # 516260)
Claire Laporte  (BBO # 554979)
Sarah Cooleybeck  (BBO # 631161)
Carla Miriam Levy  (BBO # 654212)
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA 02210-2600
Telephone:  (617) 832-1000
Facsimile:  (617) 832-7000
Attorneys for BIOGEN IDEC INC., BIOGEN IDEC
MA, INC. and GENZYME CORPORATION