UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BIOGEN IDEC INC., BIOGEN IDEC MA, INC. and GENZYME CORPORATION,<br><br>Plaintiffs,<br><br>v.<br><br>THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK,<br><br>Defendant. | CIVIL ACTION No. 04-CV-12009-MLW |

**DECLARATION OF RAMSEY R. STEWART IN OPPOSITION TO
COLUMBIA'S MOTION UNDER FED. R. CIV. P. 12(b)(1)
TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION**

I, Ramsey R. Stewart, declare as follows:

1.  I am Associate General Counsel, Intellectual Property, of Biogen Idec Inc. ("Biogen Idec") and am authorized to make this declaration on its behalf. I received a B.S. in Microbiology from Clemson University, an M.S. in Biology from the University of South Carolina, and a J.D. from the University of Denver, College of Law. I am licensed to practice law in Colorado and California. In the eleven years since graduating from law school I have practiced law as a litigator and a patent attorney, both in-house and in private practice. I have been employed as an attorney by Biogen Idec Inc. (formerly IDEC Pharmaceuticals Corporation) since October, 2000.

2.  The statements made below are based on the knowledge I have gained while working for Biogen Idec and its predecessor and on my ongoing review of documents relating to Columbia's enforcement of its patent rights, materials relating to the multidistrict litigation currently pending before the Court, and communications from Columbia, as set forth below.

3.  Biogen Idec, previously known as IDEC Pharmaceuticals Corporation ("IDEC"), is a Delaware corporation with its principal place of business in Cambridge, Massachusetts. On November 12, 2003, Bridges Merger Corporation, a wholly owned subsidiary of IDEC, was merged with and into Biogen, Inc., with Biogen, Inc. continuing as the surviving corporation and a wholly owned subsidiary of IDEC. At the same time IDEC changed its name to Biogen Idec Inc. ("Biogen Idec"), and Biogen, Inc. was renamed Biogen Idec MA, Inc. ("Biogen").

4.  Before the merger, IDEC was involved in the development and marketing of recombinant drugs manufactured using cotransformed CHO cells, including RITUXAN®, a monoclonal antibody cancer therapy which IDEC co-marketed with Genentech, Inc. and which Biogen Idec still co-markets with Genentech. Pursuant to a collaboration agreement, Genentech is responsible for the manufacture and sale of RITUXAN®, and the two companies share in the profits. IDEC also developed ZEVALIN®, a radiolabeled monoclonal antibody cancer therapy combination regimen, using cotransformed CHO cells, and has been selling ZEVALIN® since Spring 2002.

5.  Before the merger, IDEC worked to develop other products that are made or will be made using CHO cells cotransformed with a gene or genes encoding a therapeutic protein and a gene encoding a selectable marker.

6.  IDEC never had a license to the Axel patents.

7.  At the time Columbia issued its Amended and Restated Covenant Not to Sue ("Covenant") on October 12, 2004, I was very concerned that Columbia was about to sue Biogen Idec for infringement of the '275 patent. Columbia had recently issued a letter to counsel for all plaintiffs in the multidistrict litigation concerning the scope of the first covenant it had issued. In that letter, Columbia's counsel stated, "Rituxan is a product currently made and sold by

Genentech. Columbia will not sue Genentech for infringement of the '275 patent ... with respect to Rituxan at any time now or in the future." The implicit assertion that RITUXAN® infringes the '275 patent concerned me. Counsel for Biogen and Biogen Idec responded to this letter by asking Columbia to extend a covenant not to sue to Biogen's affiliate, Biogen Idec. Columbia refused to do so.

8. Columbia's refusal was ominous given Columbia's willingness to enforce the Axel patents, including the '275 patent. I was aware from litigation records that Columbia had previously enforced the original Axel patents against Roche, Inc. and Genetics Institute and had enforced the '275 patent, either by bringing suit or by bringing counterclaims, against Johnson & Johnson, Ares Trading S.A., Amgen, and Immunex. This pattern of enforcement, combined with the specific accusation against a product we co-market, was alarming.

9. Columbia has recently made statements indicating its desire to terminate the multidistrict litigation before this Court. At the time Biogen Idec brought this suit, I was concerned, and I continue to be, that Columbia's real agenda is to remove the dispute from this Court to the forum in which it has sought to litigate since the very beginning - the Northern District of California. I was aware that Columbia had sought to transfer the venue of individual cases to the Northern District of California, and that it subsequently sought multidistrict transfer to the Northern District of California. Columbia also filed its lawsuit against Johnson & Johnson and Ares Trading S.A. in the Northern District of California, where it asserted as its only federal claim a claim for a "Declaration of Patent Validity and Enforceability."

10. Based on all the foregoing, I was concerned that Columbia would initiate suit against Biogen Idec in the Northern District of California in order to obtain a "first-filed" suit there and thereby litigate the validity of the '275 patent in its preferred forum.

11. I was concerned, and continue to be concerned, that if Biogen Idec is forced to await suit from Columbia, potential damages and interest could accrue day to day. It is important for Biogen Idec to resolve the uncertainty concerning the '275 patent now, not at a later time of Columbia's choosing.

Signed under the penalties of perjury this 11th day of February, 2005.

_____
Ramsey R. Stewart