UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

---

BIOGEN IDEC INC., BIOGEN IDEC MA, INC. and GENZYME CORPORATION

                    Plaintiffs,

          v.

THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK,

                    Defendant.

Civil Action No. 04-CV-12009 MLW

---

## COLUMBIA UNIVERSITY'S REPLY MEMORANDUM
## IN SUPPORT OF MOTION TO DISMISS

Dated:  February 25, 2005

Morgan Chu
David I. Gindler
Jason G. Sheasby
Irell & Manella LLP
1800 Ave of the Stars, Suite 900
Los Angeles, CA 90067
Telephone:  (310) 277-1010
Facsimile:  (310) 203-7199

Thomas F. Maffei (BBO # 313220)
Scott McConchie (BBO # 634127)
Griesinger, Tighe & Maffei, LLP
176 Federal Street
Boston, MA  02210-2600
Telephone:  (617) 542-9900
Facsimile:  (617) 542-0900

ATTORNEYS FOR DEFENDANT
THE TRUSTEES OF COLUMBIA
UNIVERSITY IN THE CITY OF
NEW YORK

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ........................................................................1

ARGUMENT..................................................................................................2

I.    The Court Should Dismiss The Declaratory Relief Claims In
      Counts IV Through VII Pursuant To Rule 12(b)(1) For Lack Of
      Subject Matter Jurisdiction ..............................................................2

      A.    Columbia Has Never Explicitly Threatened Biogen Idec
            With An Infringement Suit ......................................................2

      B.    The Totality Of The Circumstances Shows That Biogen
            Idec Does Not Have Any Reasonable Apprehension Of Suit ..........3

      C.    Because Biogen Idec Faces No "Real And Immediate" Risk
            Of An Infringement Suit From Columbia, Its Declaratory
            Relief Claims Must Be Dismissed .......................................9

      D.    Plaintiffs' Claim For Declaratory Relief On Account Of
            Alleged Patent Misuse Cannot Survive ...........................10

      E.    Even If Subject Matter Jurisdiction Exists Over The
            Declaratory Judgment Claims, The Court Should Decline
            To Hear Such Claims ...........................................................11

II.   The Court Should Dismiss Counts I, II, And III Pursuant To Rule
      12(b)(6) For Failure To State A Claim .........................................12

      A.    The Court Should Dismiss Count I For Abuse Of Process
            Because Columbia Has Never Used "Process" With
            Respect To Plaintiffs.............................................................12

      B.    The Court Should Dismiss Count II For Breach Of Contract
            And Breach Of The Implied Covenant ...............................13

            1.    Columbia Had The Right To Terminate Plaintiffs'
                  License Agreements For Failure To Pay Royalties .............13

            2.    The Claim For Breach Of The Implied Covenant Of
                  Good Faith And Fair Dealing Should Be Dismissed
                  As Duplicative Of The Claim For Breach Of
                  Contract...................................................................17

            3.    Section 2(b) Of The License Agreements Does Not
                  Create Any Contractual Obligations Owed To
                  Biogen And Genzyme..........................................19

C.    The Court Should Dismiss Count III For Violation Of Mass. Gen. Laws Ch. 93A Because It Is Barred By The *Noerr-Pennington* Doctrine And It Fails To State A Claim ............ 22

1.    The *Noerr-Pennington* Doctrine Precludes Plaintiffs' G.L. 93A Claim ................................................. 22

(a)    Plaintiffs' Attempt To Restrict *Noerr-Pennington* To Antitrust Claims Is Contrary To The Case Law ...................................................... 22

(b)    *Noerr-Pennington* Precludes Liability Under G.L. 93A For All Of Columbia's Alleged Conduct .................................................................. 24

(i)    Plaintiffs Fail To Allege That Columbia Engaged In Any "Objectively Baseless" Litigation Conduct ........................................ 25

(ii)    Plaintiffs Fail To Allege That Columbia Attempted To Interfere Directly With Any Of Their Business Relationships Through Litigation Conduct That Was Not Genuinely Aimed At Procuring A Favorable Outcome ...................................... 29

2.    Plaintiffs' Allegations Cannot State A Claim Under G.L. 93A ............................................................................ 30

(a)    The Alleged Wrongful Conduct Did Not Occur "Primarily And Substantially" In Massachusetts ........................................... 30

(b)    The Alleged Conduct That Occurred "Primarily And Substantially" In Massachusetts Is Insufficient To State A Claim Under G.L. 93A ............................................. 31

III.    As An Alternative To Dismissal Of Count III, The Court Should Require Plaintiffs To Provide A More Definite Statement Pursuant To Rule 12(e) ................................................................................. 32

CONCLUSION ........................................................................................ 32

<u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

<u>Cases</u>

*Aisenberg v. Hallmark Marketing Corp.*,
　　337 F. Supp. 2d 257 (D. Mass. 2004) ........................................................................ 17

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*,
　　486 U.S. 492 (1988) .................................................................................................... 24

*Apfel v. Prudential-Bache Securities, Inc.*,
　　183 A.D.2d 439 (N.Y. App. Div. 1992) .................................................................... 17

*B. Braun Medical Inc. v. Abbott Labs.*,
　　124 F.3d 1419 (Fed. Cir. 1997) ................................................................................. 10

*Baltimore Scrap Corp. v. David J. Joseph Co.*,
　　237 F.3d 394 (4th Cir. 2001) ..................................................................................... 26

*Bausch & Lomb Inc. v. CIBA Corp.*,
　　39 F. Supp. 2d 271 (W.D.N.Y. 1999) .......................................................................... 5

*Biogen Idec MA, Inc. v. Trustees of Columbia Univ.*,
　　332 F. Supp. 2d 286 (D. Mass. 2004) ................................................................. 14, 16

*BP Chems. Ltd. v. Union Carbide Corp.*,
　　4 F.3d 975 (Fed. Cir. 1993) ....................................................................... 6, 9, 10, 11

*CAE Screenplates, Inc. v. Beloit Corp.*,
　　957 F. Supp. 784 (E.D. Va. 1997) ............................................................................... 7

*California Motor Transport Company v. Trucking Unlimited*,
　　404 U.S. 508 (1972) ............................................................................................. 22, 23

*Capo, Inc. v. Dioptics Med. Prods., Inc.*,
　　387 F.3d 1352 (Fed. Cir. 2004) ................................................................................... 4

*Centronics Corp. v. Genicom Corp.*,
　　562 A.2d 187 (N.H. 1989) ......................................................................................... 18

*Cignetti v. Healy*,
　　967 F. Supp. 10 (D. Mass. 1997) ......................................................................... 12, 13

*City of Columbia v. Omni Outdoor Advertising, Inc.*,
　　499 U.S. 365 (1991) ......................................................................................... 24, 25, 29

*Clinton Hospital Ass'n v. Corson Group, Inc.*,
　　907 F.2d 1260 (1st Cir. 1990) ................................................................................... 31

Page(s)

*Eastern Railroad Presidents Conference v. Noerr Motor Freight Inc.*,
    365 U.S. 127 (1961)..................................................... 22

*EMC Corp. v. Norand Corp.*,
    89 F.3d 807 (Fed. Cir. 1996) ......................................... 11

*Field Container Co., L.P. v. Somerville Packaging Corp.*,
    842 F. Supp. 338 (N.D. Ill. 1994)..................................... 5

*Fletcher v. Wagner*,
    221 F. Supp. 2d 153 (D. Mass. 2002)................................ 12

*Gen-Probe, Inc. v. Amoco Corp., Inc.*,
    926 F.Supp. 948 (S.D. Cal. 1996).................................... 23

*Globetrotter Software, Inc. v. Elan Computer Group, Inc.*,
    362 F.3d 1367 (Fed. Cir. 2004) .................................. 28, 29

*Golan v. Pingel Enter., Inc.*,
    310 F.3d 1360 (Fed. Cir. 2002) ..................................... 29

*Herr v. Herr*,
    773 N.Y.S.2d 124 (N.Y. App. Div. 2004) .............................. 15

*Hertzog, Calamari & Gleason v. Prudential Ins. Co. of America*,
    No. 93 CIV. 6395 (CSH), 1996 WL 221616 (S.D.N.Y. May 1, 1996) ..... 18

*Hooper Assocs., Ltd. v. AGS Computers, Inc.*,
    548 N.E.2d 903 (N.Y. 1989)........................................... 19

*IGEN Intern., Inc. v. Roche Diagnostics GmbH*,
    335 F.3d 303 (4th Cir. 2003) .................................. 22, 26, 28

*In re Certain Semiconductor Chips*,
    No. 337-TA-432, 2000 WL 1269386 (U.S.I.T.C. Aug. 9, 2000) ........... 16

*In re Lois/USA, Inc.*,
    264 B.R. 69 (Bankr. S.D.N.Y. 2001)................................... 17

*Indium Corp. of America v. Semi-Alloys, Inc.*,
    781 F.2d 879 (Fed. Cir. 1985) ...................................... 4, 7

*Intermedics Infusaid, Inc. v. Regents of the Univ. of Minn.*,
    804 F.2d 129 (Fed. Cir. 1986) ....................................... 16

*Jones v. Brockton Pub. Mkts., Inc.*,
    340 N.E.2d 484 (Mass. 1975)...................................... 12, 13

Page(s)

*Kuwaiti Danish Computer Co. v. Digital Equip. Corp.*,
　781 N.E.2d 787 (Mass. 2003) ................................................................. 30

*Luke Bros., Inc. v. Krusell*,
　No. Civ. A. 94-11701-MLW, 1996 WL 50965 (D. Mass. Jan. 30, 1996)................ 12

*Maurice A. Garbell, Inc. v. Boeing Co.*,
　385 F. Supp. 1 (C.D. Cal. 1973) .............................................................. 14

*Md. Cas. Co. v. Pac. Coal & Oil Co.*,
　312 U.S. 270 (1941)................................................................................ 9

*Missouri v. Nat'l Organization for Women, Inc.*,
　620 F.2d 1301 (8th Cir. 1980) ................................................................ 22

*Murphy v. American Home Prods. Corp.*,
　58 N.Y.2d 293 (N.Y. 1983) .................................................................... 18

*Pellegrino Food Products Co., Inc. v. City of Warren*,
　136 F.Supp.2d 391 (W.D. Pa. 2000)......................................................... 23

*Powers v. Leno*,
　509 N.E.2d 46 (Mass. App. Ct. 1987) ...................................................... 12

*Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*,
　508 U.S. 49 (1993)................................................................................ 25

*Raner v. Goldberg*,
　155 N.E. 733 (N.Y. 1927)...................................................................... 15

*Sakowitz v. Ketsoglou*,
　502 N.Y.S.2d 38 (N.Y. App. Div. 1986) .................................................. 19

*Scioto County Regional Water Dist. No. 1 v. Scioto Water, Inc.*,
　916 F.Supp. 692 (S.D. Ohio 1995) .......................................................... 23

*Shell Oil Co. v. Amoco Corp.*,
　970 F.2d 885 (Fed. Cir. 1992) .............................................................. 3, 8

*Sheth v. New York Life Ins. Co.*,
　273 A.2d 72 (N.Y. App. Div. 2000) ......................................................... 18

*Silvia v. Building Inspector of West Bridgewater*,
　621 N.E.2d 686 (Mass. App. Ct. 1993) .................................................... 12

*St. Jude Medical Inc. v. Leverenz*,
　No. Civ. 03-5170(DWFJSM), 2004 WL 251839 (D. Minn. Feb 9, 2004)............... 22

Page(s)

*Super Sack Mfg. Corp. v. Chase Packaging Corp.*,
  57 F.3d 1054 (Fed. Cir. 1995) .................................................................. 2, 3

*Tavoloni v. Mount Sinai Medical Ctr.*,
  26 F. Supp. 2d 678 (S.D.N.Y. 1998) ...................................................... 21

*Teva Pharmaceuticals USA, Inc. v. Pfizer, Inc.*,
  395 F.3d 1324 (Fed. Cir. 2005) .............................................................. 9

*TorPharm, Inc. v. Pfizer Inc.*,
  No. Civ.03-990-SLR, 2004 WL 1465756 (D. Del. June 28, 2004).......................... 7

*Town of Norwood, Mass. v. New England Power Co.*,
  202 F.3d 408 (1st Cir. 2000)............................................................... 27, 28

*United Mine Workers of America v. Pennington*,
  381 U.S. 657 (1965)........................................................................ 24

*United Sweetener USA, Inc. v. Nutrasweet Co.*,
  760 F. Supp. 400 (D. Del. 1991)............................................................ 3

*Vendo Co. v. Lektro-Vend Corp.*,
  433 U.S. 623 (1977)........................................................................ 28

*Viking Injector Co. v. Chemtron, Inc.*,
  No. 3:CV-93-0791, 1993 WL 625543 (M.D. Pa. Nov. 9, 1993)................................ 6

*Vittands v. Sudduth*,
  730 N.E.2d 325 (Mass. App. Ct. 2000) ...................................................... 12

*W.S.A., Inc. v. ACA Corp.*,
  Nos. 94 Civ. 1868 (CSH), 94 Civ. 1493 (CSH), 1996 WL 551599
  (S.D.N.Y. Sept. 27, 1996)................................................................. 17

*West Interactive Corp. v. First Data Resources, Inc.*,
  972 F.2d 1295 (Fed. Cir. 1992) ...................................................... 4, 5, 6

*Whelan v. Abell*,
  48 F.3d 1247 (D.C. Cir. 1995)............................................................. 24

*Whitinsville Plaza, Inc. v. Kotseas*,
  390 N.E.2d 243 (Mass. 1979)............................................................... 23

Page(s)

**Statutes**

28 U.S.C. § 1404 .................................................................................................. 28

35 U.S.C. § 282 ................................................................................................... 16

42 U.S.C. § 1983 ................................................................................................. 23

45 C.F.R. § 8.1 .................................................................................................... 21

45 C.F.R. § 8.2 .............................................................................................. 20, 21

Mass. Gen. Laws ch. 93A, § 11 .................................................................. passim

**Rules**

Fed. R. Civ. P. 12(e) ........................................................................................... 32

Fed. R. Civ. P. 50(b) .......................................................................................... 24

**Other Authorities**

10B Charles Alan Wright *et al.*, *Federal Practice & Procedure*
   § 2751 (3d ed. 2004) .................................................................................... 10

5C Charles Alan Wright *et al.*, *Federal Practice & Procedure*
   § 1363 (3d ed. 2004) .................................................................................... 28

## **PRELIMINARY STATEMENT**

Biogen Idec has no basis to claim any reasonable apprehension that Columbia will ever file suit against it for infringement of the '275 patent.  Indeed, Biogen Idec concedes that it has *never* communicated with Columbia regarding licensing or infringement of the '275 patent.  In reality, Biogen Idec's purpose in asserting its declaratory relief claims is to prompt Columbia into granting it a royalty-free covenant not to sue.  As Biogen Idec candidly states in its opposition:  "If Columbia truly did not intend to enforce the '275 patent against Biogen Idec, it could easily dispose of this suit by granting Biogen Idec a covenant not to sue." (Opp. at 17.)  It is improper for Biogen Idec to assert declaratory relief claims that are plainly defective in the cynical hope that Columbia will choose the path of least resistance over the high cost of litigation.  The Court should promptly dismiss Biogen Idec's declaratory relief claims for lack of subject matter jurisdiction.

Biogen and Genzyme also have no business asserting any of their legally defective claims—all of which were concocted for the sole purpose of continuing their attack on the validity and enforceability of the '275 patent.  To support their abuse of process claim, they rely upon a definition of "process" that is contrary to three decades of Massachusetts case law.  To support their breach of contract claim, they ignore controlling Federal Circuit authority granting Columbia the right to terminate their license agreements for non-payment of royalties, notwithstanding their challenge to the validity and enforceability of the '275 patent.  And to support their G.L. 93A claim, they misrepresent the scope and effect of the *Noerr-Pennington* doctrine, which secures Columbia's right to seek favorable governmental action from Congress, from the PTO—and from this Court.

## ARGUMENT

**I.    The Court Should Dismiss The Declaratory Relief Claims In Counts IV Through VII Pursuant To Rule 12(b)(1) For Lack Of Subject Matter Jurisdiction**

The parties agree that, under the first part of the Federal Circuit's two-part test for subject matter jurisdiction, Biogen Idec has the burden of establishing by a preponderance of the evidence "an explicit threat or other action by the patentee, which creates a *reasonable* apprehension on the part of the declaratory plaintiff that it will face an infringement suit . . . ." *Super Sack Mfg. Corp. v. Chase Packaging Corp.*, 57 F.3d 1054, 1058 (Fed. Cir. 1995) (citation omitted). As discussed below, Biogen Idec has not identified either "an explicit threat" or any "other action" by Columbia that creates a reasonable apprehension that Columbia will sue Biogen Idec for infringement of the '275 patent.

### A.    Columbia Has Never Explicitly Threatened Biogen Idec With An Infringement Suit

In two abstract ways, Biogen Idec appears to contend that Columbia has threatened it with an infringement suit. First, Biogen Idec makes much of Columbia's reference to Rituxan in a letter from Columbia's counsel to plaintiffs' counsel in the multidistrict litigation, in which Columbia's counsel responsed to certain questions raised regarding the scope of the initial covenant not to sue. (Opp. at 3-4.) As Biogen Idec admits, Columbia's counsel simply used Rituxan as an example of a product made and sold *by Genentech* that was covered by the covenant not to sue. (*Id.*) The letter does not mention Biogen Idec. The letter was not sent to Biogen Idec. Indeed, the letter does not even suggest that Columbia had any knowledge or understanding as to Biogen Idec's role with respect to Rituxan. Moreover, given Biogen Idec's admission that it neither makes nor sells Rituxan (it simply has a "co-marketing" obligation), (*Id.* at 3), it is unclear exactly what activity Biogen Idec believes Columbia possibly could be targeting. And in any event, the notion that Columbia

is "targeting" Rituxan by identifying it as *a product which is covered by a covenant not to sue* is, at best, hyperbole in the extreme.

Second, Biogen Idec argues that Columbia has an "alleged preference to file suit [against Biogen Idec] at a later date (and, implicitly, in a district more to its liking). . . ." (*Id.* at 10.)  Biogen Idec's entire basis for asserting that Columbia has an "alleged preference to file suit at a later date" is the fact that Columbia "has **not** disclaimed an intent to sue Biogen Idec for infringement of the '275 patent." (*Id.* at 8.)  This is little more than a semantic game, in which Biogen Idec has attempted to transform silence on the possibility of future litigation into an affirmative threat of future litigation.  The simple truth is that Columbia has said nothing to suggest that it will sue Biogen Idec, whether now or at any time in the future.  There is not a shred of evidence to the contrary.

Biogen Idec's reliance on *United Sweetener USA, Inc. v. Nutrasweet Co.*, 760 F. Supp. 400 (D. Del. 1991), is misplaced.  In that case, "Nutrasweet [did] not contest that reasonable apprehension [of an infringement suit] existed when the [declaratory relief] complaint was filed." *Id.* at 404.  Nutrasweet subsequently moved to dismiss United Sweetener's declaratory relief complaint after promising not to assert the patent-in-suit until the conclusion of reexamination proceedings in the PTO.  The court denied the motion, finding that Nutrasweet's limited promise did not vitiate the reasonable apprehension of suit that already existed when the complaint was originally filed.  Here, of course, Biogen Idec has never had any reasonable apprehension of an infringement suit by Columbia.

**B.    The Totality Of The Circumstances Shows That Biogen Idec Does Not Have Any Reasonable Apprehension Of Suit**

Where, as here, the patentee has not expressly threatened to sue the declaratory plaintiff, courts look to the "totality of the circumstances" to determine whether there is a reasonable apprehension of suit.  *Shell Oil Co. v. Amoco Corp.*, 970 F.2d 885, 888 (Fed. Cir.

1992).  To support its showing of reasonable apprehension, Biogen Idec relies upon the

Declaration of its Associate General Counsel for Intellectual Property, Ramsey R. Stewart,

who states that he "was concerned" and that he "continue[s] to be concerned" that Columbia

will initiate an infringement suit against Biogen Idec.  (Stewart Decl. ¶¶ 9-11.)  Mr.

Stewart's "subjective apprehension of an infringement suit is insufficient to satisfy the

actual controversy requirement."  *Indium Corp. of America v. Semi-Alloys, Inc.*, 781 F.2d

879, 883 (Fed. Cir. 1985).  "The standard is objective, and focuses on whether the patentee

manifested the intention to enforce the patent, and would be reasonably expected to enforce

the patent against the declaratory plaintiff."  *Capo, Inc. v. Dioptics Med. Prods., Inc.*, 387

F.3d 1352, 1355 (Fed. Cir. 2004).

Biogen Idec does not and cannot identify any conduct by Columbia that would lead a

reasonable person to conclude that Columbia plans to sue Biogen Idec for infringement of

the '275 patent.  Most importantly, Biogen Idec does not dispute that Columbia has never

communicated with Biogen Idec about licensing or possible infringement of the '275 patent.

The Federal Circuit has found the absence of any meaningful communication between the

patentee and the declaratory plaintiff fatal to a finding of reasonable apprehension of suit.

For example, in *West Interactive Corp. v. First Data Resources, Inc.*, 972 F.2d 1295

(Fed. Cir. 1992), First Data, the patent holder, had licensed its patents to Call Interactive, a

joint venture that included one of First Data's wholly-owned subsidiaries.  *Id*. at 1296.  At

one point, Call Interactive's officials had a meeting with Semper Barris Company, at which

a representative of Call Interactive (who was the inventor of the patented devices) told the

president of Semper Barris that both Semper Barris and West infringed First Data's patents.

Although there was no representative of West in attendance at the meeting, Semper Barris's

president subsequently informed West's president about the communication.  West then

filed an action against First Data seeking "a declaration that First Data could not successfully sue it for patent infringement." *Id.*  The district court granted First Data's motion to dismiss for lack of subject matter jurisdiction, reasoning that "there has been no contact, directly or indirectly, between the plaintiff and First Data . . . There is no credible indication that First Data intends to bring suit against West." *Id.*

Affirming the district court's ruling, the Federal Circuit concluded:  "In sum, West has not shown that First Data undertook any conduct sufficient to support West's alleged apprehension of litigation.  Mr. Katz's oral statement to Semper Barris in the course of negotiations, with no West or First Data representatives present, does not give West an objective reason to fear a lawsuit." *Id.* at 1297-98.   Accordingly, the Federal Circuit held that "[t]he district court correctly detected West's failure to show an actual controversy with First Data." *Id*. at 1298.[1]

Given the absence of any communication between Columbia and Biogen Idec regarding licensing or infringement of the '275 patent, Biogen Idec must point to some other type of conduct that has created a reasonable apprehension of suit.  It cannot do so.  While Biogen Idec contends that its exclusion from Columbia's covenant not to sue creates a reasonable apprehension of suit, neither of the cases cited by Biogen Idec supports this contention.  Quite to the contrary, they directly undermine it.  As here, both cases involve

---

[1] *See also Bausch & Lomb Inc. v. CIBA Corp.*, 39 F. Supp. 2d 271, 273 (W.D.N.Y. 1999) (where the plaintiff B&L pointed to "rumors" of a possible infringement action and a call received from a third party revealing that a representative of the patent holder CIBA had informed the third party that CIBA was going to sue B&L for infringement, court found no reasonable apprehension of suit because "there is no allegation of any direct contact between CIBA and B&L concerning possible patent . . . infringement"); *Field Container Co., L.P. v. Somerville Packaging Corp.*, 842 F. Supp. 338, 342-43 (N.D. Ill. 1994) ("The limited interaction between these parties thus strongly suggests against a finding of reasonable apprehension of suit.").

situations where the declaratory plaintiff claimed that the defendant's failure to provide a covenant not to sue created a reasonable apprehension of suit, even though the defendant had never threatened to file an infringement suit against the plaintiff. Both cases concluded that the failure to provide the covenant did not create any reasonable apprehension of suit.[2]

Nor does Biogen Idec's reliance on Columbia's litigation history suggest any reasonable apprehension of suit. As to the original Axel patents (which are not now at issue), Biogen Idec points only to two suits that Columbia filed (in 1990 and 1993) during the entire seventeen years that those patents were in force. As to the '275 patent, Biogen Idec points only to Columbia's counterclaims *for breach of contract* against Amgen and Columbia's initiation of a single action against Johnson & Johnson and Ares Trading S.A. at a time when all other licensees with material royalty obligations had already sued Columbia to invalidate the '275 patent. Biogen Idec does not identify any conduct in any of those lawsuits that would lead a reasonable person to conclude that Columbia "invariably pursues litigation against alleged infringers," *West Interactive*, 972 F.2d at 1298, let alone that Columbia is now poised to bring suit for infringement against Biogen Idec. Indeed, Columbia's conduct in the multidistrict litigation—the filing of its covenant not to sue the

---

[2] *BP Chems. Ltd. v. Union Carbide Corp.*, 4 F.3d 975, 980 (Fed. Cir. 1993) ("Although a patentee's refusal to give assurances that it will not enforce its patent is relevant to the determination, this factor is not dispositive. The district court's finding that [defendant] did not threaten suit for patent infringement, or place [plaintiff] or its licensees in reasonable apprehension of suit, has not been shown, in the circumstances, to be clearly in error.") (internal citations omitted); *Viking Injector Co. v. Chemtron, Inc.*, No. 3:CV-93-0791, 1993 WL 625543, at *2 (M.D. Pa. Nov. 9, 1993) (holding that "regardless of Defendant's failure to make reassurances that this court interprets as legally binding and absolute, the court can not conclude that Plaintiff has a reasonable apprehension of suit").

MDL plaintiffs and its unequivocal commitment not to sue anyone for infringement of the '275 patent while proceedings in the PTO are ongoing—suggests just the opposite.[3]

For many of the same reasons, Biogen Idec's reference to non-specific statements made by Columbia's counsel in the multidistrict litigation concerning the possibility of infringement counterclaims (which are *mandatory* counterclaims in a declaratory relief action alleging patent invalidity) does nothing to suggest that Biogen Idec has any reasonable apprehension of suit.  (Opp. at 5-6.)  None of those statements was directed—either explicitly or implicitly—against Biogen Idec.  None of those statements suggested that Columbia planned to broadly enforce the '275 patent against the entire biotechnology industry.  None of those statements suggested that Columbia planned to sue any affiliates of the MDL plaintiffs.  Moreover, Biogen Idec simply ignores that all of these statements were made well before Columbia gave the unequivocal and binding assurance that it will not initiate infringement suits based on the '275 patent while the PTO is considering the reissue application and the reexamination petition.  In these circumstances, Biogen Idec has no basis

---

[3] *See also Indium Corp.*, 781 F.2d at 883 ("The prior patent litigation initiated by Semi-Alloys in 1975, against two other parties unconnected with Indium, was too remote to make Indium's apprehension of further litigation in 1982 reasonable . . ."); *TorPharm, Inc. v. Pfizer Inc.*, No. Civ.03-990-SLR, 2004 WL 1465756, at *10-11 (D. Del. June 28, 2004) (where there had not been "any communication, either direct or indirect, from defendants concerning the '450 patent," court found that an infringement suit based on the '450 patent against another company does not "translate into an intent to enforce the '450 patent against plaintiffs" and infringement litigation against other companies based on other patents "does not provide any indication of [the patent holder's] intentions regarding the '450 patent and [plaintiff's product] *quinapril hydrochloride*"); *CAE Screenplates, Inc. v. Beloit Corp.*, 957 F. Supp. 784, 792 (E.D. Va. 1997) (finding no reasonable apprehension of suit based on defendant's filing of four patent infringement suits against unrelated parties in the past 27 years).

to claim that these statements create a reasonable apprehension that Columbia will sue Biogen Idec for infringement of the '275 patent.[4]

Finally, having reached the bottom of the barrel, Biogen Idec lists a hodge-podge of unsupported allegations and miscellaneous acts to suggest that it has a reasonable apprehension of suit, including Columbia's lobbying activities before Congress, Columbia's settlements with other licensees, Columbia's termination of unidentified licenses (presumably those belonging to Biogen and Genzyme), and Columbia's patent prosecution activities before the PTO.  (Opp. at 15.)  Biogen Idec presents no factual support for many of these alleged activities, even though Biogen Idec well knows that it has the burden of proving by a preponderance of the *evidence*—not unsupported allegations—that Columbia has engaged in conduct creating a reasonable apprehension of suit.  *See Shell Oil*, 970 F.2d at 887 ("the plaintiff has the burden of establishing by a preponderance of the evidence . . . that it has a reasonable apprehension that it will be sued.").  In any event, Biogen Idec provides no explanation as to how any of these alleged activities demonstrates that it is reasonable to conclude that Columbia intends to sue *Biogen Idec* for infringement of the '275 patent—particularly given that all of them pre-date the covenant not to sue and Columbia's repeated assurances in open court and elsewhere that it will not sue anyone during the pendency of reexamination and reissue proceedings in the PTO.

---

[4] Biogen Idec suggests, without any citation of evidence, that Columbia has made threats "against an entire product industry."  (Opp. at 17.)  Biogen Idec does not cite any evidence to support this statement because there is none.

**C.    Because Biogen Idec Faces No "Real And Immediate" Risk Of An Infringement Suit From Columbia, Its Declaratory Relief Claims Must Be Dismissed**

In an effort to soften the standard by which "reasonable apprehension" is judged, Biogen Idec argues that this Court should essentially ignore the Federal Circuit's recent decision in *Teva Pharmaceuticals USA, Inc. v. Pfizer, Inc.*, 395 F.3d 1324 (Fed. Cir. 2005), which states that a declaratory judgment plaintiff "must be able to demonstrate that it has a reasonable apprehension of *imminent* suit." *Id*. at 1333 (emphasis in original). Taking issue with the requirement of "imminent suit," Biogen Idec argues that "there is no support for this statement as a general proposition of law divorced from its factual context." (Opp. at 11.) Yet in the very next sentence of its opinion, the Federal Circuit—quoting the United States Supreme Court—explains exactly what it means by this statement: "Whether there is an 'actual controversy' between parties having adverse legal interests depends upon whether the facts alleged show that there is a substantial controversy between the parties '*of sufficient immediacy and reality* to warrant the issuance of a declaratory judgment.'" 395 F.3d at 1333 (quoting *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941)) (emphasis added). The Federal Circuit has repeatedly affirmed this long-standing rule. *E.g.*, *BP Chems.*, 4 F.3d at 978 ("The purpose of the two-part test is to determine whether the need for judicial attention is *real and immediate*, or is prospective and uncertain of occurrence.") (emphasis added, citation omitted).

Columbia has not said or done anything that could be reasonably construed as a threat to sue Biogen Idec—whether today, tomorrow, or someday in the future—for infringement of the '275 patent. Accordingly, Biogen Idec cannot establish that it has a "real and immediate" need for judicial attention. As even Biogen Idec concedes, the purpose of the Declaratory Judgment Act is to "afford one *threatened with liability* an early

adjudication without waiting until an adversary should see fit to begin an action after the damage has accrued."  10B Charles Alan Wright *et al.*, *Federal Practice & Procedure* § 2751 (3d ed. 2004) (emphasis added).  Here, Columbia has not, by words or conduct, *threatened* Biogen Idec with liability for infringement of the '275 patent.

Ultimately, Biogen Idec argues that, to satisfy the reasonable apprehension of suit requirement, the only thing that "must be imminent is the potential **infringement**, not the adversary's future lawsuit."  (Opp. at 13) (emphasis in original.)  Biogen Idec cites no authority for this statement, and there is none.  Indeed, Biogen Idec's proposed rule would essentially merge the two parts of the Federal Circuit's test for subject matter jurisdiction, allowing proof of "imminent" infringing conduct (the second part of the test) to establish reasonable apprehension of suit (the first part of the test).  That is not the law, for reasonable apprehension of suit turns on "the objective words and actions of the patentee," *BP Chems.*, 4 F.3d at 979, not the actions or subjective belief of the declaratory plaintiff.

## D. Plaintiffs' Claim For Declaratory Relief On Account Of Alleged Patent Misuse Cannot Survive

Relying solely upon *B. Braun Medical Inc. v. Abbott Labs.*, 124 F.3d 1419 (Fed. Cir. 1997), plaintiffs argue that they are entitled to pursue their claim for a declaration that the '275 patent is unenforceable on account of patent misuse because they may be entitled to additional relief beyond a declaratory judgment.  (Opp. at 19-20.)  They are wrong.  In *B. Braun Medical*, the Federal Circuit found that "once a court *properly has jurisdiction to enter a declaratory judgment*, it may also grant 'further necessary or proper relief based on a declaratory judgment . . . after reasonable notice and hearing.'"  124 F.3d at 1428 (emphasis

added).  This Court does not have proper jurisdiction over this declaratory judgment claim.

Accordingly, the Court should dismiss Count VII as to all plaintiffs.[5]

### E.    Even If Subject Matter Jurisdiction Exists Over The Declaratory Judgment Claims, The Court Should Decline To Hear Such Claims

"The purpose of the [Declaratory Judgment] Act is to enable a person who is reasonably at legal risk because of an unresolved dispute, to obtain judicial resolution of that dispute without having to await the commencement of legal action by the other side."  *BP Chems.*, 4 F.2d at 977.  The Federal Circuit has held that "as long as the district court acts in accordance with the purposes of the Declaratory Judgment Act and the principles of sound judicial administration, the court has broad discretion to refuse to entertain a declaratory judgment action."  *EMC Corp. v. Norand Corp.*, 89 F.3d 807, 813-14 (Fed. Cir. 1996).

Columbia has repeatedly stated that it will not commence litigation against anyone while PTO proceedings are ongoing, and that it does not know what action it might take if the '275 patent survives reexamination and reissue proceedings.  Moreover, no one knows what claims if any may ultimately emerge from the PTO.  In light of the foregoing, the possibility of future litigation between Columbia and Biogen Idec is entirely hypothetical.  Accordingly, the objectives of the Declaratory Judgment Act would be ill served by devoting scarce judicial resources to litigate the validity and enforceability of a patent whose very existence is in limbo.

---

[5] As discussed in Columbia's moving papers, the Court lacks subject matter jurisdiction over Biogen Idec's claim because Columbia has not made explicit threats or engaged in other conduct that would create a reasonable apprehension of suit.  The Court lacks subject matter jurisdiction over Biogen and Genzyme's claim because any case or controversy was eliminated by the covenant not to sue.

## II.   The Court Should Dismiss Counts I, II, And III Pursuant To Rule 12(b)(6) For Failure To State A Claim

### A.   The Court Should Dismiss Count I For Abuse Of Process Because Columbia Has Never Used "Process" With Respect To Plaintiffs

Biogen and Genzyme argue that they have stated a claim for abuse of process by charging that all of Columbia's litigation conduct had an ulterior purpose. No Massachusetts law supports this claim.

The Supreme Judicial Court's decision in *Jones v. Brockton Pub. Mkts., Inc.*, 340 N.E.2d 484 (Mass. 1975), remains the leading authority on abuse of process in Massachusetts. *Jones* defines "process" as "the papers issued by a court to bring a party or property within its jurisdiction." *Id*. at 486. *Jones* further states that there are only "three types of process: writs of attachment, the process used to institute a civil action, and, the process related to the bringing of criminal charges." *Id*. (internal citations omitted). This definition of "process" has been consistently followed by federal and state courts in Massachusetts for three decades.[6]

Plaintiffs' citation to *Cignetti v. Healy*, 967 F. Supp. 10 (D. Mass. 1997), does not support their effort to rewrite Massachusetts law. Indeed, *Cignetti* does not even address whether a party's conduct during the course of a litigation proceeding can serve as the basis

---

[6] *E.g.*, *Fletcher v. Wagner*, 221 F. Supp. 2d 153, 155 (D. Mass. 2002) (citing *Jones* for principle that process related to bringing criminal charges "is one of the three types of process supporting a claim for abuse of process"); *Luke Bros., Inc. v. Krusell*, No. Civ. A. 94-11701-MLW, 1996 WL 50965, at *2 (D. Mass. Jan. 30, 1996) (Wolf, J.) (citing *Jones* in support of holding that "plaintiffs did not 'cause' process to issue against Wholesalers [because] Wholesalers entered the litigation voluntarily by filing a motion to intervene"); *Vittands v. Sudduth*, 730 N.E.2d 325, 332 n.9 (Mass. App. Ct. 2000) (citing *Jones* for limited definition of "process"); *Silvia v. Building Inspector of West Bridgewater*, 621 N.E.2d 686, 687 n.4 (Mass. App. Ct. 1993) (quoting *Jones* for principle that "the word 'process' in the context of abuse of process means causing papers to issue by a court 'to bring a party or property within its jurisdiction'"); *Powers v. Leno*, 509 N.E.2d 46, 48 (Mass. App. Ct. 1987) (quoting *Jones* for limited definition of "process").

for an abuse of process claim. *Cignetti* deals only with the narrow question of "whether a civil service hearing constitutes 'process' for the purpose of an abuse of process claim." *Id.* at 18. In analyzing this question, the district court considered whether the commencement of a civil service hearing was essentially analogous to the process used to initiate a civil suit or criminal proceeding. After citing *Jones* for the definition of "process," the court concluded that, "[b]ecause the Civil Service proceeding compelled the parties to submit to the jurisdiction of the Civil Service Commission, to retain counsel, to provide testimony, and to abide by the decision of the ALJ, a reasonable argument can be made that the Civil Service hearing constitutes such 'process.'" *Id*.

Nothing in *Cignetti* suggests any intent to expand the definition of "process" to broadly encompass all litigation activity in a civil proceeding. Moreover, none of the other cases that plaintiffs cite—all of which discuss the abuse of process tort in other states—has ever been followed (or even mentioned) by any federal or state court in Massachusetts.

### B.    The Court Should Dismiss Count II For Breach Of Contract And Breach Of The Implied Covenant

#### 1.    Columbia Had The Right To Terminate Plaintiffs' License Agreements For Failure To Pay Royalties

Plaintiffs do not dispute that (1) the license agreements require payment of royalties on "Licensed Products," which are defined as products covered by "Licensed Patent Rights which have neither expired nor been held invalid by a court of competent jurisdiction from which no appeal has or may be taken," (RJN Exs. M and P at § 1(d)(i)); (2) the '275 patent is included within the definition of "Licensed Patent Rights"; (3) plaintiffs had not paid royalties on products covered by the '275 patent at the time that Columbia terminated their license agreements in March 2004; and (4) the license agreements provide that the failure to pay royalties is a material breach. In light of the foregoing, Columbia had every right to

terminate plaintiffs' license agreements. *Biogen Idec MA, Inc. v. Trustees of Columbia Univ.*, 332 F. Supp. 2d 286, 293 (D. Mass. 2004) ("It is undisputed that failure to pay royalties that are due constitutes a material breach under the license agreements.").

Plaintiffs nevertheless argue that the allegations of their amended complaint—which they stress must be accepted as true for purposes of Columbia's motion—are sufficient to establish that they owed no royalties at the time that Columbia terminated their license agreements. First, plaintiffs argue that, because the amended complaint alleges that the claims of the '275 patent "merely duplicate" the claims of the expired Axel patents, the '275 patent is also an expired patent. (Opp. at 25.) This argument rests on nothing more than linguistic trickery. The '275 patent issued on September 24, 2002, with a term of seventeen years. It will not expire—as that term is understood in the patent law—until September 24, 2019. Plaintiffs cite nothing in their license agreements, New York contract law, or federal patent law to support their bizarre definition of "expire."[7]

In a similar vein, plaintiffs argue that, because their amended complaint alleges that the '275 patent is unenforceable, they have never owed royalties to Columbia on products covered by that patent. Plaintiffs claim to find support for this argument in the definition of "Licensed Products," which includes products covered by "Licensed Patent Rights which have neither *expired nor been held invalid* by a court of competent jurisdiction." Plaintiffs appear to suggest that, although this language requires the payment of royalties until a

---

[7] This Court may take judicial notice of the dates of issuance and expiration of a patent. *See Maurice A. Garbell, Inc. v. Boeing Co.*, 385 F. Supp. 1, 32 (C.D. Cal. 1973) (taking judicial notice of year of expiration of patent in suit). This Court has already observed that the '275 patent "will not expire until September 24, 2019—seventeen years after the date on which it was issued." *Biogen Idec MA, Inc.*, 332 F. Supp. 2d at 293.

Licensed Patent Right has been held *invalid*, it does not require the payment of royalties until a Licensed Patent Right has been held *unenforceable*.  (Opp. at 25.)

This argument is specious.  Nothing in the definition of "Licensed Products" or elsewhere in the license agreement suggests that Biogen and Genzyme are relieved of their contractual obligation to pay royalties merely by *alleging*—as opposed to *proving*—that a "Licensed Patent Right" is unenforceable.  To import such a condition would violate New York law, which prohibits a court from implying a condition that the parties elected not to incorporate.  *See Herr v. Herr*, 773 N.Y.S.2d 124, 125 (N.Y. App. Div. 2004) ("'[w]e may not now imply a condition which the parties chose not to insert in their contract'") (quoting *Raner v. Goldberg*, 155 N.E. 733, 734 (N.Y. 1927)).  If the parties intended to relieve Biogen and Genzyme of their contractual obligation to make royalty payments before a "Licensed Patent Right" has been found unenforceable, the parties would have included such a provision in their license agreements.

Moreover, no rule of federal patent law allows plaintiffs to avoid the contractual consequences of withholding royalties while challenging the validity or enforceability of a licensed patent.  Indeed, the Federal Circuit reached just the opposite conclusion in *Cordis Corp. v. Medtronic, Inc.*, 780 F.2d 991 (Fed. Cir. 1985).  There, Cordis sought a declaratory judgment that patents it had licensed from Medtronic were invalid.  The district court granted Cordis's motion to allow payment of required royalties into an escrow account and to enjoin Medtronic from terminating the license for non-payment of royalties.  The Federal Circuit vacated these rulings, holding that Medtronic had both the contractual right to receive royalties pursuant to the license agreement and the right to terminate Cordis's license upon non-payment of royalties.  The court of appeals held that, while federal patent policy "permit[s] a licensee to cease payments due under a contract while challenging the

validity of a patent," it "*does not* permit the licensees to avoid facing the consequences that such an action would bring." *Id.* at 995 (emphasis in original). In language directly applicable here, the Federal Circuit concluded that "we find no authority in *Lear* for . . . preliminarily enjoining a licensor from canceling the license agreement and, thus, from counterclaiming for patent infringement *when this material breach of the license occurs*." *Id.* (emphasis added). In reaching this conclusion, the court reasoned that "*[p]atents are presumed to be valid, 35 U.S.C. § 282; until invalidity is proven, the patentee should ordinarily be permitted to enjoy the fruits of his invention*." *Id.* (emphasis added).

Biogen and Genzyme attempt to distinguish *Cordis* on the narrow ground that it involved only the weighing "of the traditional four factors affecting preliminary injunctions." (Opp. at 26.) This is untrue. The Federal Circuit would only have considered whether the district court properly enjoined termination of the license agreement if there were a right to terminate in the first place. Indeed, this Court followed the principles in *Cordis* when it denied Biogen and Genzyme's motion to enjoin Columbia from terminating their license agreements. *Biogen Idec MA, Inc.*, 332 F. Supp. 2d at 302 (although Biogen and Genzyme "need not . . . pay royalties while challenging the '275 patent, . . . it is consistent with the public interest to allow Columbia to terminate their licenses.").[8]

_____

[8] *See also Intermedics Infusaid, Inc. v. Regents of the Univ. of Minn.*, 804 F.2d 129, 133 (Fed. Cir. 1986) ("This Court held in [*Cordis*] that a licensee is not entitled . . . to preclude a licensor from terminating the license agreement for breach by reason of nonpayment of royalties."); *In re Certain Semiconductor Chips*, No. 337-TA-432, 2000 WL 1269386, at *13 (U.S.I.T.C. Aug. 9, 2000) (holding that the patent holder had properly terminated the license upon the licensee's non-payment of royalties, the International Trade Commission concluded that: "[*Cordis's*] statement of law by the Federal Circuit . . . is clear and *not diminished by the preliminary injunction context* in which it arose. It is a general statement of the law that . . . the licensee cannot avoid the consequences of failure to pay royalties.") (emphasis added).

2.    **The Claim For Breach Of The Implied Covenant Of Good Faith And Fair Dealing Should Be Dismissed As Duplicative Of The Claim For Breach Of Contract**

Biogen and Genzyme do not dispute that their claim for breach of the implied covenant of good faith and fair dealing is based on the exact same allegations as their claim for wrongful termination of the license agreements. Under New York law, their implied covenant claim must be dismissed as duplicative. *See Apfel v. Prudential-Bache Securities, Inc.*, 183 A.D.2d 439, 439 (N.Y. App. Div. 1992) ("The cause of action alleging a breach of good faith is duplicative of a cause of action alleging breach of contract, since every contract contains an implied covenant of good faith and fair dealing."); *see also W.S.A., Inc. v. ACA Corp.*, Nos. 94 Civ. 1868 (CSH), 94 Civ. 1493 (CSH), 1996 WL 551599, at *9 (S.D.N.Y. Sept. 27, 1996) (dismissing implied covenant claim based on "allegations also presented in support [of] the breach of contract claim," court observed that "[r]aising both claims in a single complaint is . . . redundant. As a result, every court confronted with such a complaint brought under New York law has dismissed the claim for breach of the covenant of fair dealing."). As plaintiffs' implied covenant claim is governed by the New York choice of law provision in the license agreements, their appeal to Massachusetts law is improper. *See Aisenberg v. Hallmark Marketing Corp.*, 337 F. Supp. 2d 257, 261 (D. Mass. 2004) (finding that "choice of law provision . . . applies to [claim] for a breach of the implied covenant of good faith and fair dealing because such a claim has been held to sound in contract rather than in tort"); *In re Lois/USA, Inc.*, 264 B.R. 69, 97-98 (Bankr. S.D.N.Y. 2001) (holding that choice of law provision governing contract applies to claim for breach of the implied covenant of good faith and fair dealing).

Plaintiffs' reason for asserting an implied covenant claim is obvious: They are attempting to avoid the express terms of their license agreements, which do not relieve them

of their contractual obligation to pay royalties while challenging the validity or enforceability of a licensed patent. Indeed, plaintiffs admit as much when they argue that Columbia's conduct "would unquestionably violate the implied covenant of good faith and fair dealing," even if the license agreements "technically permitted" Columbia to "extract payments from licensees because the patent had not yet been held invalid." (Opp. at 28.) It is well settled under New York law, however, that the implied covenant cannot be used to derogate from the express terms of a written contract. *See Murphy v. American Home Prods. Corp.*, 58 N.Y.2d 293, 304 (N.Y. 1983) ("No obligation can be implied . . . which would be inconsistent with other terms of the contractual relationship."); *Sheth v. New York Life Ins. Co.*, 273 A.2d 72, 73 (N.Y. App. Div. 2000) (dismissing claim for breach of the implied covenant of good faith and fair dealing because "it would be incongruous to say that an inference may be drawn that the employer impliedly agreed to a provision which would be destructive of his right of termination") (quotation marks omitted); *see also Hertzog, Calamari & Gleason v. Prudential Ins. Co. of America*, No. 93 CIV. 6395 (CSH), 1996 WL 221616, at *2 (S.D.N.Y. May 1, 1996) ("the implied covenant cannot controvert contractual language").

Relying upon *New Hampshire law*, plaintiffs argue that their license agreements should be read "to invest one party with a degree of discretion in performance sufficient to deprive another party of a substantial proportion of the agreement's value." (Opp. at 27) (quoting *Centronics Corp. v. Genicom Corp.*, 562 A.2d 187 (N.H. 1989)). Plaintiffs do not cite any provision of their license agreements that purportedly invests Columbia with discretion in the performance of its duties, such as a "best efforts" provision. While plaintiffs argue that "the license agreements gave Columbia discretion in the prosecution of the Axel patents," (Opp. at 28), that is not so. The license agreements say not one word

about Columbia's rights or obligations in connection with the prosecution of any patent applications.[9]

### 3. Section 2(b) Of The License Agreements Does Not Create Any Contractual Obligations Owed To Biogen And Genzyme

Plaintiffs can point to no language in section 2(b) of their license agreements that creates a contractual obligation on the part of Columbia that plaintiffs are entitled to enforce. By its terms, section 2(b) simply preserves certain rights and obligations that Columbia owes to the United States Government, notwithstanding the rights granted to Biogen and Genzyme under their respective license agreements. It preserves those rights by providing that the "rights granted by Columbia under this agreement *are subject to* any rights required to be granted to the Government . . . ." The phrase "are subject to" cannot reasonably be interpreted as investing Biogen and Genzyme with the power to enforce the rights "required to be granted [by Columbia] to the Government."

Instead of relying on the language of their license agreements, plaintiffs argue that section 2(j) of the NIH determination letter "provides that the prohibition on 'unreasonable royalties and repressive practices' must be incorporated into each license agreement." (Opp. at 30.) This is untrue. The NIH determination letter provides that "[a]ny license granted by the University under the U.S. patent application shall include adequate safeguards against

---

[9] While plaintiffs claim that they have incurred damages as a result of the alleged wrongful termination of their license agreements and the alleged breach of the implied covenant, the only damages that they identify are their attorney's fees. Attorney's fees may not be recovered for breach of contract under New York law. *See Hooper Assocs., Ltd. v. AGS Computers, Inc.*, 548 N.E.2d 903, 904 (N.Y. 1989) (in breach of contract action, court found that "attorney's fees are incidents of litigation and a prevailing party may not collect them from the loser unless an award is authorized by agreement between the parties, statute or court rule"); *Sakowitz v. Ketsoglou*, 502 N.Y.S.2d 38, 39 (N.Y. App. Div. 1986) (in action for breach of contract, court noted that attorney's fees are "recoverable only when permitted by contract or statute").

unreasonable royalties and repressive practices.  Royalties shall not in any event be in excess

of normal trade practice."  (RJN Ex. J at 5.)  This language creates an obligation that

Columbia owes to the United States Government to include adequate safeguards in its

license agreements to prevent unreasonable royalties and repressive practices, including

royalties not in excess of normal trade practice.  Nothing in this language even remotely

suggests the creation of some general contractual obligation that Columbia owes directly to

its licensees to refrain from "repressive licensing practices."

Apparently recognizing the weakness of their position, Biogen and Genzyme now

argue, for the first time, that they are entitled to enforce the NIH determination letter as third

party beneficiaries.  Their amended complaint contains no such claim for relief, nor should

they be granted leave to assert such a claim (as they improperly request in a *footnote* in their

opposition).[10]  Moreover, any such claim would fail as a matter of law for one simple

reason:  The NIH determination letter is not a contract.  It is an administrative determination

made by the Assistant Secretary for Health and Scientific Affairs, Department of Health and

Human Services, in response to a petition filed by Columbia requesting permission "to

retain and administer the principal rights" in the Axel inventions, which resulted from

research funded by two grants from the NIH.  (*Id*. at 1.)  Columbia filed its petition pursuant

to 45 C.F.R. § 8.2, the relevant portion of which provided:

> If [the Assistant Secretary] finds that the invention will . . . be
> more adequately and quickly developed for widest use and
> that there are satisfactory safeguards against unreasonable

---

[10] Biogen and Genzyme have already filed four pleadings—two complaints in this action and two complaints in *Biogen I*—in which they could have attempted to assert such a claim.  They should not be allowed yet another stab at rewriting their complaint to include a claim that they have failed to assert in their four previous pleadings.  Indeed, their request for leave to amend only serves to highlight the way in which they have improperly used this second action as a means to escape their failure to seek leave to amend in *Biogen I*.

> royalties and repressive practices, the invention may be
> assigned to a competent organization for development and
> administration for the term of the patent or such lesser period
> as may be deemed necessary.

45 C.F.R. § 8.2(b).  In granting the petition, the Assistant Secretary imposed a set of non-

negotiable conditions on Columbia pursuant to 45 C.F.R. § 8.1(a) with respect to the

commercialization and licensing of the Axel inventions.  Those non-negotiable conditions

are set forth in the determination letter.  The very language quoted by Biogen and Genzyme

regarding "safeguards against unreasonable royalties and repressive practices" was taken

directly from 45 C.F.R. § 8.2(b).  Nothing in the determination letter or the applicable

regulations suggests any intent to allow enforcement of these non-negotiable conditions by

third parties.

Moreover, in an analogous setting, one court has rejected a plaintiff's claim to third

party beneficiary rights based on an NIH research grant.  In *Tavoloni v. Mount Sinai

Medical Ctr.*, 26 F. Supp. 2d 678 (S.D.N.Y. 1998), the plaintiff, a doctor employed by

Mount Sinai, alleged that he was a third party beneficiary to an NIH research grant to Mount

Sinai.  The court found that such NIH "grants are governed by statute, not contract law."  *Id.*

at 683.  Since the plaintiff could point to "nothing in the applicable statute and regulations

that gives rise to any right to relief," his claim was dismissed.  *Id.*  The Second Circuit

affirmed the district court's holding in an unpublished decision, explaining that the "[t]he

N.I.H. awards grants pursuant to statutory authority.  The terms of its awards are not subject

to negotiation between the parties and, on review, we will interpret an N.I.H. grant by

examining the relevant statute and regulations and not the parties' understanding."  198 F.3d

235, 1999 WL 972656, at *2 (2d Cir. 1999) (unpublished).

C.     **The Court Should Dismiss Count III For Violation Of Mass. Gen. Laws Ch. 93A Because It Is Barred By The *Noerr-Pennington* Doctrine And It Fails To State A Claim**

1.     **The *Noerr-Pennington* Doctrine Precludes Plaintiffs' G.L. 93A Claim**

Plaintiffs contend that the *Noerr-Pennington* doctrine does not apply to a G.L. 93A claim and that, even if it does, they have adequately alleged conduct falling within the "sham" exception to the doctrine.  Both arguments are equally meritless.

(a)     **Plaintiffs' Attempt To Restrict *Noerr-Pennington* To Antitrust Claims Is Contrary To The Case Law**

The *Noerr-Pennington* doctrine is rooted in the right of petition protected by the United States Constitution.  *California Motor Transport Company v. Trucking Unlimited*, 404 U.S. 508, 510 (1972) ("'The right of petition is one of the freedoms protected by the Bill of Rights, and we cannot, of course, lightly impute to Congress an intent to invade these freedoms.'") (quoting *Eastern Railroad Presidents Conference v. Noerr Motor Freight Inc.*, 365 U.S. 127, 138 (1961)).  As such, courts routinely hold that this *constitutional* doctrine is not restricted to the defense of antitrust claims.  Rather, in the four decades since the *Noerr-Pennington* doctrine was first introduced, courts have consistently applied this doctrine to a wide variety of state-law business torts, including unfair competition.[11]

_____

[11] *See IGEN Intern., Inc. v. Roche Diagnostics GmbH*, 335 F.3d 303, 310 (4th Cir. 2003) (applying *Noerr-Pennington* to Maryland unfair competition claims because "although originally developed in the antitrust context, the doctrine has now universally been applied to business torts"); *Missouri v. Nat'l Organization for Women, Inc.*, 620 F.2d 1301, 1318-19 (8th Cir. 1980) (holding that *Noerr-Pennington* immunized boycott activities from state claim for intentional infliction of emotional harm based on the Supreme Court's "shift in focus from the *Noerr* holding that [petitioning] activities are beyond the intent of . . . the Sherman Act . . . to the *Noerr* statement that there are serious constitutional questions involved also"); *St. Jude Medical Inc. v. Leverenz*, No. Civ. 03-5170(DWFJSM), 2004 WL 251839, at *1-2 (D. Minn. Feb 9, 2004) (dismissing abuse of process counterclaim based on *Noerr-Pennington* immunity and rejecting the defendant's contention that the doctrine does not apply to tort claims); *Gen-Probe, Inc. v. Amoco Corp., Inc.*, 926 F. Supp. 948, 955-56

While plaintiffs suggest that they "know of no case . . . applying *Noerr-Pennington* immunity to deflect an action under M.G.L. c. 93A," (Opp. at 36), they apparently did not look very hard. In *Whitinsville Plaza, Inc. v. Kotseas*, 390 N.E.2d 243 (Mass. 1979), the plaintiff, who owned property adjacent to the defendant's land, alleged that the defendant had violated a covenant running with his parcel that prohibited the operation of certain businesses on that parcel. *Id.* at 244-245. The Supreme Judicial Court rejected the defendants' contention that the plaintiff had violated the antitrust laws or G.L. 93A by filing suit to enforce the covenant. Citing *Noerr* and *California Motor Transport*, 404 U.S. 508 (1972) (which expanded *Noerr-Pennington* immunity to litigation activities), the court stated that "we reject the suggestions that, merely by bringing suit to enforce the [covenant], [the plaintiff] has violated the antitrust laws *or c. 93A*. Absent oppressive or vexatious misuse of legal process, it is not illegal to resort to the courts in an attempt to limit competition." *Id.* at 252-53 (emphasis added). The court's citation to *Noerr* and *California Motor Transport* confirms that the *Noerr-Pennington* doctrine applies to G.L. 93A claims, just as it applies to state-law unfair competition claims generally.

The "exemplary" case that plaintiffs cite for the proposition that the *Noerr-Pennington* doctrine does not apply to a G.L. 93A claim involves a defendant who, for reasons not disclosed in the opinion, chose not to rely upon that doctrine when moving to

---

(S.D. Cal. 1996) (applying *Noerr-Pennington* to dismiss unfair competition claim and observing that "[t]he majority of courts . . . have concluded that [*Noerr-Pennington*] immunity is constitutional and rooted in the First Amendment right to petition"); *Scioto County Regional Water Dist. No. 1 v. Scioto Water, Inc.*, 916 F. Supp. 692, 702 (S.D. Ohio 1995) (applying *Noerr-Pennington* to tortious interference claim and stating that *Noerr-Pennington* "is grounded on the First Amendment [right to petition, which] . . . applies whether those efforts are challenged under federal antitrust law or under state law"); *Pellegrino Food Products Co., Inc. v. City of Warren*, 136 F. Supp. 2d 391, 411 (W.D. Pa. 2000) (applying *Noerr-Pennington* to tortious interference with business and contractual relations claim, to abuse of process claim, and to claim under 42 U.S.C. § 1983).

dismiss the G.L. 93A claim. The opinion says nothing, one way or the other, about the applicability of the *Noerr-Pennington* doctrine to a G.L. 93A claim—no doubt because the defendant did not raise the issue, thereby waiving it.[12]

        **(b)**    **_Noerr-Pennington_ Precludes Liability Under G.L. 93A For All Of Columbia's Alleged Conduct**

Plaintiffs make no effort to argue that Columbia's lobbying activities before Congress or patent prosecution activities before the PTO fall outside of the *Noerr-Pennington* doctrine. That is hardly surprising, given that the very purpose of those activities—as expressly alleged in plaintiffs' complaint—was to secure favorable governmental action. As such, those activities are clearly protected by the *Noerr-Pennington* doctrine. *City of Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365, 380 (1991) (*Noerr-Pennington* immunity is available unless defendant's activities "are 'not genuinely aimed at procuring favorable government action' at all.") (quoting *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 500 n. 4 (1988)). It is irrelevant that plaintiffs allege that Columbia undertook such action for an improper purpose. *United Mine Workers of America v. Pennington*, 381 U.S. 657, 670 (1965) ("*Noerr* shields . . . a concerted effort to influence public officials regardless of intent or purpose.")

Plaintiffs argue only that Columbia's *litigation conduct* falls within the "sham" exception to the *Noerr-Pennington* doctrine. As discussed below, plaintiffs do not and cannot allege facts sufficient to satisfy the two-part test for "sham" litigation established in

---

[12] *See Whelan v. Abell*, 48 F.3d 1247, 1251 (D.C. Cir. 1995) (by failing to raise *Noerr-Pennington* immunity in Rule 50(b) motion, defendants waived that theory as a basis for judgment as a matter of law)

*Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49 (1993) ("*PRE*").[13]

(i)  **Plaintiffs Fail To Allege That Columbia Engaged In Any "Objectively Baseless" Litigation Conduct**

The parties agree that the two-part test for "sham" litigation set forth in *PRE* has both an objective prong and a subjective prong, both of which must be satisfied to establish that litigation conduct falls within the "sham" exception to the *Noerr-Pennington* doctrine. Specifically, to meet this test, plaintiffs must allege that Columbia's defense of the previous lawsuit was both (1) "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits" and (2) "conceals an attempt to interfere *directly* with the business relationships of a competitor, through the use [of] the governmental *process*—as opposed to the outcome of that process—as an anti-competitive weapon." *Id.* at 60-61 (quotations omitted).[14]

---

[13] Plaintiffs contend that, when cataloguing the allegations that support their G.L. 93A claim, Columbia has "distort[ed]" that claim by "misleadingly focus[sing] on only a few aspects of Columbia's overall unfair dealings regarding the '275 patent." (Opp. at 35.) Plaintiffs contend that paragraphs 68-72 and 81 of the amended complaint pertain to a "long-term pattern of deceitful and unscrupulous conduct designed to extract revenue from invalid patents," (*id.*), not addressed by Columbia's motion. Yet plaintiffs do not, because they cannot, identify any allegations in those paragraphs that go beyond the conduct analyzed in Columbia's motion to dismiss. The "conduct" described in those paragraphs pertains to Columbia's activities (a) prosecuting the '275 patent before the PTO (AC ¶ 71); (b) filing and opposing motions with the intent to "delay court proceedings" and allegedly attempting to "extort settlement agreements" from plaintiffs, (AC ¶¶ 68-72); and (c) writing letters to plaintiffs attempting to "enforce" the '275 patent, including terminating plaintiffs' license agreements, (AC ¶¶ 72, 81). All of that conduct is discussed in Columbia's Motion to Dismiss. (Mot. at 28-35).

[14] Plaintiffs cite not one case that has ever applied, or even suggested the application of, the "sham" exception to a party's *defense* of litigation initiated by another. For the "sham" exception to apply to a party's defense of litigation, a court would need to accept the incredible proposition that a party alleged to have engaged in serious wrongdoing and facing substantial liability would conduct its defense without any genuine desire to "procure[e] favorable governmental action *at all*. . . ." *City of Columbia*, 499 U.S. at 380 (emphasis

While plaintiffs suggest otherwise, (Opp. at 37), their amended complaint does not set forth allegations that satisfy the objective prong of the "sham" litigation test. To satisfy that prong, plaintiffs would need to *allege* that no reasonable litigant could realistically expect to defeat plaintiffs' claims that the '275 patent is invalid and unenforceable—even though patents are presumed to be valid and can only be proven invalid upon a showing of clear and convincing evidence. Instead of making any such allegations, plaintiffs focus on what Columbia allegedly *knew or intended* by its litigation conduct. (AC ¶ 68) (Columbia "sought to exploit the '275 patent, and the costs and uncertainty of litigation, by attempting to extract settlements from several plaintiffs . . ."); (*id.* ¶ 71) (Columbia "has engaged in an ongoing strategy to delay court proceedings . . ."); (*id.* ¶ 75) ("Columbia has manipulated and abused the judicial process for ulterior and illegitimate purposes . . ."). These allegations as to Columbia's *intent or purpose* are insufficient to defeat *Noerr-Pennington* immunity. *See PRE*, 508 U.S. at 59 ("[W]e have repeatedly reaffirmed that evidence of anticompetitive intent or purpose alone cannot transform otherwise legitimate activity into a sham."); *IGEN*, 335 F.3d at 312 ("[E]ven litigation that is deceitful, underhanded, or morally wrong will not defeat immunity unless it satisfies the objective baselessness requirement.") (citing *Baltimore Scrap Corp. v. David J. Joseph Co.*, 237 F.3d 394, 398-99 (4th Cir. 2001)).

To be sure, Count III does allege that "the '275 patent is invalid and unenforceable." (AC ¶ 88.) But that is much different than alleging that Columbia's defense of the previous litigation was "objectively baseless" and that the only course of action reasonably available

---

added). Columbia submits that the Court should decline plaintiffs' flight of fancy. Nevertheless, Columbia's discussion above assumes that it is appropriate to re-fashion the two-part *PRE* test to apply to the defense of a lawsuit, even though it was created for the filing and prosecution of a lawsuit.

to Columbia was to stipulate to the entry of judgment against it.  In short, plaintiffs do not, and cannot, allege that no objective litigant could have held "a reasonable belief that there is a chance that [Columbia's defense of its patent] may be held valid upon adjudication."  *PRE*, 508 U.S. at 62-63.**15**

Plaintiffs also appear to argue that various actions that Columbia took while defending the previous case—and not just Columbia's substantive position with respect to the validity and enforceability of the '275 patent—fall within the "sham" litigation exception.  (Opp. at 38.)  Again, plaintiffs are wrong.  Plaintiffs do not *allege* that any of Columbia's actions during the defense of the previous lawsuit were objectively baseless.  Their amended complaint does not even attempt to allege, and their opposition makes no effort to argue, that a reasonable litigant would not have realistically expected any chance of success when moving to consolidate the various cases in a single forum, or when moving to prevent duplicative discovery before consolidation was achieved, or when opposing Biogen and Genzyme's motion to enjoin the termination of their license agreements, or when moving to dismiss the declaratory relief claims after granting a covenant not to sue.  The absence of any such allegations is fatal to plaintiffs' position.  Nor could plaintiffs amend their complaint to cure this problem, given that Columbia was ultimately *successful* in all of these endeavors.  *See PRE*, 508 U.S. at 58 ("[A] successful 'effort to influence governmental

---

**15** Plaintiffs object to Columbia's request that the Court take judicial notice of two expert reports prepared by Dr. Francis Ruddle.  Both reports are part of the record in the previous MDL proceeding, and therefore can be subject to judicial notice.  *Town of Norwood, Mass. v. New England Power Co.*, 202 F.3d 408, 412 n.1 (1st Cir. 2000).  However, given that plaintiffs have failed to allege that Columbia's defense of the '275 patent was objectively baseless, the Court need not reach the question of whether Dr. Ruddle's expert reports may be considered in connection with this motion.

action . . . certainly cannot be characterized as a sham.'") (quoting *Vendo Co. v. Lektro-Vend Corp.*, 433 U.S. 623, 645 (1977) (Blackmun, J., concurring)).[16]

Plaintiffs attack not the *objective merits* of Columbia's actions, but rather Columbia's *intent* when implementing them:  "Plaintiffs allege that Columbia manipulated the court system for the purpose of delaying judicial scrutiny of its patent and extracting settlements from plaintiffs—rather than for the purpose of defending the validity of its patents."  (Opp. at 38.)  As discussed above, allegations of improper purpose or motive are inadequate to establish "sham" litigation conduct, unless that conduct is also objectively baseless.  *IGEN*, 335 F.3d at 312.

Finally, plaintiffs briefly argue that federal patent law does not immunize Columbia from G.L. 93A liability for its letters seeking royalty payments and terminating their license agreements.  (Opp. at 40.)  They are wrong.  The Federal Circuit has held that federal patent law preempts any state-law claim based on communications relating to the enforcement of a patent, whether before or during litigation, unless those communications are objectively baseless.  *Globetrotter Software, Inc. v. Elan Computer Group, Inc.*, 362 F.3d 1367, 1377 (Fed. Cir. 2004).  Moreover, the Federal Circuit has held that when the information

---

[16] Plaintiffs take issue with Columbia's reliance upon various court filings referenced in their amended complaint, such as Columbia's oppositions to various efforts to conduct discovery in advance of a ruling on its MDL motion, Columbia's motions to transfer under 28 U.S.C. § 1404 and the MDL statute, Columbia's opposition to plaintiffs' motion for a preliminary injunction, and Columbia's motion to dismiss the declaratory relief claims in light of the covenant not to sue.  It is well established, however, that filings from a previous case are properly subject to judicial notice, *Town of Norwood*, 202 F.3d at 412, and that the Court need not accept as true allegations that are contradicted by judicially noticeable facts. 5C Charles Alan Wright *et al.*, *Federal Practice & Procedure* § 1363 (3d ed. 2004). Columbia has asked the Court to take judicial notice of the existence and content of the documents solely to address plaintiffs' self-serving and incomplete descriptions of salient events in *Biogen I*.  Columbia has not offered these documents for any other purpose, such as to show that Columbia did not act with an intent to "stall and manipulate litigation" or to "extract settlements from licensees," as plaintiffs suggest.  (Opp. at 38.)

contained in such a communication is objectively accurate, the communication is not objectively baseless and is thus immune from liability under state-law claims. *Id.* at 1377 (citing *Golan v. Pingel Enter., Inc.*, 310 F.3d 1360, 1371 (Fed. Cir. 2002)). Plaintiffs do not allege that any of the statements in Columbia's letters to plaintiffs were not objectively accurate, (Mot. at 34), and plaintiffs' opposition does not argue otherwise. (Opp. at 40.)

> **(ii)   Plaintiffs Fail To Allege That Columbia Attempted To Interfere Directly With Any Of Their Business Relationships Through Litigation Conduct That Was Not Genuinely Aimed At Procuring A Favorable Outcome**

To satisfy the subjective prong, plaintiffs must allege that Columbia's defense activities were in reality "'an attempt to interfere *directly* with the business relationships of a competitor,' through the 'use [of] the governmental *process*—as opposed to the *outcome* of that process—as an anticompetitive weapon[.]'" *PRE*, 508 U.S. at 60-61. In their opposition, plaintiffs argue that they have satisfied this requirement by alleging that Columbia's actions were undertaken "merely for the purpose of using protracted litigation to extort payments from plaintiffs and other licensees." (Opp. at 37.) This allegation falls far short of the mark.

In order to establish that Columbia's litigation activities were intended to harm plaintiffs "through the 'use [of] the governmental *process*—as opposed to the *outcome* of that process," 508 U.S. at 60-61, plaintiffs must allege that those activities were "not genuinely aimed at procuring favorable governmental action *at all*." *City of Columbia*, 499 U.S. at 380 (emphasis added). Their amended complaint contains no such allegation. Indeed, any such allegation would be absurd, for it would require plaintiffs to contend that Columbia was indifferent to the outcome when it moved to consolidate all of the pending cases in a single forum, when it moved to prevent duplicative discovery, when it opposed

Biogen and Genzyme's motion to enjoin the termination of their license agreements, and when it moved to dismiss all of the declaratory relief claims for lack of subject matter jurisdiction.

Moreover, plaintiffs do not and cannot allege that any of Columbia's litigation conduct was intended to "*interfere directly*" with any of plaintiffs' business relationships, as required by *PRE*.   Their opposition does not even argue that Columbia intended to interfere with any of Biogen's or Genzyme's business relationships.

### 2.    Plaintiffs' Allegations Cannot State A Claim Under G.L. 93A

#### (a)    The Alleged Wrongful Conduct Did Not Occur "Primarily And Substantially" In Massachusetts

Plaintiffs cannot state a claim under G.L. 93A unless "the center of gravity of the circumstances that give rise to the claim is primarily and substantially within the Commonwealth."  *Kuwaiti Danish Computer Co. v. Digital Equip. Corp.*, 781 N.E.2d 787 (Mass. 2003).  In their opposition, plaintiffs do not dispute that (1) none of Columbia's lobbying activities or patent prosecution activities occurred in Massachusetts; (2) the vast majority of the factual allegations of their amended complaint describe these wholly out-of-state activities; and (3) the only allegedly wrongful conduct that took place in Massachusetts relates to a narrow series of events leading to, or occurring during, the litigation of *Biogen I*.

Instead, in an effort to manufacture some connection to Massachusetts, plaintiffs observe that Columbia "accepted $60 million originating in Massachusetts, . . . enforced the original Axel patents in Massachusetts, and directed substantial and regular communications to Massachusetts plaintiffs concerning their license agreements and the Axel patents." (Opp. at 40).  Of course, none of those actions is alleged to be wrongful.  They are therefore irrelevant to the geographic requirements of the statute.  G.L. 93A, § 11 ("No action shall be brought or maintained under [G.L. 93A] unless *the actions and transactions constituting the*

*alleged unfair method of competition or the unfair or deceptive act or practice* occurred primarily and substantially within the Commonwealth.") (emphasis added).

Relying upon *Clinton Hospital Ass'n v. Corson Group, Inc.*, 907 F.2d 1260 (1st Cir. 1990), plaintiffs also contend that Columbia can be subject to liability under G.L. 93A, even though it is located in New York. This argument is a straw man. Columbia has never asserted that it is insulated from liability under G.L. 93A simply because it is an out-of-state entity. Rather, Columbia has no liability here because the "center of gravity" of the circumstances allegedly giving rise to plaintiffs' claim did not occur "primarily and substantially" in Massachusetts.

Finally, plaintiffs' contention that the Court should not consider the geography issue until it has had the opportunity to make "findings of fact," (Opp. at 42), rings hollow in the context of this case, where the relevant facts regarding geography are not in dispute. Columbia's conduct before the PTO occurred in New York and Virginia; Columbia's lobbying activities occurred in New York and Washington, D.C.; and Columbia's litigation conduct occurred in New York and Massachusetts. Further development of the record in this case will do nothing to alter these essential facts.

> **(b)    The Alleged Conduct That Occurred "Primarily And Substantially" In Massachusetts Is Insufficient To State A Claim Under G.L. 93A**

Plaintiffs do not directly address any of Columbia's arguments in section II(C)(2)(b) of its memorandum supporting dismissal of their G.L. 93A claim. Rather, in a section generally describing their G.L. 93A claim, plaintiffs argue that "[a] wide variety of acts can fall within the ambit of unfair and deceptive practices actionable under M.G.L. c. 93A." (Opp. at 33.) That general proposition, while undoubtedly true, does little to rescue their defective pleading. Accordingly, for the additional reasons discussed in Columbia's

motion—and ignored in plaintiffs' opposition—Columbia respectfully requests that the Court dismiss Count III.

**III.    As An Alternative To Dismissal Of Count III, The Court Should Require Plaintiffs To Provide A More Definite Statement Pursuant To Rule 12(e)**

Plaintiffs essentially ignore Columbia's argument that they have not specified any particular conduct on Columbia's part that was purportedly "unfair" or "deceptive" within the meaning of G.L. 93A.  How can Columbia properly respond to paragraph 87 of the Amended Complaint, which merely alleges that "Columbia's acts, as described [in paragraphs 1 through 86], constitute unfair and deceptive acts and practices . . ."?  There is no indication of what particular allegations in those eighty-six paragraphs support the G.L. 93A claim, nor any explanation about why any particular allegations in those paragraphs constitute "unfair" or "deceptive" conduct within the meaning of G.L. 93A.  Plaintiffs have not cited a single case in which a court denied a Rule 12(e) motion where a party asserted claims that indiscriminately incorporated all of the preceding allegations without any indication of which allegations actually pertained to a particular claim.

## CONCLUSION

For the foregoing reasons, Columbia respectfully requests that the Court grant its motion to dismiss.

February 25, 2005                                   Respectfully submitted,

                                                    THE TRUSTEES OF COLUMBIA
                                                    UNIVERSITY IN THE CITY OF NEW YORK

                                                    By its attorneys,

                                                     /s/ David I. Gindler_____
                                                    David I. Gindler
                                                    Irell & Manella LLP